# EXHIBIT B

```
 1   UNITED STATES DISTRICT COURT
 2   SOUTHERN DISTRICT OF NEW YORK
 3    - - - - - - - - - - - - - - - - - - - - -x
 4   LARBALL PUBLISHING COMPANY, INC. and
     SANDY LINZER PRODUCTIONS, INC.,
 5
                            Plaintiffs,
 6
                            No. 1:22-cv-01872-KPF
 7         v.
 8   DUA LIPA, CLARENCE COFFEE JR., SARAH
     HUDSON, STEPHEN KOZMENIUK, SONY MUSIC
 9   PUBLISHING (US) LLC, UNIVERSAL MUSIC
     CORPORATION, and WARNER RECORDS INC.,
10
                            Defendants.
11
      - - - - - - - - - - - - - - - - - - - - -x
12
              Mitchell Silberberg & Knupp, LLP
13                   437 Madison Avenue
                     New York, New York
14
                     January 30, 2024
15                   10:13 a.m.
16
17      Video recorded DEPOSITION of Lawrence
18   Ferrara, Ph.D., the Expert Witness in the
19   above-entitled action, held at the above
20   time and place, taken before Garry J.
21   Torres, a Stenographer and Notary Public
22   of the State of New York, pursuant to the
23   Federal Rules of Civil Procedure, Notice
24   and stipulations between Counsel.
25              *       *       *
```

Page 1

```
 1     APPEARANCES:
 2
       BROWN LLC
 3             Attorney for Plaintiffs
               LARBALL PUBLISHING COMPANY, INC.
 4              and SANDY LINZER PRODUCTIONS,
                INC.
 5             111 Town Square, Suite 400
               Jersey City, New Jersey 07310
 6             EMAIL: jtb@jtblawgroup.com
               TEL: (877) 561-0000
 7
       BY:  JASON T. BROWN, ESQ.
 8             ERIC SANDS, ESQ.
               ZIJUAN GUAN, ESQ.
 9             PATRICK ALMONDRODE
10
11     MITCHELL SILBERBERG & KNUPP LLP
               Attorney for Defendant
12             DUA LIPA, CLARENCE COFFEE JR.,
                SARAH HUDSON, STEPHEN KOZMENIUK,
13              SONY MUSIC PUBLISHING (US) LLC,
                UNIVERSAL MUSIC CORPORATION, and
14              WARNER RECORDS INC.
               437 Madison Avenue, 25th Floor
15             New York, New York 10022
               TEL: (917) 546-7703
16             EMAIL: ctl@msk.com
17     BY:  CHRISTINE LEPERA, ESQ.
               ELAINE NGUYEN, ESQ.
18             JIM BERKLEY, ESQ.
19
20     ALSO APPEARING:
21             JOE RAGUSO, VIDEOGRAPHER
22                  *       *       *
23
24
25
```

Page 2

```
 1              STIPULATIONS
 2      IT IS HEREBY STIPULATED AND AGREED, by
 3   and among counsel for the respective
 4   parties hereto, that the filing, sealing
 5   and certification of the within deposition
 6   shall be and the same are hereby waived;
 7      IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to form of
 9   the question, shall be reserved to the
10   time of the trial;
11      IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be signed
13   before any Notary Public with the same
14   force and effect as if signed and sworn to
15   before the Court.
16              *      *      *
17
18
19
20
21
22
23
24
25
```

```
 1              THE VIDEOGRAPHER:  Good morning.
 2       We're going on the record at
 3       10:13 a.m., EST, on Tuesday,
 4       January 30th, 2024.  Please note that
 5       the microphones are sensitive, may
 6       pick up whispering and private
 7       conversation.  Audio and video
 8       recording will continue to take place
 9       unless all parties agree to go off the
10       record.
11              This is media unit one of the
12       video-recorded deposition of
13       Professor Lawrence Ferrara being taken
14       by counsel here in the matter of
15       Larball Publishing Company Inc. and
16       Sandy Linzer Production Inc. v. Dua
17       Lipa, et al., filed in the United
18       States district court for the Southern
19       District of New York, case Number
20       122CV01872LPF.
21              This deposition is being held at
22       Mitchell Silberberg and Knupp, LLP.
23              My name is Joe Raguso with
24       Veritext.  I'm the videographer.  The
25       court reporter is Garry Torres, also
```

Page 4

```
 1        with Veritext.  I'm not authorized to
 2        administer an oath, I'm not related to
 3        any party in this action, nor am I
 4        financially interested in the outcome.
 5             Counsel in the room will state
 6        an appearance and affiliation for the
 7        record followed by the court reporter
 8        swearing in the witness.
 9             MR. BROWN:  Good morning,
10        everyone.  Attorney Jason T. Brown for
11        the Plaintiffs from Brown LLC.  With
12        me in the room is also Eric Sands and
13        Zijuan Guan and, remotely, is Patrick
14        Almondrode.
15             MS. LEPERA:  Christine Lepera,
16        Mitchell Silberberg & Knupp, counsel
17        for the Defendant.  My co-counsel will
18        state their own appearance.
19             MR. BERKELEY:  James Berkeley
20        with Mitchell Silberberg & Knupp,
21        co-counsel for Defendants.
22             MS. NGUYEN:  Elaine Nguyen, also
23        with MSK for Defendants.
24             MR. BROWN:  Could you swear in
25        the witness, please?
```

Page 5

```
 1   L A W R E N C E   F E R R A R A, PH.D.,
 2            having first been duly sworn by
 3            Garry J. Torres, the Notary
 4            Public, was examined and
 5            testified as follows:
 6   EXAMINATION
 7   BY MR. BROWN:
 8        Q.    Good morning, Dr. Ferrara.
 9   Thank you for joining us today.
10        A.    Good morning.
11        Q.    Thank you for not wearing a
12   mask.  I understand that sometimes you
13   like to wear a mask, and if at any point
14   you feel uncomfortable, we can go back to
15   that.  But it's greatly appreciated that
16   you're unmasked for purposes of the
17   deposition today.
18        A.    Thank you.
19        Q.    I have a burning question to
20   start off with:  Tell me about your dance
21   band.
22        A.    Well, in the 1970s, I formed --
23   I had already been playing since I was 14
24   with bands.  By the time I was 16, I
25   joined a well-established society group
```

Page 6

```
1    that played weddings and dinner dances and
2    so forth.  The other members of the group
3    were in their 30s and early 40s.  I was
4    16.  I joined a musicians union, the
5    American Federation of Musicians, then at
6    16.
7              By the time I was in my,
8    certainly, mid-20s then -- maybe a little
9    earlier -- I broke off and created my own
10   band, the Larry Ferrara Orchestra.  We
11   then moved into a niche.  So a good
12   portion of what I -- of the -- of the
13   clients who hired us for weddings and for
14   dinner dances were Latin.  And so for that
15   portion of my business, instead of the
16   Larry Ferrara Orchestra, it was La
17   Orchestra de Larry Ferrara, and I had
18   business cards and so forth.  And we
19   played many, many, many Latin weddings and
20   played in well-known at the time clubs and
21   places that had regular dances like Club
22   España, Casa Callisia on 11th Street -- it
23   was a huge dance place -- Centro Arenzano.
24   There were any number of jobs, and so we
25   played all of the usual Latin dances, you
```

Page 7

1   know, from merengue to tango to cumbia and

2   so forth.  And so that is part of my

3   background:  1970s, 1980s, primarily.

4        Q.    And are, like, the tango,

5   merengue -- are those styles, or what are

6   you referring to there?

7              MS. LEPERA:  Objection to form.

8        A.    When I say cumbia or merengue,

9   these are dance types.  There's a

10  particular rhythm, boom, boom, boom, boom,

11  boom, boom, boom, boom, boom, boom, boom,

12  boom, boom, boom, boom, boom, boom, boom,

13  which would be a merengue; boom, boom,

14  boom, boom, boom, boom, boom, boom, would

15  be a tango.  And so those names refer to

16  the type of dance that would be danced to

17  works within, you know, those dance types.

18       Q.    Did the band create any music

19  itself?

20             MS. LEPERA:  Objection to form.

21       A.    I was the --

22       Q.    Let me strike that question.

23  I'm sorry.

24       A.    Sure.

25       Q.    Did the -- and I apologize if I

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

```
 1    don't say the name right -- the first or
 2    second band create any of its own music?
 3         A.    Well, they --
 4              MS. LEPERA:  Same objection to
 5         form.
 6              THE WITNESS:  I'm sorry.
 7              MS. LEPERA:  No, it's okay.
 8              THE WITNESS:  I'll wait.
 9              MS. LEPERA:  Definition of
10         creation.
11              THE WITNESS:  Yeah.
12              MS. LEPERA:  You can answer.
13         A.    First, both bands were
14    concomitant, that is I started the Larry
15    Ferrara Orchestra which continued in the
16    '70s and the '80s, and as I testified
17    earlier, for particular clientele, to make
18    it easier for them, many of whom primarily
19    spoke Spanish, I also called the band La
20    Orchestra de Larry Ferrara which is simply
21    a translation of the Larry Ferrara
22    Orchestra; no change.  So they were
23    concomitant.  And I did not write original
24    music for the band, but I wrote all of the
25    arrangements for the instrumentation that
```

Page 9

```
 1    we had.  I'd be happy to tell you what the
 2    instrumentation is if you'd like to know,
 3    but all of the arrangements -- and
 4    literally hundreds of them -- were mine in
 5    those couple of decades.
 6         Q.    Have you ever been involved with
 7    an arrangement that you created that was a
 8    hit?
 9              MS. LEPERA:  Objection to form.
10              But you can answer.
11         A.    No.
12         Q.    Have you ever composed music
13    that was a hit?
14         A.    No.
15         Q.    When did you first become aware
16    of this litigation?
17         A.    To the best of my recollection
18    and through a different law firm on behalf
19    of Defendants, in 2021.
20         Q.    And I don't want to hear
21    anything that a law firm explicitly said
22    to you.  I'm going to -- so other than
23    from a law firm, did -- were you aware of
24    the litigation at all?
25         A.    I was only informed by the
```

Page 10

```
 1    previous attorney for Defendants --
 2              MS. LEPERA:  He's not asking you
 3         to talk about conversations with
 4         anyone other than -- he's looking for
 5         anyone other than a lawyer.
 6         A.    Repeat the question, please.
 7         Q.    Is there anyone that you
 8    discussed this case with other than
 9    counsel?
10         A.    Oh, other than either of the
11    counsels?
12         Q.    Either of the counsels:  Me,
13    counsel at the table today or prior
14    counsel?
15         A.    Not that I can recollect.
16         Q.    When you first became aware of
17    the case -- strike that.
18              Did you become aware of the case
19    at all in the media?
20         A.    I don't recall.
21         Q.    Do you recall one way or the
22    other whether any media had reached out to
23    you for any comments about the case?
24         A.    I don't recall any media
25    reaching out to me for commentary on this
```

Page 11

```
 1    issue.
 2         Q.    Did you ever discuss this case
 3    with any of your students?
 4         A.    Not that I recall.
 5         Q.    Have you ever communicated with
 6    any of the Plaintiffs of this case?
 7         A.    Not that I recall.
 8         Q.    Do you know who Sandy Linzer is?
 9             MS. LEPERA:  Objection to form.
10             You can answer.
11         A.    I only know who Sandy Linzer is
12    in connection with this litigation as a
13    composer of "Wiggle."
14             (Whereupon, the Stenographer
15        spoke.)
16         A.    "Wiggle," W-I-G-G-L-E.  You
17    don't mind me using the shortened title?
18         Q.    As long as we both agree we can
19    use "Wiggle" and some other terms as this
20    case and discussion progresses.
21         A.    Thank you.
22         Q.    Going back to my question
23    though, you don't recall one way or the
24    other speaking with Sandy Linzer?
25             MS. LEPERA:  Ever?
```

Page 12

```
 1        Q.    Ever.

 2        A.    I don't.  That doesn't mean that

 3   I didn't, but I don't recall that.

 4        Q.    You don't recall Sandy Linzer

 5   reaching out to you directly asking if

 6   you'd like to be the expert for him in

 7   this case?

 8        A.    I do not recall that.

 9        Q.    Do you recall that you gave the

10   advice of a different expert to use

11   indicating that you were too busy?

12        A.    I don't recall that.

13        Q.    Do you have anything to dispute

14   that that occurred?

15        A.    No.

16        Q.    Had you ever heard of Sandy

17   Linzer by -- strike that.

18              Had you ever heard of Sandy

19   Linzer by reputation before the case

20   commenced?

21        A.    I don't recall.

22              MS. LEPERA:  Asked and answered.

23        A.    As I said, I don't recall.

24        Q.    Have you ever heard of

25   L. Russell Brown before the case
```

Page 13

```
 1    commenced?
 2        A.    No.  As far as I know, I've
 3    never heard that name before this
 4    litigation was presented.
 5        Q.    Did you ever hear about --
 6    strike that.
 7            As you became more involved in
 8    the case, are you familiar of the works of
 9    Sandy Linzer and L. Russell Brown?
10            MS. LEPERA:  Objection to form.
11            You can answer.
12        A.    As I recall, I may have listened
13    to some of the other songs on perhaps an
14    album of Sandy Linzer that "Wiggle" was
15    part of.  I -- this is just too many years
16    ago, but I can't say that I did any
17    detailed analysis of any of the other
18    songs of Sandy Linzer.
19        Q.    Were you familiar with the song
20    "Wiggle" before this litigation?
21        A.    I don't recall being familiar
22    with it before this litigation.
23        Q.    Were you familiar with the song
24    "Don Diablo" before this litigation?
25        A.    I don't recall being familiar
```

Page 14

```
 1   with the song "Don Diablo" before this
 2   litigation.
 3        Q.    Do you recall one way or the
 4   other, whether either of your bands ever
 5   played "Don Diablo"?
 6            MS. LEPERA:  Same objection.
 7        Asked and answered.
 8            But you can answer.
 9        A.    I feel quite confident that we
10   did not.
11        Q.    And based upon your
12   recollection, you never did any
13   arrangements for "Don Diablo" then?
14        A.    That is correct.
15        Q.    When did you first become aware
16   of the song "Levitating"?
17        A.    I don't recall.  It may have
18   been soon after it was released.  It may
19   have been for the first time related to
20   this matter.
21        Q.    Going back to songs by the
22   Plaintiffs, were you familiar with the
23   song "Tie a Yellow Ribbon Around the Old
24   Oak Tree" before this litigation?
25        A.    Yes.
```

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

```
 1          Q.     Were you familiar with the song
 2     "I Believe in You and Me"?
 3          A.     Yes.
 4          Q.     And did you have any opinions
 5     about that music?
 6                 MS. LEPERA:  Objection to form.
 7          A.     You'd have to clarify what you
 8     mean, "opinions."
 9          Q.     Did you like the music?
10          A.     That's certainly on a
11     musicological opinion, but yes, I like
12     both of those songs.
13          Q.     Were there any additional songs
14     you listened to after this litigation
15     started from L. Russell Brown?
16                 MS. LEPERA:  Objection.  Asked
17          and answered.
18                 You can answer.
19          A.     Not that I recall.
20          Q.     How much money have you been
21     paid for this case to date; if you know?
22          A.     About $48,000 in 2023.  Going
23     back to 2021, when I was engaged as a
24     consultant, not a testifying witness, I
25     don't recall any invoicing that was in
```

Page 16

1  2021, but certainly, in 2023, 40 -- about

2  $48,000.

3      Q.    Do you recall one way or the

4  other when you consulted whether the case

5  was already in litigation or it was

6  pre-litigation?

7      A.    I do not.

8      Q.    Do you remember approximately

9  when in 2021 you spoke with prior counsel.

10 Again, overemphasizing I don't want to

11 hear any substance of communications with

12 counsel.

13     A.    I don't recall during 2021.

14     Q.    How much money overall is it --

15 strike that.

16          How much of your income is

17 attributable to you being an expert in the

18 music industry?

19          MS. LEPERA:  I just caution I

20      think that, obviously, this is it not

21      something that's relevant.

22      Percentage-wise, I think it's fine,

23      but actual dollars, I think, is

24      inappropriate.

25     A.    It's about 60 percent.

Page 17

```
 1        Q.    How many cases per year do you
 2    consult on?
 3              MS. LEPERA:  Filed cases?
 4        Q.    We can start with filed cases.
 5        A.    Filed cases.  Well, the average
 6    would have to be about one to two; more
 7    recently, perhaps, two to three.  When I
 8    say "average," over close to 30 years, one
 9    to two, more recently, perhaps, two to
10    three of filed case.  That is where there
11    is an actual filed complaint.
12        Q.    And just to clarify your
13    remarks, two to three a year?
14        A.    That's correct.
15        Q.    And how many are you paid to
16    consult on per year?
17              MS. LEPERA:  Objection to form.
18        This is over three decades or
19        currently?
20        Q.    Per year -- for the last few
21    years?
22        A.    How many am I?
23        Q.    Paid to consult on.
24        A.    When you say "consult," do you
25    mean as a consultant or as a testifying
```

Page 18

```
 1   witness?
 2        Q.    As a consultant.
 3        A.    As a consultant.  And that's
 4   pre-filing of a complaint?
 5        Q.    It could be pre, post, at any
 6   stage.
 7        A.    I can't say offhand how many
 8   pre, but I think probably, maybe, three or
 9   four that I've been paid for, but that I
10   haven't provided a report for.  You know,
11   I may have done an initial preliminary
12   report and had a verbal discussion of my
13   findings or, you know -- but in terms of
14   actually writing reports, it's difficult
15   for me to say.
16             MS. LEPERA:  I assume you just
17        want an estimate as opposed to
18        speculation.
19             MR. BROWN:  Yeah.  Estimate is
20        fine.
21        Q.    What are the most recent cases
22   that you testified in?
23             MS. LEPERA:  Objection to form.
24        Time frame?
25        Q.    Most recent.
```

Page 19

1         A.     Well, if you look at my CV,
2    close to the last page, I provide those
3    for you.
4         Q.     Based on your recollection, what
5    was the last case you testified in?
6         A.     Was a Sam Smith case.  I
7    remember Dancing with a Stranger.
8         Q.     And what sort of testimony, if
9    any, did you provide to that case?
10             MS. LEPERA:  Objection to form.
11        A.     Can you just -- since you
12    haven't given me my CV to look at --
13        Q.     Happy to give it to you.
14        A.     Thank you.
15             MS. LEPERA:  Yeah.  It's not a
16         memory test on that issue.
17        Q.     Let me give you something that
18    we're going to introduce as Plaintiff's
19    Exhibit 1?
20             MS. LEPERA:  So is this his
21         report?
22             MR. BROWN:  This is both his
23         report along with his CV.
24             MS. LEPERA:  Affirmative report,
25         not the rebuttals?

Lawrence Ferrara, Ph.D.
January 30, 2024

```
 1              MR. BROWN:  The affirmative
 2      report.
 3              MS. LEPERA:  Okay.  We have
 4      extra copies here.  Do you mind if we
 5      just use that -- you can use that one
 6      for the witness, and then you don't
 7      have to give us extra copies.  Okay.
 8      It's all right.  We've prepared.  And
 9      we can just obviously go through and
10      make sure you're representing it's the
11      accurate replication of his
12      affirmative report.
13              MR. BROWN:  I'd like to label
14      this Plaintiff's Exhibit 1 for
15      purposes of today's deposition.
16              (Whereupon, the Ferrara report
17      and CV was marked as Plaintiff's
18      Exhibit 1 for identification.)
19      Q.    You can take a moment, review
20   it.  If -- there's supposed to be a copy
21   of your report along with your CV at the
22   back.  If there's any problems, let us
23   know.  We'll go over, probably, a lot of
24   the pages later on.  Thank you for
25   communicating that you wanted to look at
```

Page 21

```
 1    it which may help, but it isn't a memory
 2    exam today so --
 3          A.    Yes.  Please go ahead.
 4          Q.    Thank you.
 5                Page 11 of your -- when I say
 6    "page 11," page 11 of your CV at the back.
 7          A.    Yes.  And it goes to page 12.
 8    There are two other cases that I've given
 9    testimony for on page 12, the most recent.
10          Q.    I want to understand -- well,
11    strike that.
12                You can actually start with --
13    on page 11, at the top of it, there's a
14    long list of individuals.  Those are all
15    individuals you provided some sort of
16    consulting services to I --
17          A.    These are individuals whose
18    compositions I have analyzed that have
19    been sent to me over 30 years.
20          Q.    So these individuals may not
21    necessarily have been your clients?
22                MS. LEPERA:  Objection to form.
23          A.    I don't consider any party that
24    engages my service as a client.  I
25    understand, legally, that that might be
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                www.veritext.com

```
 1    the proper term.  I consider myself an
 2    independent scholar that provides opinions
 3    and analyses.
 4              And so in each of these cases --
 5    in almost all cases, I was engaged through
 6    a party affiliated with -- for example,
 7    the first one on page 11 is Taylor Swift
 8    on behalf of Ed Sheeran and so forth, on
 9    behalf of Lady Gaga.  So in most cases, no
10    direct contact with those artists.
11        Q.    And going to the deposition
12    and/or trial testimony since 2016, for the
13    Copeland v. Bieber, I'm assuming that's
14    Justin Bieber.
15        A.    That's correct.
16        Q.    And which party did you
17    represent in that -- or strike that.
18              Who did you provide testimony
19    for?
20        A.    On behalf of Defendants Bieber,
21    et al.
22        Q.    For all nine of these, how many
23    of them were plaintiff testimony versus
24    defense testimony?
25              MS. LEPERA:  Objection to form.
```

```
 1              You can answer if you understand
 2      the question.
 3      A.    For the nine cases listed on
 4   pages 11 and 12 for which I provided
 5   deposition and/or trial testimony since
 6   2016, eight were on behalf of Defendants.
 7   The entry Number 6, Ambrosetti, was on
 8   behalf of plaintiff.
 9      Q.    Can you tell me a little bit
10   about your testimony in that case?
11              MS. LEPERA:  Objection to form.
12      Vague.  Ambiguous.
13      A.    Well, I provided a report and a
14   rebuttal report.  As I recall, I think
15   that most of my work there in that case
16   was in 2021, and as I recall, the
17   deposition that this is referring to,
18   Number 6 on page 11 of my CV, was in
19   January of 2022.  So needless to say, the
20   other discovery of reports and rebuttals
21   and so forth would have been in 2021.
22      Q.    You testified for the plaintiff.
23   Do you remember what the posture of the
24   case was?
25              MS. LEPERA:  Objection to form.
```

Page 24

```
 1        Q.     Strike that.

 2               What -- do you know what the

 3    case -- was the case about infringement?

 4        A.     It was and Ambrosetti claimed an

 5    infringement of a hymn by Ambrosetti used

 6    in Catholic masses.

 7        Q.     And do you know the result of

 8    that case?

 9        A.     As far as I know, the district

10    court judge has not decided on any number

11    of -- a little dizzying, but there are any

12    number of cross-motions.  So as far as I

13    know, there's been no decision from the

14    district court judge on that.

15        Q.     And the other case -- strike

16    that.

17               For that case, what sort of

18    musicological report did you provide, if

19    anything?

20               MS. LEPERA:  Objection to form.

21        A.     Bringing back memory now, this

22    is a very interesting case because I was

23    initially hired by a different law firm.

24    In fact, it was Loeb & Loeb here in New

25    York City.  That was in 2016.  I completed
```

Page 25

```
 1   a brief report for Loeb & Loeb that was
 2   perhaps six or seven, eight pages at most,
 3   and I named it -- I -- preliminary report.
 4   It was by no means an affirmative report
 5   that one would proffer or submit as per
 6   rule 26 and the rest.
 7              Now, much to my surprise and
 8   chagrin, I discovered, perhaps in 2020 or
 9   in 2021, that Loeb & Loeb -- not -- I
10   wasn't chagrined that Loeb & Loeb was no
11   longer the attorneys, but I discovered
12   that the new attorney proffered my
13   preliminary report without asking me
14   anything about it and proffered it, as an
15   exchange, as my affirmative report.  I had
16   no CV, there was no listing of previous
17   testimony, my fees, nothing that one would
18   expect following rule 26 which I certainly
19   knew.  I had to decide whether I was just
20   going to simply inform the judge or go
21   through that preliminary report and see if
22   it at least was consistent, you know, with
23   what would be a -- you know, a fuller
24   report.  I decided that it could be
25   submitted, but I wrote in my rebuttal
```

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

```
 1    report, which is a rebuttal to the
 2    musicologist for Defendants, this
 3    information.  I was very candid with the
 4    court, essentially saying what I just
 5    said, what I just testified to and that
 6    thereby, while I stand by my earlier
 7    findings, this would -- was not nearly as
 8    detailed as a report that I would normally
 9    proffer for exchange, and to the extent
10    that certain expectations related to
11    rule 26 were not included in the report, I
12    included them here.  So it was that --
13    that all was part of the process.
14        Q.    So the technical part of the
15    law, but the substantive part, has there
16    ever been a time where a court rejected
17    your conclusions?
18            MS. LEPERA:  Objection to form.
19        There's a preface to that question,
20        then there was a question.  I'm not
21        sure what's the question --
22        Q.    Strike the preamble.
23            MS. LEPERA:  Okay.
24        Q.    Has there ever been a time where
25    the court rejected your conclusions?
```

Page 27

1     A.     I don't know what you mean by

2     "rejected."

3     Q.     Has there ever been a time where

4     a court has found your methodology to be

5     unscientific?

6     A.     Not in my memory, to be

7     unscientific, no.

8     Q.     Has there ever been a time in

9     which the court concluded that your

10    findings weren't dispositive and the

11    matter needed to go to a jury?

12            MS. LEPERA:  Objection to form.

13            You can answer.

14    A.     Well, to the extent that, in

15    some instances, when my report was

16    submitted to the court as part of a motion

17    for summary judgement, to the extent that

18    that motion was denied, then, indeed, the

19    court would have found that my report or

20    reports were not sufficient in weighing

21    toward a granting of a motion for summary

22    judgement.

23    Q.     For example, in the Griffin v.

24    Sheeran case from 2023 --

25    A.     Yes.

Page 28

```
 1           Q.      -- is that what happened there?
 2                   MS. LEPERA:  Objection to form.
 3           A.      Yes.  As I recall, that case
 4     started in 2016.  I don't recall the year
 5     in which the Defendants, Warner, Sony, Ed
 6     Sheeran, et al., submitted a motion for
 7     summary judgement to Judge Stanton in the
 8     southern district of New York, but
 9     Judge Stanton did not grant that motion
10     for summary judgement.  And so it
11     ultimately went to trial last spring.
12           Q.      And at trial, Mr. Sheeran
13     prevailed, correct?
14           A.      The Defendants prevailed.
15           Q.      The Defendants prevailed?
16           A.      Yes.
17           Q.      Your report that you proffered
18     for summary judgement, did that have to do
19     with building blocks?
20                   MS. LEPERA:  Objection to form.
21           Mischaracterizes.
22                   You can answer if you understand
23           the question.
24           A.      I understand the question.  I'm
25     trying to think back.  It might or it
```

Page 29

```
 1    might not have.  I -- it's been too many
 2    years.  Again, this started in 2016.  To
 3    the extent a chord progression -- there
 4    were also melodies that were put at issue
 5    by the plaintiff's expert, but to the
 6    extent that the chord progression was at
 7    issue, it would not surprise me that,
 8    during an earlier report or -- and/or
 9    during my trial testimony, that I would
10    have referred to the chord progression as
11    a building block.
12        Q.    Other than the Sheeran case, do
13    you recall which other of these cases, if
14    any, made it past summary judgement and
15    went to trial -- strike that.
16             Do you recall which of these
17    cases, if any, went past summary
18    judgement?
19        A.    Let's see.  In Copeland, that
20    was in Virginia -- as I recall, Virginia
21    federal court, the judge granted
22    defendant's motion for summary judgement,
23    and in that decision, cited my analysis as
24    part of that.
25             In Skidmore v. Led Zeppelin,
```

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

```
1    obviously, the judge did not grant -- I
2    think that was Judge Klausner -- did not
3    grant motion for summary judgement; it
4    went to trial.
5              And in Gray v. Perry, a truly
6    interesting case because, indeed, Judge
7    Snyder, S-N-Y-D-E-R, did not grant
8    defendant's motion for summary judgement,
9    but then on the basis of trial testimony,
10   vacated the jury decision and dismissed
11   the case as a matter of law.
12             Of course, that Gray v. Perry,
13   et al., was -- that decision to vacate and
14   dismiss the case was upheld by the ninth
15   circuit.  So that would be one that went
16   beyond the motion for summary judgement.
17             In Hall v. Swift, the district
18   court judge in the central district in
19   California granted defendant's motion --
20   this is Taylor Swift -- granted
21   defendant's motion for summary judgement;
22   however, the ninth circuit overturned that
23   decision and remanded it to the district
24   court.
25             In Ambrosetti -- again, I'm not
```

Page 31

```
 1   aware that the district court judge has
 2   provided a decision.
 3              In Brunson v. Capitol, that was
 4   interrupted.  There was a motion for
 5   summary judgement.  I was deposed, but it
 6   seems to me that other motions took
 7   precedence.  And so now the motion for
 8   summary judgement has kind of been
 9   sidelined.  So there's been no decision on
10   the motion for summary judgement with
11   respect to Brunson.
12              In Sound and Color, the court, I
13   believe, is also the central district of
14   California in Los Angeles.  I was again
15   engaged on behalf of Sam Smith, et al.
16   The district court dismissed the case and
17   accepted -- granted defendant's motion for
18   summary judgement.  That, I believe, is
19   under appeal to the ninth circuit now.
20              And in Griffin v. Sheeran, I
21   think I already testified that -- yeah,
22   you already have that on testimony.
23       Q.    You testified about Griffin v.
24   Sheeran.  How about any of these other
25   cases?  Do you recall whether or not your
```

Page 32

1   expert report had any discussion of

2   building blocks in there?

3           MS. LEPERA:  Objection to form.

4       A.    I can't say offhand.  It would

5   depend on what was at issue and to the

6   extent that there were building blocks

7   like the one at issue here, then it would

8   not surprise me that I did.

9       Q.    Even back in 2016, do you think

10  you had references to building blocks in

11  your report?

12          MS. LEPERA:  Objection to form.

13      Asked and answered.

14      A.    I don't recall.  The crux of the

15  expert on the other side, as I testified

16  earlier, in Griffin was on a number of

17  melodies, ultimately reduced to only three

18  at trial, but more in earlier reports, and

19  that was the crux.  Clearly, the chord

20  progression which, you know, as per Led

21  Zeppelin en banc, is a building block and

22  not copyrightable, would not have been at

23  the forefront of my report; it would have

24  been melodies -- and melodies that are not

25  simple scales, but melodies that have much

Page 33

January 30, 2024

```
 1    more going.
 2        Q.    If you recall, beyond the list
 3    of these cases, when did you first start
 4    injecting the notion of building blocks
 5    into your expert reports?
 6            MS. LEPERA:  Objection to form.
 7        No foundation.  Misrepresents.
 8            You can answer if you
 9        understand.
10        A.    I don't recall.
11        Q.    How many times would you say
12    you've been deposed throughout your
13    career?
14            MS. LEPERA:  An estimate, I
15        assume, is fine.
16        Q.    An estimate.
17            MS. LEPERA:  No speculation.
18        Q.    You can always say
19    approximately --
20        A.    Yeah, sure.
21        Q.    -- and then I'll ask you --
22        A.    I will say approximately two
23    dozen times where I was actually deposed.
24    There have been cases where I submitted a
25    report, but my deposition was not
```

Page 34

```
 1   requested.
 2       Q.    Generally, they probably start
 3   off in a different manner than today's
 4   deposition?
 5           MS. LEPERA:  Objection.  That is
 6       a rhetorical question, I assume.
 7           MR. BROWN:  He can answer.
 8       A.    Probably, most of the time, not
 9   asking about La Orchestra de Larry
10   Ferrara.
11       Q.    I do want to go over some other
12   preamble information -- and that's not
13   part of the question, but do you go by any
14   other names?
15       A.    Other than Lawrence Ferrara?
16       Q.    Other than Lawrence Ferrara?
17       A.    Dad, Grandpa, Professor.
18       Q.    Doctor?
19       A.    Doctor.
20       Q.    Larry?
21       A.    Family, friends.
22       Q.    What emails do you use
23   professionally?
24       A.    I have two.  Obviously,
25   lawrence.ferrara@nyu.edu which is my
```

Page 35

```
 1     primary.  I also have an email account, a
 2     Gmail account.
 3          Q.     What's that Gmail account that
 4     you use professionally?
 5          A.     lf2nyu@gmail.com.
 6          Q.     In your CV, you list quite an
 7     extensive amount of information.  I
 8     couldn't find any peer-reviewed
 9     publications.
10          A.     Peer-reviewed publications, my
11     understanding of rule 26 is publications
12     less than ten years ago, and so I have
13     either peer review or book chapters
14     somewhere, maybe 11 or 12, but they are
15     all pre-ten-years.
16          Q.     What did you write about back
17     then?
18               MS. LEPERA:  Objection to form.
19          Are you asking about a particular
20          peer-reviewed publication?
21          Q.     Peer-reviewed publications from
22     10, 11 years ago?
23          A.     When I say -- 10, 11
24     publications, not 10 or 11 --
25          Q.     I'm sorry.  Thank you.
```

Page 36

Lawrence Ferrara, Ph.D.
January 30, 2024

```
 1        A.      -- years ago.
 2              Essentially, matters related to
 3    scholarship and music, for example, an
 4    article in The Musical Quarterly which is
 5    a major peer-reviewed journal about music
 6    analysis, others about research in music
 7    and -- and so forth.
 8        Q.    Do you recall the title of that
 9    article that you just referenced about
10    musical analysis?
11        A.    Yes.  "Phenomenology" -- that's
12    pheno-meno-ology -- "Phenomenology as a
13    Tool for Musical Analysis."
14        Q.    Do you know if that article
15    discussed building blocks at all?
16              MS. LEPERA:  Objection to form.
17              You can answer if you
18        understand.
19        A.    I would be surprised if it did.
20    I don't think so.
21        Q.    Why would you be surprised if it
22    did?
23        A.    Because it was essentially an
24    article that was proffering a methodology
25    for analysis.
```

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

```
 1          Q.     Did any of your other articles,
 2    to your recollection, reference building
 3    blocks?
 4                 MS. LEPERA:  Same objection.
 5          A.     Yeah.  Not that I recall.
 6          Q.     Do you know if there's any
 7    peer-reviewed articles about building
 8    blocks?
 9                 MS. LEPERA:  Objection to form.
10          By him?  By anyone on the planet?
11          Q.     By anyone.
12          A.     I would have to check.  Let me
13    say that my use of building blocks comes
14    from, as I recall, some of the case law
15    that was associated with cases in which I
16    gave testimony.  And so building blocks,
17    for example, in Led Zeppelin, in the ninth
18    circuit decision with respect to Gray v.
19    Perry, et al., those decisions, as I
20    recall, used the word "building blocks."
21    Those decisions go back about four years.
22    And so it would seem to me, whenever I
23    became aware of that, I would certainly
24    use the term, but with this very important
25    context.  And that is that my
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

1    understanding of a building block -- just

2    per se, not in the music -- a building

3    block is a basic, essential unit upon

4    which other elements are built or created.

5            And so certainly, for as long as

6    I've been a musicologist, I know that

7    scales are a musical building block.  I

8    know that and have known a very long time

9    that the Compendium on Practices in the

10   U.S. Copyright Office lists scales as

11   non-copyrightable material.

12           And so I would certainly have

13   said that the use of scales for example --

14   and only for example -- as in this case,

15   would have been something that is

16   commonplace, that is basic, that is

17   fundamental.  If, ten years ago or

18   15 years ago, I didn't use the word

19   "building block," the meaning was the

20   same, and so that may be a reason why it

21   hasn't been used.  But I can say that that

22   term has been used quite a bit, and I gave

23   two instances of ninth circuit decisions

24   that use it overtly.

25       Q.    So would you say the term

```
 1    building block originated from the legal
 2    context and not the musical context?
 3              MS. LEPERA:  Objection to form.
 4       Mischaracterizes.
 5              You can answer.
 6       A.    No.  The point is:  As per my
 7    long testimony a moment ago, the legal
 8    context grows out of being informed by
 9    what, in the ninth circuit, is called the
10    extrinsic analysis.  So the -- not just my
11    reports in those two cases that I just
12    cited that use the term, but also in
13    reports that were proffered -- Amechi
14    reports that were proffered in both of
15    those cases, in fact, that, to the best of
16    my recollection, also talk about building
17    blocks, and those were Amechi
18    presentations that were written by
19    musicologists.
20       Q.    Does the term "building blocks"
21    appear in any of the textbooks that you
22    teach at university?
23       A.    I would have to check.  Once
24    again, I want to make very clear for the
25    record that the term "building block,"
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                www.veritext.com

```
 1    used as a musicologist, is as I defined it
 2    and that I think any musicologist who is
 3    trained would recognize that scales,
 4    descending or ascending, are a building
 5    block in music.  I -- it would be hard for
 6    me to fathom that anyone -- any
 7    musicologist would find fault with that,
 8    that basic English usage of the term
 9    "building blocks," which I defined earlier
10    in testimony, as it would relate to a
11    descending scale.
12         Q.    Is there an objective list
13    that's published about what consists of
14    building blocks?
15              MS. LEPERA:  Objection to form.
16              You can answer if you
17         understand.
18         A.    I'm not aware.
19         Q.    You're not aware one way other
20    the other?
21              MS. LEPERA:  Asked and answered.
22         A.    To the extent that one could go
23    to the Compendium on Practices of the
24    United States Copyright Office.  In the
25    portion on music, the compendium names at
```

Page 41

```
 1   least three, what would clearly be called,
 2   building blocks that the compendium says
 3   are not copyrightable, that one cannot say
 4   they have authorship over, and they
 5   specifically list major scales, minor
 6   scales, chromatic scales.  To me, that is
 7   another instance of what any musicologist
 8   knows, and that is that major scales --
 9   which would be in the case of "Wiggle" and
10   "Don Diablo" -- or minor scales because
11   they're different -- which would be in the
12   case in "Levitating" -- that these
13   two scales -- which are different in the
14   issue at hand -- are building blocks;
15   they're not monopolize-able, and any
16   musicologist would say, well, of course.
17       Q.    Other than scales, what else is
18   a building block?
19           MS. LEPERA:  Objection to form.
20           You can answer if you
21       understand.
22           In music, I assume you mean.
23       Q.    In music.
24       A.    Thank you.
25           MS. LEPERA:  Maybe we'll do some
```

Page 42

```
 1          architecture.
 2          A.    I agree that basic chord
 3    progressions are building blocks.  I
 4    certainly testified to that in the Sheeran
 5    trial, that the chord progression at issue
 6    was a building block, and as I mentioned,
 7    to the best of my recollection, in the en
 8    banc decision in Led Zeppelin, the
 9    court -- in fact, the court not only so
10    stated, but I believe the en banc court
11    cited Swirsky, S-W-I-R-S-K-Y v. Carey --
12    which was, what, 15 years at least,
13    20 years before -- I think cited Swirsky
14    by saying that chord progressions were not
15    copyrightable, but certainly, the en banc
16    court so stated.  So I would have
17    certainly used that term -- and I did --
18    in the Sheeran trial.
19          Q.    Going back to my question, what
20    else besides now scales and chord
21    progressions would be considered building
22    blocks in music?
23              MS. LEPERA:  Objection to form.
24              You can answer in this context
25          if you understand.
```

Page 43

```
 1              THE  WITNESS:   Yeah.
 2         A.     Well,  for  example,  the
 3    three-note  portion  that  was  at  issue  in
 4    Newton  v.  Diamond,  an  often-cited  case  in
 5    the  ninth  circuit  that  went  to  the  en  banc
 6    court,  James  Newton,  a  famous  jazz  flutist
 7    at  University  of  California  at  the  time
 8    and  Diamond,  Michael  Diamond,  one  of  the
 9    members  of  Beastie  Boys.   I  worked  on
10    behalf  of  the  Defendants,  and  Judge  Manela
11    accepted  and  granted  motion  for  summary
12    judgement,  cited  my  report.   And  in  that
13    report,  I  noted  that  the  chord  --  the
14    composition  of  the  sound  recording  which
15    Beastie  Boys  digitally  sampled  and  dually
16    licensed  --  they  licensed  the  sound
17    recording  with  the  German  record  company
18    that  owned  the  master  copyright.   They  did
19    not  seek  what  would  be  called  a  publishing
20    license  on  the  composition,  and  the  reason
21    is  that  the  portion  that  was  sampled  was
22    merely  C,  D-flat  C,  literally  a  half  step
23    apart,  three  notes.   And  so  while  back  in,
24    what,  2004,  perhaps,  when  that  case  was
25    being  litigated,  I  might  not  have  used  the
```

Page 44

1    term "building block."  I certainly

2    established and, to the extent I recalled

3    Judge Manela's decision -- and then going

4    up to the en banc court which also cited

5    my analysis, I called it trite and

6    commonplace.  Today, being more consonant,

7    if you will, with more recent case law to

8    facilitate and help a court in making its

9    decisions, I would certainly call C,

10   D-flat, C a musical building block that

11   had been used in other works including in

12   a work by a Pulitzer prize winner, as I

13   recall.

14        Q.    Scales, chord progressions,

15   three-note sequence that you just

16   referenced.  What else would you say is a

17   building block?

18             MS. LEPERA:  Objection to form.

19        A.    Well, I'm giving you concrete

20   answers.  To go beyond them on the fly

21   would begin to border on speculation.  I

22   know that that's not my role here.

23        Q.    If I were to go look for an

24   authority to find out where is a

25   comprehensive list of what's considered

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

```
 1    building blocks in music, where would I
 2    look?
 3              MS. LEPERA:  Objection to form.
 4         No foundation.  Mischaracterizes.
 5              You can answer.
 6         A.    I think you asked that question.
 7    You framed it almost exactly the same, and
 8    I said I'm not aware of any so-called list
 9    of building blocks.  What I am aware of is
10    decades and decades and decades of
11    musicological analysis, none of which
12    would contradict calling a descending
13    scale that merely repeats notes in a flat
14    rhythm -- and that's what's at issue
15    here -- no one would object to the fact
16    that that is a musical building block.  It
17    would be really quite incomprehensible to
18    me that that would be the case.
19              So to the extent that I am
20    not -- once again, descending scales --
21    ascending or descending are in that
22    compendium that we've talked about and
23    that are part of the decision.  I believe
24    also, in Gray, they talked about a
25    descending on white keys of a keyboard,
```

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

```
 1    and certainly in the en banc decision,
 2    they talk about the descending chromatic
 3    scale which was at issue in Skidmore v.
 4    Led Zeppelin.  So you have two decisions
 5    there that are based on musicology.
 6    They're not based on the intrinsic
 7    analysis -- they listen or test -- they
 8    were based and cited the extrinsic
 9    analysis that is:  In those two cases, my
10    analyses that were objective, that
11    followed the expectations of the extrinsic
12    analysis to dissect and to put back
13    together to consider prior art and the
14    rest.  So I find nothing startling or
15    meaningful in the fact that one cannot
16    produce some published list of musical
17    building blocks.  In fact, what I've
18    called musical building blocks are
19    consistent with musicology and, as it
20    turns out, quite consistent with recent
21    case law.
22        Q.    In your affirmative report, you
23    define many terms, if you recall.  Did you
24    ever define the term "building blocks"?
25        A.    No.
```

Page 47

```
 1        Q.     Would a term like that, you
 2   think, appear in the Harvard Music
 3   Dictionary that you keep citing to in your
 4   affirmative report?
 5             MS. LEPERA:  Objection to form.
 6        A.     No.
 7        Q.     And why is that?
 8             MS. LEPERA:  Objection to form.
 9        A.     Because, once again, it almost
10   is redundant.  That is:  If you were to
11   look at the entry on scales in the
12   Harvard -- it is -- it would be redundant
13   because, for example -- and by way of
14   example, if one were to look at the entry
15   on scales in the Harvard dictionary, it
16   would note steps -- that there are seven
17   steps in a major scale, seven steps in a
18   natural minor scale.  Each of the steps
19   have a particular function -- one, two,
20   three, four, five, six, seven -- and that
21   this is one of the basic parts of tonal
22   music in the West for the last many
23   centuries.
24             So -- and the same would be on
25   key.  And so what's in another musical
```

Page 48

1    building block?  Major keys.  You can't
2    possibly consider a major key to be
3    anything other than a musical building
4    block.  Now, in the Harvard entry on keys
5    where they say there are two main keys,
6    major and minor, does it say this is a
7    building block?  No.  That would be
8    redundant.  There are two major keys --
9    two fundamental keys according to the
10   entry on key in the Harvard, major and
11   minor.  Are those building blocks?  Of
12   course.  Does the Harvard have to say so?
13   I think musicologists would read that and
14   say, of course, of course it's a building
15   block.  A major key is a building block.
16        Q.    Is there a minimum amount of
17   notes that need to be played within in a
18   scale for it to be considered a building
19   block?
20             MS. LEPERA:  Objection to form.
21        No foundation.
22             You can answer if you
23        understand.
24        A.    No, I don't think so.  I think
25   what is at issue is essentially, the

Page 49

```
 1    manner in which -- for example, may I use
 2    this case as a paradigm example or not?
 3        Q.    I'd prefer to talk about
 4    something else, and we'll get back to talk
 5    about this case.  Thank you for that --
 6        A.    Okay.  So then the answer is no.
 7        Q.    Is there a maximum amount of
 8    notes where it would no longer be
 9    considered a building block?
10            MS. LEPERA:  Objection to form.
11        Speculation.
12            You can answer if you understand
13        the question.
14        A.    No.  And for example, if a song
15    in a major key -- two songs are in a major
16    key, they're at issue.  Does it matter how
17    long those songs are to say the fact that
18    they're both in major keys is a building
19    block and would be filtered out?  And so
20    no.
21        Q.    But within the context of the
22    scales, if I were to play D, D, D, D, D
23    20 times, vary the rhythmic value of the
24    notes, then go down to C and play it
25    30 times, then go down B and play it
```

Page 50

```
 1    50 times, would you consider that one big
 2    piece still a building block?
 3              MS. LEPERA:  Objection to form.
 4              Did you --
 5              THE WITNESS:  Yeah, I do
 6        understand.
 7        A.    So you talked about, maybe,
 8    80 notes, and importantly, you said "and
 9    varied it."  I believe you used the word
10    "varied."  So I would say, purely
11    speculatively, it would be difficult to
12    consider what you described as a musical
13    building block.  In fact, I don't think it
14    could be so described.  On the other hand,
15    if you have 20 notes that are in a flat
16    rhythm -- a flat rhythm, simply 16th notes
17    that merely go down the major scale in
18    "Diablo" and "Wiggle" and the minor scale
19    in "Levitating," a difference, on
20    different scale degrees, one would have to
21    say that what is similar in these two
22    works, that is a descending scale with
23    repeated flat 16th notes in those 20
24    notes, that is a musical building block
25    because that simply doesn't change
```

Page 51

```
 1    meaningfully a descending major scale in
 2    "Don Diablo" or a descending minor scale
 3    in "Levitating."
 4         Q.    If there's no minimum amount of
 5    notes that consists of a building block,
 6    aren't songs just a whole bunch of
 7    building blocks cobbled together?
 8              MS. LEPERA:  Objection to form.
 9         A.    Well, that presumption or
10    that -- let's say the presumption under
11    that question disregards my answer to the
12    questions when you said, you know,
13    20 notes but with variation and then
14    30 notes and then 50 notes -- you know,
15    we're now up to 80 notes and, in a song,
16    much more.  Building block for an entire
17    song isn't the point.
18              In the case at issue, I don't
19    say that "Don Diablo" is a building block;
20    I say that a very small portion of the
21    song which, in fact, is only in bars one
22    through four of ten-bar verses in "Don
23    Diablo" and "Wiggle" are at issue, and
24    they, in fact, represent a musical
25    building block.  So the way in which you
```

Page 52

```
 1    framed and presumptions in that question
 2    are really quite far afield from the
 3    answers.
 4         Q.    But I'm not asking specifically
 5    about those songs.  I'm asking about what
 6    your understanding of a building block is
 7    and what constitutes a building block.  So
 8    my question is:  Can't you just take,
 9    let's say, four notes from a song and say
10    this a building block?
11              MS. LEPERA:  Objection to form.
12         Q.    Any four notes?
13         A.    I would have to see what
14    four notes you're talking about, the
15    context, the context of the melody and so
16    forth.  So no, I can't answer that.  I'd
17    be speculating.
18         Q.    If you viewed the sheet music of
19    the song could you then say this part is a
20    building block and this part isn't --
21              MS. LEPERA:  Objection -- I'm
22         sorry.  Did you finish your question?
23         Objection to form.  Mischaracterizes.
24              You can answer the question if
25         you understand.
```

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

```
1           A.    There is always the -- well, in
2     looking at the sheet music of any whole
3     song, if, for example, the song was in a
4     major key and one were to isolate
5     five notes on a scale that reads five,
6     four, three, two, one with a flat rhythm,
7     one could say those five notes are a
8     musical building block.  It would not
9     necessarily tell you anything else about
10    what came before or what came after, but
11    the point is that, yes, one can do that.
12    One can do that, you know, with a -- with
13    taking out words from a paragraph in a
14    short story to say, well, these three
15    words were used by others and are
16    commonplace and trite, but I don't know
17    that that necessarily -- it certainly has
18    nothing do with the analysis in this case.
19              MS. LEPERA:  Any time that's
20         good for a short break, I'm going to
21         use the restroom.
22              MR. BROWN:  Yeah.  That's fine.
23         I was going to ask more questions
24         about the CV, but we can come back.
25              MS. LEPERA:  Oh, yeah.  Well,
```

Page 54

```
 1        I'm sure there's much more.  Okay.
 2             MR. BROWN:  Let's go off the
 3        record, please.
 4             THE VIDEOGRAPHER:  Off the
 5        record.  The time is 11:11 a.m.
 6             (Whereupon, an off-the-record
 7        discussion was held.)
 8             (Whereupon, a recess was taken.)
 9             THE VIDEOGRAPHER:  We are back
10        on the record.  The time is 11:32 a.m.
11        Q.    Doctor, I remind you you're
12    still under oath.
13        A.    Thank you.  Yes.
14        Q.    Just like we took a break there,
15    if at any point you need to take a break,
16    please let me know, and we can take a
17    break moving forward as well.
18        A.    Thank you.
19        Q.    We Shall Overcome Foundation,
20    are you familiar with who they are?
21        A.    I recall being engaged in an
22    early part of a litigation.  I was not
23    engaged in the final part of that
24    litigation.
25        Q.    And you gave no testimony in
```

Page 55

1    that case?

2        A.    No, I don't believe I was

3    deposed.  No.  In fact, I'm almost certain

4    I wasn't.  I provided a report, and then

5    there was another -- there was another --

6    the case continued forward in a different

7    format.  I don't remember exactly what the

8    details were, but I felt that I had

9    provided -- maybe, a different --

10            MS. LEPERA:  Don't speculate.

11            THE WITNESS:  Yeah.

12       A.    I can reconstruct it in my mind.

13   I was initially asked to do an analysis on

14   the basis of some works -- of a report on

15   some works at issue which I did, and then

16   there was, perhaps, a new plaintiff and

17   new issues.  I was not involved with that.

18   They had a different expert.  I felt that

19   my testimony was concluded -- that is, my

20   report was concluded in the first part,

21   and it really did not obtain with the

22   respect to the second.

23       Q.    I didn't finish up going through

24   your credentials.  Hopefully that will

25   take another five, ten minutes.

Page 56

```
 1              Your membership and professional
 2     organizations, the American Musicological
 3     Society, can anybody join that?
 4          A.    Essentially, people who have an
 5     interest in musicology.  That's correct.
 6     It's most musicologists.
 7          Q.    In answer to my question, anyone
 8     can join?
 9          A.    Yes.
10          Q.    What about the Society For Music
11     Theory?  Can anybody join that?
12          A.    Probably, I would think so, but
13     essentially, its people who are music
14     theorists.
15          Q.    The books that you listed, are
16     those considered peer-reviewed
17     publications; do you know?
18          A.    They are.
19              MS. LEPERA:  Objection to form.
20              You can answer.
21              THE WITNESS:  I'm sorry.
22          A.    They are in this sense.  The
23     publishers, Greenwood, you know, and the
24     other of them for the fourth and fifth
25     editions, certainly, the Philosophy and
```

Page 57

```
 1    the Analysis of Music and the fourth and
 2    fifth editions of Research in Music,
 3    those -- those were reviewed by the
 4    publisher.  For example, I am sometimes
 5    called as an external reader by scholarly
 6    book publishers to review a book that's in
 7    draft form.  Sometimes asked whether they
 8    should be published -- I've certainly done
 9    that -- whether there are things that are
10    at issue and so forth.  And so in that
11    sense, that's a peer review.  It is my
12    understanding that the fourth and fifth
13    edition of music -- Research in Music --
14    let me just see where that is so I state
15    it properly.
16             MS. LEPERA:  Nine.
17             THE WITNESS:  Thank you.
18        A.    So Guide to Research and Music
19    Education, fourth and fifth editions, they
20    would have been reviewed certainly by the
21    press -- that's Rowman Littlefield -- and
22    I don't know that Keyboard Harmony and
23    Improv was -- well, actually, Excelsior,
24    at the time, would have certainly also
25    reviewed it.  So they are peer reviewed.
```

Page 58

```
 1    Peer review is a -- you know, a generic
 2    term, but certainly books are -- as per my
 3    CV, I sit on two -- have for a very long
 4    time -- two peer-reviewed scholarly
 5    journals in music:  One published by
 6    Indiana University Press, one published by
 7    University of Illinois Press.  And I am
 8    part of the peer review.  That is, we who
 9    are on the editorial board review any
10    number of submitted articles for
11    publication, and then we essentially write
12    a review for the editor.  And we basically
13    say, this should be published, it should
14    not be published, it should be published,
15    but these are significant changes that
16    need to be made.  That is the peer review,
17    and, indeed, I'm part of it, whether for
18    publishers or in these two journals.  And
19    I also sat on other journals as well.
20        Q.    So the example you just gave,
21    that's an academic peer review you're
22    referring to?
23        A.    An academic peer review?  What
24    do you mean by "academic"?
25        Q.    Is it related to academic
```

Page 59

1    publications?

2              MS. LEPERA:  Objection to form.

3        A.     These are scholarly

4    publications.  I don't know that the word

5    "academic" is necessarily --

6        Q.    Did the publication of your

7    books go through the same process that you

8    just described?

9              MS. LEPERA:  Objection to form.

10       A.    My understanding is that,

11   certainly, with Greenwood, there was a

12   review of my book, and as I recall, there

13   was also a review of the fourth and fifth

14   editions of Guide to Research books.  I

15   don't again recall because this was too

16   far back, 1986, the Keyboard Harmony, the

17   first book, but the review that I just

18   described in my answer, that I am part of

19   that review.  I don't know I'd call it an

20   academic review.  The point is that it is

21   a peer review; I would be considered a

22   peer.  And when a publishing company like

23   Greenwood or like Rowman Littlefield would

24   send me a draft book, I would do a peer

25   review of it and respond, as I've done now

Page 60

```
 1    for 20 years, on major journals in music
 2    that are, again, respectfully published by
 3    Indiana University Press and University of
 4    Illinois Press.
 5         Q.    Minor question about the year of
 6    publication for your Guide to Research in
 7    Music Education, fifth edition:  You have
 8    it here listed 2005; do you know one way
 9    or the other why Amazon lists it as 2004?
10         A.    No.  I have the book that says
11    2005.
12         Q.    I want to ask you about other
13    individuals involved in this case.  Before
14    the case commenced, were you familiar with
15    Barbara Salani?
16         A.    No.
17         Q.    Were you familiar with Charlie
18    Calello?
19         A.    No.
20         Q.    Did have you a chance to review
21    Mr. Calello's -- not just his report, but
22    his CV?
23         A.    Yes, attached to his report.
24         Q.    Were you familiar with some of
25    the musical -- strike that.
```

Page 61

```
 1                    Were you familiar with some of
 2      the songs that he arranged and/or
 3      produced?
 4           A.    Yes.
 5           Q.    After reviewing the list of
 6      songs that he arranged and/or produced,
 7      did you have an opinion about his
 8      credentials to any extent?
 9                    MS. LEPERA:  Objection to form.
10                    You can answer if you
11           understand.
12           A.    I certainly would say that he
13      has credentials as a producer and an
14      arranger.  That doesn't necessarily mean
15      or translate into credentials as a
16      musicologist doing an analysis of
17      two works of issue.
18           Q.    What is a musicologist?
19           A.    Well, first of all,
20      musicology -- musicology, as defined, both
21      in Grove Dictionary of Music and the
22      Harvard, is -- essentially, it is the
23      scholarly study of music, and so if you're
24      a musicologist, you are someone who is
25      active in the scholarly study of music.
```

Page 62

```
 1        Q.    Would that preclude somebody who
 2    is somebody that actively actually creates
 3    music?
 4              MS. LEPERA:  Objection to form.
 5        No foundation.
 6        A.    The creative process, of course,
 7    is not the same as the analysis of works
 8    after they've been created.  There are
 9    expectations of objectivity and distance
10    in scholarship -- and that's not just in
11    musicologists, but across the board,
12    whether it's in science or the social
13    sciences, the humanities.  These
14    expectations of distance and objectivity
15    are important.  As per my rebuttal of the
16    Calello report, I did not find that kind
17    of scholarship and sufficient distance;
18    rather, I found a report that was largely
19    the work of an advocate.
20        Q.    Taking Mr. Calello out of the
21    equation, my question is:  Can an
22    individual who's not educated in the
23    classical sense serve as a musicologist?
24              MS. LEPERA:  Objection to form.
25        Vague and ambiguous.
```

Page 63

```
 1              MR. BROWN:  I withdraw the
 2      question.
 3      Q.    Can an individual who doesn't
 4   have an advanced degree in music theory
 5   serve as a musicologist?
 6              MS. LEPERA:  Same objection.
 7      Use of the term "serve."
 8      A.    Highly speculative, but the
 9   point is:  Of course.  Someone who does
10   not have a Ph.D., for example, can
11   certainly do analysis of music, and it
12   could be very good.  The proof of the
13   pudding is in the tasting, and in
14   Mr. Calello's report, there's a failure
15   with respect to musicological analysis.
16   That does not suggest at all that someone
17   else that doesn't have, as you say, an
18   advanced degree in music might not be more
19   successful.
20      Q.    And what about Ms. Salani?
21              MS. LEPERA:  Objection to form.
22      Can you put more words on that
23      sentence?
24      Q.    For Ms. Salani, would you
25   consider her a musicologist?
```

Page 64

Lawrence Ferrara Ph.D.
January 30, 2024

```
 1        A.     Yes.
 2        Q.     Mr. Calello, would you consider
 3   him a musicologist?
 4        A.     It's difficult for me to say.  I
 5   haven't seen the -- I haven't seen his
 6   work in the scholarship in music; whereas,
 7   in looking at Barbara Salani's background,
 8   her current work as a Ph.D. student,
 9   certainly, that would be the scholarly
10   study of music.  So I'm not saying one way
11   or the other about Charles Calello.  What
12   I am saying is that, based on his report,
13   there's a failure.
14        Q.     Would you say -- strike that.
15               Has the quality of your reports
16   improved over the years?
17               MS. LEPERA:  Objection to form.
18        Q.     Has the quality of your reported
19   exert reports improved over the years?
20               MS. LEPERA:  Same objection.
21        A.     I don't know.
22        Q.     Do you recall the first report
23   you ever crafted for litigation?
24        A.     Yes.
25        Q.     Do you think that quality --
```

Page 65

```
 1    strike that.
 2            Were there things that you wish
 3    you did differently in that report?
 4            MS. LEPERA:  Objection to form.
 5        A.    May I name the report?
 6        Q.    Sure.  Name your report.
 7        A.    -- speculation.  The report was
 8    a report that I did on behalf of defendant
 9    Andrew Lloyd Webber in Repp v. Webber, and
10    that was ultimately a trial in the
11    Southern District of New York in 1998.  I
12    proffered a report several years earlier,
13    and it was used on behalf of defendants
14    for a motion for summary judgement.
15    Judge Kram, K-R-A-M, granted defendant's
16    motion for summary judgement, and as I
17    recall, cited the report.  The second
18    circuit then, on appeal, overturned,
19    remanded, and it ultimately went to trial
20    in 1998.  That was my first report.  As I
21    recall, it was an in-depth analysis of
22    melody, harmony, rhythm, the structure and
23    so forth.  And certainly, part of the
24    reports in -- more so in the rebuttal; I
25    don't remember exactly, but point is that
```

Page 66

```
 1     I named the prior art that was at issue
 2     not -- and so very much like in this case,
 3     I named -- I did the analysis, named the
 4     prior art at issue -- certainly by the
 5     rebuttal report, that was all done -- and
 6     noted that, in addition to prior art that
 7     went back into public domain works, that,
 8     in fact, Andrew Lloyd Webber, in the
 9     Phantom song, "The Phantom of the Opera,"
10     essentially copied from himself, from
11     works in two of his earlier musicals that
12     predated the creation of "Till You,"
13     plaintiff's work, which is -- I think was
14     created in 1978.  And so Andrew Lloyd
15     Webber, in Jesus Christ Superstar, 1970,
16     and in Joseph and the Amazing Technicolor
17     Dreamcoat, originally written in '69, a
18     stage show -- one of the pieces was for
19     that -- and then completed in 1975 which
20     is the show you would see today which
21     retained the 1969 work -- that in those
22     two musicals, we have absolute and clear
23     evidence -- musicological evidence that,
24     essentially, Andrew Lloyd Webber had
25     written and borrowed the theme at issue of
```

Page 67

```
 1    "The Phantom of the Opera."
 2            So essentially, that stands
 3    exactly like what I did here that is in
 4    this case, and I don't know.  I haven't
 5    read it in decades, but the point is I
 6    don't know if I'd go back and change
 7    anything.  It was certainly successful;
 8    defendant prevailed at trial.
 9      Q.    How do you determine what the
10    prior arts are at issue?
11            MS. LEPERA:  Objection to form.
12            But you can answer.
13      A.    You begin with an analysis of
14    both works in their entirety.  You then
15    look at -- and this is essentially what I
16    said I did in Repp v. Webber -- you then
17    look and do analysis of, certainly,
18    harmony, melody, rhythm, to the extent
19    that they're at issues, lyrics with an
20    overall structural form, and on the basis
21    of the analysis of those individual
22    elements, you then put the whole thing
23    back together.  It's sometimes called in
24    the social sciences the hermeneutic
25    circle.  It's not hermeneutics, per se;
```

Page 68

```
1    that's not what we're talking about, but
2    the hermeneutic circle mean that you start
3    with the whole, you dissect -- which is in
4    keeping with the extrinsic analysis -- and
5    then you put it all back together again.
6              On that basis, I identified
7    those elements that have similarity and
8    those elements that are different.  On
9    that basis, I also try to answer:  Do I
10   think that there was -- that the
11   similarities are significant from a
12   musicological standpoint?  And finally,
13   once I have done the prior art search,
14   based on the similarities of that -- that
15   are existent in the two works at issue, I
16   can then also opine as to whether I think
17   the similarities suggest copying.
18        Q.    My question was about:  How do
19   you go about doing the prior art search?
20        A.    Well, that's context for doing
21   the prior art.
22        Q.    But you just said you do the
23   prior arts -- where do you look to?
24              MS. LEPERA:  Different question.
25        Okay.
```

Page 69

1    A.    That's a different question.  I
2  understood your question:  How do I decide
3  what to look for?  And that's how I
4  decide, based on the analysis of the
5  whole, the parts and so forth.
6         So now we've -- I've established
7  what to, quote/unquote, look for, and to
8  the extent that there is a complaint, that
9  the complaint has musicology in it and it
10  identifies purported similarities, to the
11  extent sometimes I don't agree with those
12  purported similarities or the significance
13  that's attributed to those similarities,
14  but the point is I understand that, in
15  order to ultimately respond, perhaps, in
16  the form of a rebuttal, that I will also
17  have to include in my prior art search
18  those similarities that have been placed
19  at issue.
20         So with that information,
21  whether it's as a result of my analysis or
22  to the extent that added to that is the
23  analysis of a musicologist or
24  musicologists on the other side, I then go
25  about looking for works.

```
 1              How do I do that?  There are any
 2    number of ways.  First, there are thematic
 3    indices, and there is a site.  It's called
 4    RISM, R, period, I, period, S, period, M,
 5    period (sic), which stands for a French
 6    title.  It's in France.  Apparently, it's
 7    been around for decades.  It has a
 8    database of just enumerable works, and I
 9    think there's something like 50 to 60
10    commissions around the world that -- made
11    up of scholars that send things into RISM.
12    And RISM then provides, in chippets --
13    that is, the beginnings of melodies that
14    one could look at -- in chippet meaning
15    the beginning of a work, not the beginning
16    of the verse necessarily, but beginning of
17    the work.  And so the point is that if you
18    plug in scale degrees, you will be aligned
19    in the database.
20              Now, by simply doing scale
21    degrees, you can put in five, four, three,
22    two, one, and, you know, it may go in a
23    different direction.  It might be five
24    going up to four and three going down --
25    you know, up to two and so forth.  So what
```

Page 71

```
 1   you plug in doesn't necessarily always
 2   come right back out, but that's one of the
 3   databases using the same kind of process.
 4   Themefinder -- I think that's .org -- is
 5   another database.  Folk Song Finder is
 6   another database.  And so these are all
 7   databases that one can look at.
 8              I also look to -- for example,
 9   in the case of drumbeats, I have student
10   drum method books in my library.  I cited
11   one and attached it as an exhibit, the
12   Pain book that had, I think, about a
13   dozen examples of four on the floor, the
14   kick drum playing quarter beats, that is
15   essentially the only similarity in the
16   rhythms at issue between "Wiggle" and
17   "Levitating" and between "Don Diablo" and
18   "Levitating."  A commonplace -- that one
19   could call a musical building block, four
20   on the floor, boom, boom, boom, boom.
21   That is so commonplace and trite that it
22   exists in disco, in house music, in rap.
23   It's just all over the place, and it has
24   been for decades.
25              So essentially, I -- as I did in
```

Page 72

```
 1    this case, I would show that, in this
 2    student method book, this rhythm is
 3    present.  I've done the same with string
 4    books.  I also, in this case, used the
 5    classic, the truly iconic trumpet method
 6    book Arban, A-R-B-A-N, considered by many
 7    to be the founder of modern trumpet
 8    school, a 19th-century trumpet expert who
 9    published this very important book.  In
10    fact, my son, in grade school, used Arban
11    when he was -- and into middle school --
12    when he was playing trumpet, and so it's
13    just very well known.  I have the Arban
14    book at home.
15        Q.    The databases that you refer to,
16    are they public demain?
17             MS. LEPERA:  Objection to form.
18        A.    Most of the works in those
19    three cites, Folk Finder -- but not all --
20    Folk Finder, Theme -- Themefinder and
21    RISM, most them are public domain, as I
22    understand the term.  Certainly, going
23    back to the 19th century and, some cases,
24    going back to the 17th century, clearly
25    public domain.  But there are some
```

Page 73

```
 1    instances in Folk Finder, for example,
 2    where you -- there'll be a folk song from
 3    the 1940s or '30s.  In Themefinder, there
 4    may be a song from the '30's -- in the
 5    1930s or '40s which certainly could be
 6    still under copyright protection.
 7              But to answer your question, I
 8    would say the majority of the compositions
 9    in those three sites tend to be public
10    domain.
11        Q.    Does it cost money to access
12    those sites?
13        A.    No, it does not.
14        Q.    Are you familiar with any of the
15    present gadgetry where you play a song,
16    and it tells you what song that song
17    sounds like?
18              MS. LEPERA:  Objection to form.
19        Vague.  Ambiguous.
20        A.    I'm aware that they exist, but I
21    must say that I haven't used them.
22        Q.    Is there any reason that if you
23    hum the melody to "Levitating" into Google
24    Voice, it'll indicate it also sounds like
25    "Don Diablo"?
```

Page 74

```
 1              MS. LEPERA:  Objection to form.
 2      No foundation.
 3              You can answer if you understand
 4      the question.
 5      A.    Well, first of all, your
 6  question is much too broad because if I
 7  were to sing the melody to other parts of
 8  the verse in "Don Diablo" --
 9      Q.    Let me withdraw the question --
10      A.    Thank you.
11      Q.    -- and much tighter.
12              We can both agree that there's a
13  phrase at issue here, correct?
14      A.    Yes.
15      Q.    If I were to hum the part of the
16  phrase at issue to Google Voice from
17  "Levitating," do you have any idea why it
18  would come up with similarities to "Don
19  Diablo"?
20              MS. LEPERA:  Objection to form.
21      No foundation.
22              You can answer if you understand
23      it.
24      A.    Yes, I do have an idea, and that
25  is because they are both based on a
```

Page 75

1    descending scale that the -- that the
2    software would not be able to distinguish
3    as a major descending scale, that is, a
4    decent based on a major scale in "Don
5    Diablo" and a decent based on a minor
6    scale in "Levitating."  So the software
7    can't ferret that out -- clearly, one's
8    major; one's minor -- but what they both
9    do, like the Czerny -- the 19th century
10   Czerny exercise, bars five through eight
11   in Opus 299, Czerny -- is they both move
12   down in 20 notes that sound the same.  In
13   fact, they are different notes on
14   different scale degrees, one in major and
15   one in minor; whereas, in Czerny, they're
16   identical in "Don Diablo" and Czerny.
17            So if, for example, one were to
18   plug that in, it wouldn't surprise me, but
19   it's not meaningful because what it's
20   identifying is a descending repetitive
21   flat-rhythmed scale which has differences,
22   as I've just described, in modality and
23   scale degree, but are just simply part of
24   the same musical building block.
25       Q.    If that part wasn't just a

Page 76

```
 1    musical building block, would that have
 2    any significance to your conclusion there?
 3            MS. LEPERA:  Objection to form.
 4       A.   It's simply too speculative.  In
 5    order for the portion at issue not to have
 6    a musical building block status, it would
 7    have to be different.  You're asking me to
 8    speculate how different it could be.  I
 9    mean, what are the possible permutations
10    of the differences?  So no.  It's a purely
11    speculative question to which I don't
12    think my role is to answer.
13       Q.   I want to go back and ask you
14    about Geluso report.
15            MS. LEPERA:  It's actually
16        Geluso, I've learned myself; it's not
17        a hard G.
18            MR. BROWN:  Let me --
19            (Whereupon, simultaneous
20        conversation took place disrupting the
21        record, and the court reporter
22        requested one person speak at a time
23        without interruption from anyone
24        else.)
25            MS. LEPERA:  We're good.
```

Page 77

```
 1        Q.    Let me apologize in advance
 2   because, once I misremember a name, it may
 3   stick, but tell me about your relationship
 4   with -- is it Mr. Geluso or Dr. Geluso?
 5        A.    Okay.  You said "go back to."  I
 6   believe we --
 7        Q.    I want to go back to talking
 8   about other people in the case.
 9        A.    Okay.  I didn't hear the --
10        Q.    You got me.
11        A.    No problem.  Paul Geluso,
12   G-E-L-U-S-O, is a professor at New York
13   University in the Steinhardt School.  It
14   has a major program in music technology,
15   bachelor's, master's and Ph.D., and as
16   department chair for 16 years, it is a --
17   one of the programs like music theater and
18   music business which is highly ranked
19   throughout world and draws applicants from
20   throughout the world.
21             Professor Geluso -- not doctor;
22   he does not have a Ph.D. --
23   Professor Geluso is the director of those
24   programs, and my relationship with him is
25   that when he came on -- I guess he came on
```

Page 78

```
 1    to the faculty sometime in the 1990s.  I
 2    became chair in 1995, and so I certainly
 3    would have met him by that point.  I don't
 4    know that he was ever in any of my
 5    classes, but I would have met him as a
 6    colleague.  Understand that after 16 years
 7    when I stepped down, there are more than
 8    400 faculty in Steinhardt Music and
 9    Performing Arts, essentially advising,
10    mentoring, teaching 1,600 majors,
11    baccalaureate to Ph.D., and another 13-,
12    1,400 non-majors from throughout the
13    university.  They came to us for music,
14    you know, classes, lessons, ensembles and
15    the rest.
16            So in any given semester, the
17    unit that I oversaw essentially was
18    catering and serving about 3,000 students
19    with more than 400 faculty.  He would have
20    been one of those, but I certainly do
21    remember him as a kind of a bright light.
22    He joined the full-time faculty in 2012,
23    as I recall, about 12 years ago.
24        Q.    How often do you speak with him?
25        A.    Rarely.  We see each other at
```

Page 79

```
 1    faculty meetings, sometimes -- in fact, as
 2    I recall, the last faculty meeting -- my
 3    office is on the sixth -- the 11th floor,
 4    his office is on the sixth floor, and he
 5    came into the elevator.  I was standing
 6    there with other colleagues, going down to
 7    the third floor where we had our faculty
 8    meeting.  It's just kind of a happenstance
 9    kind of a meeting, but that's basically
10    it.
11         Q.    When you say "rarely," is it,
12    like, four times a year?
13         A.    During meetings.
14         Q.    How often -- how many times a
15    year, approximately?
16         A.    Meetings, usually, monthly.
17         Q.    Did you ever discuss this case
18    with him?
19         A.    No.  As a rule, I do not discuss
20    a case that I'm working on with another
21    musicologist, let alone another person.
22    So no, I have not discussed this with
23    Professor Geluso.
24         Q.    Did you have occasion to see his
25    report in this case?
```

Page 80

```
 1          A.      I was given -- not in the final
 2     form, but I was given some portions of his
 3     report, mostly the spectral, the spectral
 4     grams, the spectral analysis, and that's
 5     it, but it was before -- I believe before
 6     the final report.  I just don't remember
 7     the dates now.
 8          Q.      And again, if there's a lawyer
 9     involved, I don't want to hear about this,
10     but did you edit portions of that?
11             MS. LEPERA:  Objection to form.
12         Just for clarification, edit portions
13         of Professor Geluso's report?
14          Q.      Professor Geluso's report that
15     you just referred to, that you saw
16     portions of.
17          A.      I recall discussing the report
18     with --
19             MS. LEPERA:  He doesn't want to
20         know.
21          Q.      I don't want to know about your
22     discussions with counsel.  I want to know
23     if you edited any portion of it yourself.
24          A.      I can't say that I remember.
25          Q.      How many -- strike that.
```

Page 81

```
 1              Do you know if -- strike that as
 2    well.
 3              Were there any conclusions you
 4    disagreed with in his report?
 5         A.    To the extent that I would have,
 6    I would have articulated them in
 7    confidential conversation.  So I don't
 8    recall finding fault with any of the
 9    conclusions.
10         Q.    Again, I don't want to hear
11    counsel.  I'll keep saying that again, but
12    I do want to know that if you had
13    suggestions, was it because that you
14    thought there was something substantively
15    inaccurate about an earlier iteration of
16    his report?
17              MS. LEPERA:  Objection.  No
18         foundation.
19         A.    I have to listen to my answer.
20    Did I say "make suggestions"?  I don't
21    know that I made suggestions.
22         Q.    Did you make suggestions?
23         A.    I don't --
24              MS. LEPERA:  Okay.  No
25         conversations with counsel.
```

Page 82

```
 1        Q.    No conversations --
 2              MS. LEPERA:  So the question is:
 3        Did you make suggestions?
 4              And what's the rest of the
 5        question?
 6        Q.    Did you have suggestions about
 7   his report in your mind that you may or
 8   may not have --
 9              MS. LEPERA:  Communicated, if
10        you remember.
11              THE WITNESS:  Yeah.
12        A.    As per my earlier answer, I
13   don't remember when I submitted the
14   rebuttal report.  Was his submitted as a
15   rebuttal report?
16              MS. LEPERA:  Nope.  You don't
17        have to go there.
18        A.    I just don't remember.
19              MS. LEPERA:  That's good enough.
20        Q.    Did you see a final copy of his
21   report?
22        A.    No.
23        Q.    Do you know if he saw your
24   report?
25              MS. LEPERA:  Objection.  Which
```

Page 83

```
 1         one?
 2         Q.    Do you know if you saw your
 3    affirmative report?
 4         A.    I don't.
 5         Q.    Do you know if he saw either of
 6    your rebuttal reports?
 7         A.    I think -- again, this is going
 8    back to conversations with --
 9         Q.    No --
10              MS. LEPERA:  Don't speculate.
11         Don't speculate.  Either you know from
12         personal knowledge or you don't.
13              MR. BROWN:  I'm not trying --
14         let me -- I didn't mean to talk over
15         you.
16         Q.    I'm not even trying to
17    indirectly elicit information that was
18    discussed with counsel so --
19         A.    Do you want to re-ask that --
20              MS. LEPERA:  Can you repeat it?
21              MR. BROWN:  Could you read back
22         the last question, please?
23              (Whereupon, a portion of the
24         record was read back.)
25              "QUESTION:  Do you know if he
```

Page 84

```
1           saw either of your rebuttal reports?
2                "ANSWER:  I think -- again, this
3           is going back to conversations with --
4                "QUESTION:  No" --
5           Q.    Do you know whether he saw your
6      report -- your rebuttal reports at any
7      point before he issued his reports?
8                MS. LEPERA:  Other than through
9           conversations with counsel, do you
10          know whether or not he saw any --
11          either of your two rebuttal reports at
12          any point in time?
13               MR. BROWN:  Thank you.  That's a
14          standing thing about other than
15          counsel.  Thank you.
16          A.    As I try to remember back, you
17     know, these months, I think that I was
18     informed that he had a portion --
19          Q.    Again, if you're informed
20     through counsel, I don't want to know.
21     Do -- if you --
22               MS. LEPERA:  That's what I was
23          saying.  Other than through
24          conversations with counsel, do you
25          have any knowledge about this?
```

Page 85

```
 1                 THE WITNESS:  Oh.
 2       A.    No.
 3                 MS. LEPERA:  That's it.
 4       A.    No.
 5       Q.    One last background question:
 6   What is your favorite song to perform?
 7                 MS. LEPERA:  Objection.  No
 8       foundation.
 9       Q.    In your dance band?
10                 MS. LEPERA:  Still no
11       foundation.
12       A.    It's been too many years, but it
13   was a wonderful time that helped to pay
14   for bills while I was just starting out at
15   NYU and preschool for my children and all
16   of that.  It was a part that I relished
17   quite a bit.
18       Q.    I want to walk-through your very
19   lengthy Plaintiff's Exhibit 1 which is
20   your affirmative report.
21                 MS. LEPERA:  You're okay with
22       him having it in front of him?
23                 MR. BROWN:  Yeah.
24                 MS. LEPERA:  Great.
25       Q.    And certain times, I'll refer
```

Page 86

```
1    you directly to things, and certain times,
2    I may be in front of you.  But again, as
3    we indicated earlier, this is not a
4    memorization.  So if there's stuff you
5    need to look back at to refresh your
6    recollection, be my guest.  Just tell me
7    you're going to be doing it if I don't
8    direct you to a particular paragraph.
9              But on page two, you talk about
10   that it's your understanding that fact
11   discovery has not yet begun in this matter
12   and you reserve the right to amend,
13   modify, supplement this report on the
14   basis of such discovery or otherwise as
15   new information becomes available.
16             Do you remember writing that?
17   A.    I remember having --
18             MS. LEPERA:  No conversations
19   with counsel.
20   A.    Yeah.
21   Q.    Do you remember writing this?
22   A.    Yes.
23   Q.    Was this your full report based
24   from -- strike that.
25             Is this the initial iteration of
```

Page 87

Lawrence Ferrara, Ph.D.
January 30, 2024

```
 1    the report?
 2              MS. LEPERA:  Objection to form.
 3        A.    Initial -- that is 2021?
 4        Q.    I'm not talking about -- in the
 5    past you indicated that you may have given
 6    some sort of consulting report, correct?
 7              MS. LEPERA:  Objection to form.
 8    No foundation.
 9        A.    No, I did not -- I can't testify
10    to what I did as a consultant because it's
11    privileged.
12              MS. LEPERA:  Right.
13        A.    I did not write a report before
14    this.
15        Q.    Was there an earlier iteration
16    of this report?
17              MS. LEPERA:  Objection to form.
18    That's the same question.
19        A.    Do you mean -- well, no.  To the
20    extent that it evolved from page one to
21    page five to page, you know, 50 and so
22    forth.
23        Q.    Was there an earlier draft that
24    there were substantive changes?
25        A.    Ah -- question.  There was an
```

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

```
1    earlier essentially completed draft that I
2    sent to --
3              MS. LEPERA:  Again, we're not
4         going --
5         Q.    -- earlier draft, then it's a
6    yes or no.
7              MS. LEPERA:  That's it.
8         A.    There was an earlier essentially
9    complete draft.
10        Q.    Do you know -- strike that.
11             Do you recall what the changes
12   are from the earlier draft to this draft?
13   And let me ask you a question in between.
14   So I will withdraw that.
15             So there was a first draft.  And
16   is this the only other draft, or are there
17   any drafts in between the first draft and
18   this?
19             MS. LEPERA:  Let me just have a
20        continuing line of objection to any
21        discussion about what -- how many
22        drafts, what changes were made in
23        drafts, conversations with counsel
24        about changes in draft because that is
25        all, under the rules, subject to
```

Page 89

```
 1              privilege.
 2        Q.     I'm not asking about anything
 3    that was a conversation with counsel at
 4    all.
 5        A.     Right.
 6        Q.     But how many different drafts
 7    were there?
 8              MS. LEPERA:  You can answer that
 9         if you know the number, but other than
10         that, no content.
11        A.     I don't know.  I think the word
12    "drafts," how many "other drafts," is
13    somewhat of a misnomer because the first
14    draft was essentially a finished draft.
15    What might have gone back and forth might
16    have been stylistic, grammatical.  At one
17    point, I had a problem with formatting,
18    believe it or not.  My Word was just going
19    crazy.  I didn't know why.  I couldn't
20    figure out the formatting issue.  So it
21    was those kinds of things.
22              So is it possible -- would I
23    have sent a draft with a formatting
24    problem noting there's a formatting
25    problem and then receiving -- I can't
```

Page 90

```
 1   talk -- essentially having that corrected.
 2           So the idea that there were
 3   drafts suggesting that there were
 4   substantive changes from draft to draft is
 5   simply not reflective of what occurred.
 6       Q.    Wasn't suggesting it; was asking
 7   it.  And then we can move on.
 8           Going back to paragraph four
 9   about fact discovery has not yet begun in
10   this matter, what facts, if anything, do
11   you think you could learn that would
12   change some of your opinions in this case?
13           MS. LEPERA:  Objection.
14       Speculation.  Out of context.
15           You can answer if you
16       understand.
17       A.    Well, this is something that
18   I've actually seen in this insert, seen in
19   reports of other musicologists on the
20   other side.  In fact, I see it more often
21   than not, and so it's not -- it's
22   certainly not new to me.
23           And the point is:  What other
24   facts would come forward?  Well, the
25   Salani deposition, that certainly had not
```

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

1    occurred here -- that's part of fact

2    discovery -- the Calello deposition.  And

3    so to the extent that those depositions

4    and that part of fact discovery had not

5    yet occurred, I wanted to make certain

6    that, to the extent that there were

7    important fact issues in that were

8    musicological issues, that I would be able

9    to respond to them.

10        Q.    Did you, in fact, at some point,

11   view the Salani deposition?

12        A.    No.

13        Q.    Did you read the Salani

14   deposition?

15        A.    No.

16        Q.    Did you view the Calello

17   deposition?

18        A.    No.

19        Q.    Did you read the Calello

20   deposition?

21        A.    No.

22        Q.    If I'm to understand this

23   report -- and if you disagree with my

24   understanding, please correct me -- one of

25   your conclusions is that "Levitating" is

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

1    original, correct?

2              MS. LEPERA:  Objection to the

3         form.  Preamble.  References about

4         "your understanding."

5         A.    I don't recall using the term

6    "original" for "Levitating."  My

7    recollection is that the analyses that

8    I've done of "Levitating" point to the

9    portions that are at issue and the fact

10   that they are essentially a musical

11   building block and to the portions that

12   are not at issue and the fact that they

13   are different and that the songs, in their

14   entirety, at issue are quite different.

15   So I don't recall -- you have to point me

16   then, please -- wherein where I say

17   "Levitating" is an original composition.

18        Q.    We'll get to that as we work

19   through the report, and you'll have ample

20   opportunity to talk about that.  But if

21   you were aware that one of the Defendants

22   had actually testified -- and this is a

23   hypothetical -- that he or she had strove

24   to copy "Don Diablo," would that change

25   your opinion at all?

1        MS. LEPERA:  Objection to form.

2        You can answer if you

3     understand.

4        A.    Yeah.  It is extrinsic to the

5     musicological analysis.  Musicological

6     analysis looks at the portions that are at

7     issue, and to the extent that we're

8     talking about a repeated-note descending

9     scale -- which has been around for

10    centuries -- and a patter style -- that is

11    singing one syllable per note with rapid

12    note is patter style, sometimes called

13    patter song -- the point is:  To look at

14    that would undercut -- would undercut

15    the -- any suggestion of there being a

16    significant purported copying.  So no,

17    it's really extrinsic to what a

18    musicologist does.

19       Q.    Would it undercut any

20    conclusions about originality?

21        MS. LEPERA:  Same objection.

22    And vague and ambiguous.  Originality

23    of what?

24       A.    First, let me say my

25    understanding of original, in the law, is

Page 94

1    independently created.  Original in
2    musicology generally tends to be the usual
3    English version, and that is first.  And
4    so I know that one could give an example
5    of someone writing something that had
6    already existed, but having no access to
7    that.  You lived on a desert island and
8    you had no access to the original work,
9    would that be considered original?  Under
10   the law, the answer would be, I
11   understand, yes, to the extent that I
12   understand that little bit.
13          A musicologist might say, well,
14   no, it's not original because it was
15   written ten years before, 20 years before.
16   So I try not to use the word "original"
17   because I'm aware that there's a
18   difference in the way musicologists use it
19   and, sometimes, under the legal use of the
20   term.
21       Q.    So the concept of access would
22   have no impact on your report, is that
23   what you're saying?
24       A.    The concept of access I would
25   consider to be extrinsic -- largely

Page 95

```
 1    extrinsic to musicology, and certainly,
 2    one can find -- the trier of facts can
 3    find access and still find no
 4    infringement.  Access, in and of itself,
 5    does not necessarily mean copying, and it
 6    certainly doesn't mean a substantial
 7    similarity, as I it understand that legal
 8    term, but do not opine as a musicologist.
 9         Q.    What is patter?
10         A.    Well, patter by itself
11    doesn't --
12              MS. LEPERA:  I'm going to object
13         to the form of the question.  I assume
14         you're meaning as used in this report,
15         but I don't mean to presume.
16         A.    Patter song, patter style, these
17    are two terms that are interchangable.  It
18    is rapidly singing syllabically one note
19    per syllable.
20         Q.    Is a style a building block?
21              MS. LEPERA:  Objection to form.
22         A style of what?
23         Q.    Is patter style a building
24    block?
25         A.    That's different.  Patter style,
```

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

```
 1    as I've just defined it -- which I think
 2    is consistent with the way it's defined;
 3    that is, rapid singing syllabically one
 4    note per syllable -- that is a certainly a
 5    building block.  It's been around at least
 6    since Mozart through the opera composers
 7    in the early Romantic period in Italy
 8    through the operettas of Gilbert and
 9    Sullivan, all of those in the public
10    domain, as well as other prior art.
11        Q.    And when I asked you earlier to
12    list different things that were building
13    blocks, you didn't list patter style --
14            MS. LEPERA:  Objection to form.
15        Q.    -- do you recall that?
16        A.    As I said, you're asking me on
17    the fly, and I did not suggest and,
18    certainly, the record will show that I did
19    not suggest that my answers were even
20    remotely exhaustive.
21        Q.    Can I find in a book anywhere
22    that patter style should be considered a
23    musical building block?
24            MS. LEPERA:  Objection to form.
25        A.    Consistent with my testimony
```

Page 97

```
 1    earlier, to the extent that the entry on
 2    key doesn't say key, it's fundamental, oh,
 3    by the way, it's a musical building block.
 4    It doesn't have to say that.  When you say
 5    that there are two basic keys, you know
 6    that it's a fundamental building block.
 7    You don't have to say the same with
 8    scales.  You don't have to say the same
 9    with patter style or patter song.  It's
10    understood.  It's commonplace.  It is a
11    building block which -- upon which other
12    elements are built.
13        Q.    Going back to my question, where
14    can I find it, if at all, in writing that
15    patter style should be considered a
16    building block?
17            MS. LEPERA:  Objection to form.
18        A.    Once again, it's consistent with
19    musicological --
20            (Whereupon, simultaneous
21        conversation took place disrupting the
22        record, and the court reporter
23        requested one person speak at a time
24        without interruption from anyone
25        else.)
```

Page 98

1            MS. LEPERA:  Well, don't

2        interrupt the witness.  Don't

3        interrupt the witness.  And there's no

4        foundation.  I object to the form of

5        the question.

6            You can answer once again.

7        A.    I am not aware where one can

8    find a source that says patter style or

9    patter song is, quote/unquote, a musical

10   building block.  That it has existed in a

11   commonplace manner for centuries is the

12   functional issue here.  That is, is this

13   something that needs to be filtered out as

14   something that is commonplace and has been

15   for centuries or not?  I think the answer

16   to that is clearly:  It needs to be

17   filtered out because it's been

18   commonplace -- so commonplace and upon

19   which other elements are built that this

20   would be a paradigm example of a musical

21   building block.

22       Q.    What is filtering?

23            MS. LEPERA:  Objection to form.

24       As he's used the term?

25       Q.    What is filtering as you just

Page 99

1    used the term and throughout your report?

2        A.    It is my understanding that the

3    expectation in various circuits in the

4    United States, not be limited to music

5    copyright cases, is that an expert will

6    filter out -- I think it's called the

7    filtration process -- but will literally

8    filter out elements that are commonplace,

9    elements that are in the public domain.

10            So based on that, my

11   understanding that expectation by courts

12   that one of the roles of the expert is,

13   for example, in doing analysis and prior

14   art analysis to filter out something like,

15   well, patter song.  They're both in a

16   patter style.  That would be filtered out

17   because it has been commonplace for

18   centuries.

19       Q.    If you had a 16-note descending

20   scale followed by a D, C, D, something

21   along those lines, would each part

22   separately be considered commonplace?

23            MS. LEPERA:  Objection.  Vague

24       and ambiguous.

25            But you can answer.

Page 100

1      A.    Purely too speculative.  What

2  notes?  What three notes?  What are the

3  rhythms?  What -- you know, in what

4  context, the overall works and so forth.

5  You're asking me to speculate, and I

6  really can't.

7      Q.    Well, I want to understand your

8  prism of analysis.  So if you had all in

9  eighth notes and then you had

10  16 descending notes followed by a note

11  that went up, down and up --

12      A.    Okay.

13            MS. LEPERA:  I'm going to object

14      to the form of the question.

15            Obviously, if you understand.

16      A.    At least for the record, so the

17  reader of this will understand -- because

18  I think your question is really quite

19  ambiguous -- we have 20 notes at issue.

20  They're all 16th notes.  This is between

21  "Diablo" and "Levitating."  20 notes

22  starting on different scale degrees, but

23  descending if you put them in relative

24  keys on white notes.  Those 20 notes are a

25  musical building block that is consistent

Page 101

```
 1   not only with my report but with the prior
 2   art.  You have the identical 20 notes
 3   descending as 16th notes in Czerny Opus
 4   299 in the same key -- that is, in a major
 5   key -- as in "Diablo."
 6            So even given the differences,
 7   the point is those 20 notes are musical
 8   building blocks.  I don't say that the --
 9   what in, I believe -- let's see -- bar ten
10   in the -- in the Salani and Calello
11   reports, bar ten are the first 16 of those
12   notes to the best my recollection.  The
13   next four on beat one of bar 11 in their
14   transcriptions -- this would be example 3A
15   in Calello.  So you have 20 notes from
16   what he calls bar ten.  Again, it's a
17   mistake, but the point is bar 10 to the
18   first beat of bar 11.  But then you have
19   different notes -- one goes up, one goes
20   down -- which is kind of like what you're
21   asking.  That was part of your
22   description.  The 20 notes are the notes
23   that are at issue.
24            Indeed, I believe it was the
25   Salani report -- it might have been
```

Page 102

```
 1    example four-something -- where, in the
 2    Salani report, Salani states, this is
 3    what's at issue, and puts a red
 4    rectangular box around those 20 notes, not
 5    the two or three notes that follow.  We're
 6    in agreement, that is, those 20 notes are
 7    the notes that are at issue.
 8              In the filtration process, to
 9    the extent that I've established that
10    those 20 notes exist in prior art or the
11    similarities between them -- because there
12    are differences, as you know, not only on
13    scale degree, but differences also in
14    modality and harmony that surrounds it,
15    all those differences -- the point is that
16    to the extent that I've shown that the
17    proper filtration process is -- and
18    whether you have a problem with calling it
19    a musical building block or simply calling
20    it commonplace, the point is it was
21    commonplace prior to "Don Diablo."
22              To the extent that you filter
23    that out, what's left, use the Salani
24    transcription with the red and the black
25    overlay of "Don Diablo" and "Levitating,"
```

Page 103

```
 1    use the Calello transcription with the
 2    same overlay.  And what do they show?  One
 3    note.  One note that lands that's the
 4    same.  And so when you do the filtration
 5    process as a musicologist and you filter
 6    out those first 22 notes, then the next
 7    few notes go in different direction --
 8    they're different -- and then they land on
 9    the same last note.  What do you filter
10    out?  You filter out different notes, you
11    filter out the 20 notes that are
12    commonplace, clearly, and public domain,
13    and what you're left with is one note.
14    You simply cannot suggest that that
15    similarity that remains after the
16    filtration process is meaningful or
17    significant.
18        Q.    And this may be extrinsic -- and
19    you can tell me that, but why would the
20    listener's experience perceive that "Don
21    Diablo" and "Levitating" sound similar?
22            MS. LEPERA:  Objection.  No
23        foundation.
24        A.    Well, I think the second part of
25    the objection is the key.  I'm not aware
```

Page 104

```
 1    that the Plaintiff's experts -- and I
 2    certainly didn't -- conducted a survey of
 3    thousands of people and, on the basis of
 4    that survey, found that a certain number
 5    thought this or that, whatever the
 6    questionnaire might have been.  And so
 7    your question's purely speculative.
 8              MS. LEPERA:  I hate to bother
 9         you again, but I do need to use the
10         restroom.  I can wait a little bit if
11         you just want to finish your line of
12         questioning, 100 percent.
13         Q.    In one of the YouTube videos,
14    for example, there's a lot of commentary
15    indicating that "Don Diablo" and
16    "Levitating" sound similar.  Do you have
17    any idea why the listener would have that
18    experience?
19              MS. LEPERA:  Objection to form.
20         Same thing.  No foundation.  What
21         YouTube video?
22         A.    You're asking me to opine on the
23    lay listener and what the lay listener may
24    or may not -- my answer is -- and this is
25    part speculation -- is the fact that
```

Page 105

```
 1    they're listening to a musical building
 2    block that has similarities in 20 notes.
 3    And so yes.  But the fact that a listener
 4    can point to that similarity does not
 5    undermine the fact that that similarity
 6    represents no more than a musical building
 7    block, no more than commonplace musical
 8    expression that was commonplace and
 9    already in the public domain before "Don
10    Diablo" was created.
11              MS. LEPERA:  I apologize.
12              MR. BROWN:  No.  That's fine.
13              MS. LEPERA:  And lunch is here
14       too.
15              MR. BROWN:  Lunch and a break.
16       Thank you.  We can go off the record.
17              THE VIDEOGRAPHER:  Off the
18       record.  The time is 12:30 p.m.
19              (Whereupon, a lunch break was
20       taken at 12:30 p.m.)
21              (Whereupon, the last question
22       was read back.)
23              "ANSWER:  You're asking me to
24       opine on the lay listener and what the
25       lay listener may or may not -- my
```

Page 106

```
 1            answer is -- and this is part
 2            speculation -- is the fact that
 3            they're listening to a musical
 4            building block that has similarities
 5            in 20 notes.  And so yes.  But the
 6            fact that a listener can point to that
 7            similarity does not undermine the fact
 8            that that similarity represents no
 9            more than a musical building block, no
10            more than commonplace musical
11            expression that was commonplace and
12            already in the public domain before
13            "Don Diablo" was created."
14                 THE VIDEOGRAPHER:  Back on the
15            record.  The time is 1:43 p.m.
16            Q.    Doctor, I remind you you're
17       still under oath.
18            A.    Yes.  Thank you.
19            Q.    All right.  I'm going to do my
20       bad singing:  Dum, dum, dum, dum.
21            A.    Yes.
22            Q.    Do you know what that is?
23                 MS. LEPERA:  Is that a question?
24            A.    The opening four notes of
25       "Symphony No. 5" by Beethoven.
```

Page 107

1          Q.    And under a building blocks
2     theory, would that be original or not
3     original?
4               MS. LEPERA:  Objection to form.
5          It's a vague and ambiguous --
6               (Whereupon, simultaneous
7          conversation took place disrupting the
8          record, and the court reporter
9          requested one person speak at a time
10         without interruption from anyone
11         else.)
12              MS. LEPERA:  Vague and ambiguous
13         use of terms.
14              You can answer.
15         A.    It's a complete anomaly.  The
16    first four notes, G, G, G, E-flat --
17    that's five, five, five, three -- because
18    it continues, by the way, to F, F, F, D.
19    So it's really eight notes; you just sang
20    the first four of the eight.  And what is
21    special about that is that, as essentially
22    every musicologist knows, the most simple
23    and expected direction for -- given a
24    perfect example of -- a motif is what
25    that's called -- a short motif starts on

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

```
 1    scale degree five.  Five, four, three,
 2    two, one.  What do we have in the opening
 3    eight notes of the "Fifth Sympathy"?  We
 4    have five, five, five, three; four, four,
 5    four, two.  What do we want to hear?  One.
 6    We're dying to hear one because that is
 7    the natural -- that is the natural
 8    inclination of scale degrees, five, four,
 9    minor scale, three, two, one.  But
10    instead, what Beethoven does -- and that's
11    why it's anomalous -- is five, five, five,
12    three -- and a long three -- four, four,
13    four, two -- and a long two -- not flat
14    rhythm.  And then what do we have?  Da,
15    da, da, da, da, da, da, da, da, a
16    development of that motif.  Completely
17    different, and it's on opposite planets.
18                And so do I think the first four
19    notes are necessarily a building block?
20    Not necessarily.  Is it now a -- iconic?
21    Yes.  But it is so different from the
22    expression that's at issue that it really
23    is quite -- and it's also anomalous
24    because there's nothing quite like the
25    opening of "The Fifth Symphony."
```

Page 109

```
 1        Q.    When you say it's "anomalous,"
 2    was it original?
 3              MS. LEPERA:  Objection to form.
 4        Vague and ambiguous terms.
 5        A.    Using the word "original" from a
 6    musicological perspective meaning the
 7    first, first of all, we know that
 8    Beethoven himself, prior to "The Fifth
 9    Symphony" wrote figures with five, five,
10    five, three, but not with five, five,
11    five, three, long rest.  And so is it
12    original?  Some musicologists have
13    suggested that those first four notes is
14    something that had been used in other
15    works before.  I haven't done a study of
16    that; I'm just simply reporting.  But
17    five, five, five, three, four, four, four,
18    two, the way that is actually composed, to
19    the best of my knowledge, I believe that,
20    from a musicological perspective, it is
21    original.
22        Q.    You think the originality about
23    that is a harder case rather than
24    determining whether it was unmistakable
25    song?
```

Page 110

```
 1                 MS. LEPERA:  Objection to form.
 2        Vague and ambiguous terminology.  No
 3        foundation.
 4        A.    Yeah.  I don't quite understand
 5   your question.
 6        Q.    If someone were to say that
 7   was -- strike that.
 8                 Someone were to say, this is
 9   unmistakably Beethoven, but was it
10   unoriginal?  That's a harder case.  Do you
11   mean what they would mean by that?
12                 MS. LEPERA:  Objection to form.
13        Speculation.  No foundation.
14        A.    I don't know, especially with
15   the way you're talking about.  I think
16   I've already answered the question as to
17   originality.
18        Q.    Well, these are your words.  So
19   I'm trying to understand how it's
20   reconciled with what you just said.
21                 MS. LEPERA:  Objection.
22        Objection.
23        A.    Which of those words are mine?
24        Q.    This is unmistakably Beethoven,
25   but was it original.  That's a harder
```

Page 111

```
 1    case.
 2         A.    Yeah, but you said something
 3    about --
 4              (Whereupon, simultaneous
 5         conversation took place disrupting the
 6         record, and the court reporter
 7         requested one person speak at a time
 8         without interruption from anyone
 9         else.)
10              MS. LEPERA:  Everybody slow
11         down.
12              MR. BROWN:  I apologize to
13         everyone.
14              MS. LEPERA:  And put quotes
15         around something if you're quoting
16         someone rather than --
17         Q.    Quote, Ferrara then played the
18    most famous four note sequence in
19    classical music, the opening of
20    Beethoven's fifth, G, G, G, E-flat.  This
21    was unmistakably Beethoven.  But was it
22    original?
23              And now, quote -- from you --
24    that's a harder case, Ferrara said.
25    Although other composers wrote that,
```

Page 112

1    Beethoven himself wrote that in a piano
2    sonata, and you can find figures like that
3    in composers who predate Beethoven.
4              What did you mean by that versus
5    what you just said?
6         A.    I --
7              MS. LEPERA:  Objection.
8         Mischaracterizes and misstates what
9         the witness said.  And also vague,
10        ambiguous, overbroad and compound.
11        Q.    If there's any difference?
12        A.    I think that it's consistent
13   with the passage that you just read, and
14   that is, that it is my understanding
15   that -- first of all, I think it's in the
16   "Pathétique" sonata of Beethoven which
17   predates the "Symphony No. 5."
18   "Pathétique" is probably around 1899.
19   "The Fifth Symphony" was debuted in 1808.
20             And so it is my understanding
21   that the "Pathétique" piano sonata,
22   Opus 13, has that figure in it.  I can't
23   tell you offhand where that is, but I've
24   already read that other composers have
25   certainly written five, five, five, three.

Page 113

1              My point is that then I added
2    the fact that -- in my answer so it's
3    consistent with my answer -- then I added,
4    but don't forget that it's eight notes.
5              And one of the distinctive
6    things about it is that we're robbed of
7    the resolution of one which is not the
8    case in Diablo and "Levitating" which is
9    five, four, three, two, one.  That's in
10   major, the five, four, three -- three
11   minor, two, one, that would be minor
12   depending on, you know, what scale degree
13   you start.
14             So the point is that one of the
15   things that is memorable and moving about
16   the Beethoven is the robbing of the
17   resolution to scale degree one which is
18   absolutely not the case in "Dionne Diablo"
19   (sic) and "Levitating" which ultimately
20   move down to a -- more of a resolution
21   than, of course, is the case in the
22   opening of the Beethoven "Fifth Symphony."
23        Q.    By the way, thank you very much
24   for flattering me with recognizing what I
25   was trying to do.  So I appreciate that.

Page 114

```
 1                 Next thing, (clapping) are you
 2      familiar with the beginning of "We Will
 3      Rock You" by Queen?
 4                 MS. LEPERA:  Objection to form.
 5           A.    Yes.
 6           Q.    How does it --
 7                 MS. LEPERA:  Objection to --
 8           wait.  Wait.  Wait.  Objection to
 9           form.  The clapping is not a question,
10           and then there was a question.  So to
11           the extent the witness is answering
12           the question as opposed to confirming
13           that the clapping was representative
14           of the motif, I want to make that
15           objection.
16                 MR. BROWN:  We can strike my
17           poor clapping and -- rhythm and all.
18                 MS. LEPERA:  Thank you.
19           Q.    Going back, are you familiar
20      with the opening from Queen's "We Will
21      Rock You"?
22           A.    Yes.
23           Q.    How would you describe that
24      opening?
25                 MS. LEPERA:  Objection to form.
```

Page 115

```
 1              You can answer.
 2      A.    It's largely the way you clap
 3   conflated.
 4              (Whereupon, the Stenographer
 5      spoke.)
 6      Q.    Is there any musical way that
 7   you can write that if you were going to
 8   put it on a page --
 9              MS. LEPERA:  I have a question.
10              (Whereupon, the Stenographer
11      spoke.)
12      Q.    Let's go back to my questions.
13   I'll withdraw whatever thing is pending.
14   I'll try to rework it.
15              Is that original opening to a
16   song?
17      A.    I don't know.
18              MS. LEPERA:  Objection to form.
19      A.    I haven't done an analysis.
20      Q.    How many beats is the beats to
21   that?
22              MS. LEPERA:  Objection to form.
23      Q.    If you know.
24      A.    It's dum, dum, dum, dum, dum,
25   dum, and so I don't know -- I don't recall
```

Page 116

1    because I haven't listened to the opening
2    of the Queen song for a long time.  I
3    don't know how many times it repeats.  The
4    actual figure, obviously, is three notes
5    including the clap.
6         Q.    Would you consider that just a
7    building block?
8              MS. LEPERA:  Objection to form.
9         A.    I can't speculate as to that
10    because I haven't done the analysis within
11    the context of the whole, let alone with
12    the other works that predate Queen that
13    may have done the same thing.
14         Q.    You don't know whether that
15    excerpt by itself constitutes just a
16    building block?
17              MS. LEPERA:  Objection.  Asked
18        and answered.
19         A.    I've answered the question.  My
20    answer is the same.
21         Q.    I don't think you did.  I think
22    you answered it with conditions saying
23    that -- because you haven't done a full
24    analysis and because you haven't done a
25    prior arts.  And I'm asking you if you

Page 117

1    know one way or the other without doing

2    that whether that is a building block or

3    not.

4            MS. LEPERA:  Objection to form.

5        Misapprehends the entirety of the

6        witness's testimony.

7            But you can answer.

8        A.    You're asking me to suspend the

9    musicological expectations for an

10   analysis.  What I said is I can't answer

11   that without doing a proper musicological

12   analysis, and so that remains the same

13   answer for those reasons.

14       Q.    Are you familiar with the

15   litigation concerning Vanilla Ice and

16   David Bowie/Queen?

17           MS. LEPERA:  Objection to form.

18       No foundation.

19       A.    I know I was much earlier.  It's

20   been a while.  So I can't be explicit

21   about exactly what was at issue, but I do

22   know the case.

23       Q.    Are you familiar with the notes

24   at issue in that at all?

25           MS. LEPERA:  Objection to form.

Page 118

```
 1        A.      No, I'm not.  I don't recall.
 2        Q.      Do you know one way or the other
 3   whether that case implicated building
 4   blocks?
 5              MS. LEPERA:  Objection to form.
 6        A.      No, I do not.
 7        Q.      I didn't have -- strike that.
 8              How many cases have you and
 9   Geluso both provided expert reports for at
10   the same time?
11              MS. LEPERA:  Geluso.
12        Q.      Geluso.  Strike that.
13        A.      Could you repeat question,
14   please?
15        Q.      Do you know how many cases
16   Geluso has provided an expert report in
17   addition to you?
18              MS. LEPERA:  Objection to form.
19              You can answer.
20        A.      That is, in a case in which we
21   were both providing reports?
22        Q.      Yes.
23        A.      I don't, no.
24        Q.      Was it more than once?
25        A.      Yes.
```

Page 119

1     Q.    More than five times?

2     A.    Perhaps.

3     Q.    More than ten times?

4     A.    I doubt it.

5     Q.    Do you recall the first time he

6   issued a report with you?

7          MS. LEPERA:  Objection to form.

8     Characterization.

9     Q.    Strike that.

10         Do you recall the first time

11   that you and he both issued reports in the

12   same case?

13         MS. LEPERA:  Are you saying on

14     the same side or either way?

15     Q.    Either way.

16     A.    I do not.

17     Q.    Have you ever issued a report

18   that's adverse to Geluso?

19         MS. LEPERA:  Objection to form.

20         But you may answer it.

21     A.    I don't recall that I ever have.

22     Q.    On page nine of your report, you

23   use the term "popular music."  How do you

24   define popular music?

25     A.    Popular music is a broad

Page 120

```
 1    category that literally points to all
 2    popular music as opposed to what's called
 3    art music, classical music.  Art music
 4    subcategories under that would be dance
 5    music.  Popular music would include rap,
 6    would include country.  It's a very, very
 7    broad --
 8         Q.    When you're saying it's found in
 9    popular music, are you suggesting that the
10    music it's found in were hits of some
11    sort?
12              MS. LEPERA:  Objection to form.
13         A.    Can you point me to which
14    paragraph?
15         Q.    Sure.  The -- paragraph 20, last
16    sentence, that starts at, importantly, why
17    don't you take a moment and read that
18    sentence?
19         A.    Okay.  What I was
20    distinguishing -- and let me read it.  The
21    melodic similarity -- that's the melodic
22    similarity at issue; continuing -- is
23    merely the use of a musical building block
24    found in prior art dating back to at least
25    the 19th century and that is found in
```

Page 121

1    popular music that predates the release of

2    "Wiggle."

3                In the music of, for example,

4    Czerny and Arban and Löschhorn, either

5    exercise the studies, those are part of

6    19th century music, but they're certainly

7    not popular music.  Löschhorn, Arban,

8    Czerny is not popular music.  I was just

9    simply providing two broad categories.

10   Q.    So -- got you.  So it's not

11   suggesting that a popular music is a hit;

12   it's just suggesting that popular music is

13   the music not from the 19th century and

14   more modern?

15               MS. LEPERA:  Objection to form.

16   A.    That's exactly right.  So under

17   this large collection of probably millions

18   of works, you know, of the last century

19   would be something like "Stayin' Alive,"

20   1977 -- super hit by 1978 -- the Bee Gees,

21   from Saturday Night Fever, that would be a

22   hit, but I'm not suggesting that every

23   popular work was such a hit.  So I would

24   have to say yes to your answer, that that

25   is correct.  I'm not it suggesting that

Page 122

```
 1    all of these were hits as, of course,
 2    "Stayin' Alive" was.
 3          Q.     Which alleged prior arts were
 4    hits; if you know?
 5               MS. LEPERA:  Objection to form.
 6    Contained in his report?
 7          Q.     Which prior arts contained in
 8    your affirmative report were hits; if you
 9    know?
10          A.     Once again, "Stayin' Alive."
11    From the popular music?  I can't say
12    whether "Contestación" -- that's a
13    C-O-N-T-E-S-T-A-C-I-Ó-N -- was a hit;
14    however, it was -- as far as I know, it
15    was released by Trio La Rosa in 1958, and
16    as per my report, there are at least
17    eight covers of it, I think, seven of
18    which predate "Wiggle."  And on that
19    basis, I have to say it was a pretty
20    widely-distributed work.  So whether it
21    was a hit or not, I can't say.  I can't
22    say that it was a hit like "Stayin'
23    Alive."  So that would be the answer to
24    that.
25               In terms of "El Cafetal" --
```

Page 123

```
 1    that's E-L, new word, capital
 2    C-A-F-E-T-A-L -- I don't know.  That is an
 3    instrumental work.  I don't know whether
 4    that was a, quote/unquote, hit.  My
 5    understanding, in reading some of the
 6    background on "Se Dice" -- that's S-E,
 7    that's capital D-I-C-E -- that "Se Dice"
 8    was well known in Latin America.  Whether
 9    that would be considered a hit or not I
10    don't have sufficient data on.
11              And "Ging Gang Goolie" --
12    G-I-N-G, Gang, G-A-N-G, and Goolie,
13    G-O-O-L-I-E -- apparently well known in
14    the scouting community, but throughout the
15    world -- the international scouting
16    community starting in 1920.  And so that
17    may have quite a few people who know it,
18    but people -- or in the subcategory of the
19    scouting movement.  So I can't say whether
20    that was a hit.
21              And again, the idea of Czerny
22    being a hit or Löschhorn being a hit,
23    Arban being a hit is not apropos; however,
24    as a person who taught piano -- I started
25    giving piano lessons when I was about 15
```

Page 124

```
 1    and continued giving piano lessons
 2    privately for a while at NYU, but also
 3    privately until maybe the mid-1990s, I
 4    can't tell you -- I couldn't enumerate how
 5    many students studied Czerny under my
 6    tutelage.  Czerny may be the most used
 7    author, composer of studies -- student of
 8    Beethoven, the teacher of Franz Liszt, one
 9    of the greatest pianists ever.  He had so
10    many books -- School of Velocity, School
11    of Dexterity and so forth -- that -- and
12    so you want to talk about the piano study
13    repertoire?  Czerny's music is a hit.
14    It's widely known.  Löschhorn less so, but
15    certainly known.  Arban, it is iconic.
16    That book is absolutely iconic.  As I
17    said, my son playing, by the way, da, da,
18    da, da -- dum, dum, dum, dum, dum, dum,
19    dum, dum, dum, dum, dum, dum, this is a
20    standard trumpet exercise, by the way.
21    Not just trumpet.  It's four notes per
22    scale degree moving down the white notes
23    of the scale on a keyboard.  It's also
24    standard in string method books, C, C, C,
25    C, B, B, B, B, A, A, A, A, G, G, G, G.
```

Page 125

1    That's why we call it a musical building

2    block.  Today, you could probably point to

3    tens of thousands of students on trumpet,

4    on strings, violin, viola, cello, base,

5    who play that generic, commonplace

6    descending scale with four notes on each

7    pitch moving down scaliclly.

8              So for those reasons -- yeah,

9    Arban, the book itself, that's a hit;

10   again, a misnomer because of the genre,

11   but when it comes to trumpet studies, it's

12   "the" hit.  And again, what we're talking

13   about is something that those very

14   well-known works -- the Arban, the

15   Czerny -- are practiced.  They are

16   practiced as a basic exercise throughout

17   the world.

18        Q.    In your affirmative report, do

19   you do an analysis of the rhythmic value

20   of the notes?

21              MS. LEPERA:  Objection to form.

22        Which notes?  Which song?

23        Q.    In your affirmative report, do

24   you do any analysis of the rhythmic value

25   of the notes of the songs at issue?

Page 126

1          A.     You need to tighten that a
2     little bit more.  It's not just the
3     rhythmic value of the notes of the songs
4     at issue.  Do I do that in parts that are
5     not at issue?  I don't --
6          Q.     Just for the parts at issue.
7          A.     Thank you.  That's what I wanted
8     you to tighten.  Okay.  And so the answer
9     is:  Yes, identify them as 16th notes, and
10    that's part of the analysis, absolutely.
11         Q.     And do you recall how many
12    rhythmic value notes they had in common,
13    the three works at issue?
14              MS. LEPERA:  Objection to form.
15         Now you're conflating all three
16         together.  So that's objection Number
17         1.  Are you asking him what he found
18         or what he remembers?
19              MR. BROWN:  I'm ask asking him,
20         Number 1, what he remembers, but if he
21         doesn't remember, he's certainly
22         welcome to refer to the report.
23              MS. LEPERA:  That would be, I
24         think, the easiest solution.
25         A.     I appreciate that.  Then I can

Page 127

1    point the court and the reader of this

2    transcript to the proper musical example.

3            So let's go to "Wiggle" and "Don

4    Diablo" and the first transcription of the

5    melodies at issue.

6            So the first transcription is on

7    page 31 --

8            MS. LEPERA:  Yes.

9        A.    -- of my affirmative report, and

10   that is musical example 5A.  And what you

11   have there are "Wiggle" and "Levitating."

12   As you can see, all of the pitches -- this

13   is in parallel keys first -- all of the

14   pitches are different save for scale

15   degree seven in bar two.  So out of those

16   first 22 notes in "Levitating," in that

17   melodic phrase and 23 notes in "Wiggle,"

18   it is only scale degree seven on a

19   B-natural in "Wiggle" and B-flat -- which

20   is a different pitch -- in "Levitating"

21   that line up, and of course, the

22   difference is just as stark in the next

23   two bars.  That's the first.

24            Now we go to the next musical

25   example to continue my answer to your

```
1    question, how many line up.  This now

2    looks at the melodies at issue in "Wiggle"

3    and "Levitating" in relative keys, and

4    this is in musical example 5B on page 32.

5    And once again, even an untrained eye can

6    see, first, that the scale degrees are

7    essentially completely different except

8    for, once again, that scale degree seven

9    which lines up on the second half of beat

10   two in bar two; otherwise, scale degrees

11   are completely different.

12            How many pitches are the same?

13   Well, let's understand the definition of

14   melody presented early on in the

15   affirmative report.  Single line of notes

16   that essentially is constituted of pitch,

17   rhythmic duration within an overall

18   melodic phrase -- and rhythmic duration

19   also includes metric placement, but

20   rhythmic duration -- but here's the key:

21   The definition continues, pitch is

22   understood as the highness or lowness of a

23   sound within the musical scale, okay?

24            So while one can say, in

25   relative keys, that E, E, E, E, D are the
```

Page 129

```
 1    same pitches, they are on different scale
 2    degrees, and they function differently as
 3    per any musical dictionary.  So the first
 4    five would line up.  They are not the same
 5    in scale degree, but they are the same in
 6    pitch, rhythmic duration and metric
 7    placement, as I say in my analysis.  Then
 8    the next note -- that's the first five.
 9    The next note obviously is different:
10    Four is compared with three, that D as
11    compared with E.  The next note, that's D
12    as compared with E, they're both 16th
13    notes, that's Number 6.  They line up.  So
14    we've got six so far.  The next notes, the
15    end of beat two in bar one, it's a D in
16    "Levitating," but a C in "Wiggle."  By any
17    measure, not only are they different scale
18    degrees, but different pitches.  So that
19    doesn't work.  And of course, the rhythmic
20    duration is different because, in
21    "Wiggle," the C is held over.  So it's
22    length is actually that of an 8th note
23    because it's tied over.  And so the next
24    note -- the ninth note in "Levitating" is
25    obviously also not the same.
```

Page 130

1          So, so far, if my count is
2     right, we have six notes that are the same
3     in pitch, not the same in scale degree,
4     and the same in rhythmic duration and the
5     same in metric placement.
6          We continue.  So we have those
7     three.  So that's six, that's nine, ten,
8     11.  The next two are different, and then
9     we have four.  So we have 15 that are the
10    same going into bar two, 15 that are the
11    same in "Levitating" and "Wiggle" out of,
12    as I said earlier, 23 notes in
13    "Levitating."  And if I said 22 notes
14    earlier, I misspoke; it's 23 notes in
15    "Levitating," and here, in "Wiggle," it
16    is -- well, you have a tie.  So it's
17    23 notes.  So we're talking about five,
18    six, seven and five.  There's 12, 16.
19    Doing this on the fly, but 16 notes and
20    then the last note.  So 17 notes which
21    would be the same out of about 23.
22          Remember that there are --
23    there's prior art that has many -- and
24    it's in this section of the report -- that
25    has many more similar notes to this

Page 131

```
 1    portion of "Levitating" than "Wiggle"
 2    does.  And so those 17 notes, which are
 3    nothing more than moving down a scale on
 4    repeated notes, would be filtered out, in
 5    my opinion, based on sound musicological
 6    method.
 7         Q.    So that's 17 out of 23 notes, is
 8    that --
 9         A.    Well, that's only the first
10    two bars.  Then we move to the next
11    two bars wherein -- you know what?  I
12    miscounted.  Looking again -- just doing
13    this on the fly -- let me give you the
14    total number of notes in "Wiggle."  So
15    we've got 2, 6, 9, 10, 16, 20, 24.  So
16    there are 24 notes in that first melodic
17    phrase in "Wiggle," 17 of which line up,
18    and the way in which they line up is
19    simply based on moving down the scale.
20              Moving to the next portion which
21    is still a portion at issue, we have the
22    three pickup notes at the end of the first
23    staff, and then we have 4, 8, 12 -- 14
24    plus 3 is 15.  In the next bar, we have
25    another 9.  So once -- now we have 24
```

Page 132

1    notes at issue in "Wiggle," and I am

2    looking and there is zero -- once again,

3    zero lining up of identical notes.

4    Identical in pitch, identical in rhythmic

5    duration, identical in metric placement,

6    zero, and so, in fact, 17 out of, what,

7    maybe 46, 47 notes.  And what

8    characterizes those 17 notes that do line

9    up is merely a descending scale.

10        Q.    What does the term "rhythmic

11   value" mean to you, if anything?

12        A.    Rhythmic value would be the

13   rhythmic duration of a note:  An eighth

14   note, a quarter note, a 16th note.

15        Q.    How many of those line up?

16             MS. LEPERA:  Objection to form.

17        Q.    How many of those line up

18   between "Wiggle" and "Levitating," and

19   separately -- well, let's start with that.

20        A.    Sure.

21             MS. LEPERA:  If you understand

22        the question.

23             THE WITNESS:  I do.

24             MS. LEPERA:  Okay.

25        A.    So we are going to disregard

Page 133

```
 1    pitch which is the fundamental element of
 2    melody, and we're going to disregard scale
 3    degree which tells us the function of
 4    those pitches.  And we are only going to
 5    look at rhythmic duration and metric
 6    placement.  That is the rhythmic values.
 7         Q.    Yes, please.
 8         A.    So I understand the question.
 9         Q.    Thank you.
10         A.    All right.  Thank you.
11               So do you recall how many --
12    well, let me tell you the number in the
13    first phrase that are the same in value.
14    The first seven in "Levitating," then the
15    next two not, then the next five in
16    "Levitating" -- so that's 12 -- then the
17    next two not, the next four at bar two,
18    beat one are the same in rhythmic duration
19    and metric placement.  So that's -- did I
20    say -- how many did I say?
21               THE WITNESS:  Can you read the
22         record?  Forgive me.
23               (Whereupon, a portion of the
24         record was read back.)
25               "ANSWER:  Well, let me tell you
```

Page 134

```
 1          the number in the first phrase that
 2          are the same in value.  The first
 3          seven in "Levitating," then the next
 4          two not, then the next five in
 5          "Levitating" -- so that's 12 -- then
 6          the next two not, the next four at bar
 7          two."
 8          A.    Okay.  So 12 in the first bar,
 9    the first four notes in the second bar,
10    the next two notes -- well, the note with
11    the seven over it, it is the same rhythmic
12    value; they're completely different
13    pitches.  So that was -- 12 plus 4 is 16.
14    That's 17, 18.  So out of those first --
15    whatever we said -- 23, 24 notes, 18 have
16    the same rhythmic duration, again,
17    disregarding pitch, disregarding scale
18    degree.
19          Q.    Jumping to a melody question now
20    on this, if I may:  If you have a
21    descending pattern and then follow it with
22    some pickup notes, could the combination
23    of the descending pattern with the pickup
24    notes be considered original?
25                MS. LEPERA:  Objection to form.
```

Page 135

```
 1          Objection to the preamble about
 2          turning to melody.  And speculative.
 3          Out of context.
 4               You can answer.
 5      A.     There's no context for me to
 6  answer that question.  If you'd like me to
 7  answer that question within the context of
 8  these transcriptions, I'd be also happy,
 9  as I did earlier in my testimony, to point
10  to answers like this in the Salani and
11  Calello transcriptions.
12      Q.     I'm asking you about your
13  testimony.  So for "Levitating," for
14  argument's sake -- strike that.
15               For "Levitating" which begins
16  with the descending phrase and then has
17  some pickup notes, at what point would you
18  consider that to be original, if at all?
19               MS. LEPERA:  Objection to the
20          form of the question.
21      A.     This is literally the same
22  answer that I gave earlier -- much earlier
23  in my testimony.
24               The first 20 notes in
25  "Levitating" which are not nearly
```

Page 136

```
 1    identical to the notes in "Wiggle" in
 2    those corresponding parts, beats -- those
 3    first 20 notes, five, five, five, five,
 4    four, four, four, four, three, three,
 5    three, three, two, two, two, two, one,
 6    one, one, one, whether major or minor, but
 7    the point is that what you have there is a
 8    musical building block by any standard of
 9    musicology, whether you want to call it
10    commonplace, whether you want to call it a
11    musical building block based on how the --
12    how the chords have now adopted that term.
13    And I want to be consonant with that
14    understanding by the chords:  It doesn't
15    in any way abrogate the musicology; it's
16    based on musicology.  This is commonplace.
17              And so that portion, literally
18    the first five beats, the first 20 notes
19    in my transcription and, in fact, in the
20    transcription which, as I recall, is same
21    in Salani and Calello of "Levitating."  So
22    those first 20 notes are a musical
23    building block.  That would be filtered
24    out.
25              Let's look now -- because your
```

Page 137

```
 1    question had to do with the upbeat or the
 2    pickup that follows it, but what you have
 3    left out is beats two and three of that
 4    first musical phrase.  Let's look at them.
 5    We're looking at the second bar, once
 6    again, musical example 5B on page 32 of my
 7    affirmative report, and what we have after
 8    the first four 16th notes which are the
 9    last notes that are at issue -- that are
10    part of this building block, what you have
11    is A, A, 16th, 16th, B moving up and then
12    A moving down; whereas, in "Levitating,"
13    you have A, 8th note, not 16th note, not
14    two of them but one, you have not a
15    melodic contour of going up, you have the
16    opposite.  You're going down.  So whereas
17    "Wiggle" goes from six up to seven,
18    "Levitating" goes from one down to seven.
19    That's the difference.  There's a
20    difference not only in rhythm -- two 16ths
21    is an 8th compared to two 8th -- but it's
22    a difference also in melodic contour.  One
23    goes up and down.  The other is opposite;
24    it goes down and then up.
25                And so my point is -- and this
```

Page 138

```
 1    is consistent with my testimony --
 2    clearly, the first 20 notes going through
 3    bar two beat one, those first 20 notes are
 4    a musical building block.  Let's just
 5    simply call them commonplace, and they had
 6    been commonplace.  And so the point is
 7    that then what we have is a difference, a
 8    difference in beats two and three which
 9    I'm not going to be redundant and repeat.
10    I've just articulated those differences.
11    The only similarity is that single note A,
12    different scale degrees, and I mentioned
13    that in my earlier testimony.
14              Once you filter out from the
15    first melodic phrase the musical building
16    block, i.e., the commonplace elements that
17    are in these two melodies, all you have
18    left is A, a single note on beat three.
19              Now, let's continue with your
20    question because your question is about
21    the pickup notes, and as I state in at
22    least the footnote -- and I think -- I
23    would imagine that Calello and Salani
24    would agree -- that those pickup notes are
25    defined in Harvard, in Grove as notes that
```

Page 139

```
 1    are in front of a new melodic phrase.  So
 2    if you look at the end of the staff on
 3    "Wiggle" in, again, musical example 5B, in
 4    the first staff, the top staff, you have
 5    five, five, five.  That's part of the next
 6    musical phrase.  That's why we call it a
 7    pickup.  It's not part of the phrase that
 8    we just analyzed.  And now notice, even in
 9    relative keys below it, you have a single
10    note in "Levitating" which is the
11    corresponding pickup.  That's A.
12              So the answer to your question
13    is that when you add in the notes that
14    follow the 20 commonplace notes, you're
15    beset, from your standpoint, with
16    differences:  Differences in beat two, a
17    single note in beat three; and then a
18    stark difference, three Gs on scale
19    degree five as a pickup in "Wiggle" as
20    compared with one pickup note on scale
21    degree one.  And even if you were to
22    disregard scale degrees, three pickup
23    notes on the pitch G in "Wiggle," but one
24    pickup note on the pitch A in
25    "Levitating."  Those are starkly
```

Page 140

1    different.

2         Q.    Sticking with just "Levitating"

3    here, the one, seven, one, one part -- you

4    see that's the third -- part of the third

5    bar?

6         A.    The one, seven, one, one?

7         Q.    On page 325B where, after the

8    descending part, there's a one, seven,

9    one, one.

10        A.    Yeah.  What you have to be very

11   careful of, Counselor, is you just

12   conflated two phrases.  So one, seven, one

13   in "Levitating" are the last three notes,

14   as I explained, in the first melodic

15   phrase.  Those are the three notes that

16   follow the descending commonplace scale.

17   The A at the end of the staff, that is,

18   the second one that you just recited, is

19   part of the next musical phrase.

20        Q.    So the end -- the one, seven,

21   one, is that a building block?

22             MS. LEPERA:  Objection to form.

23        A.    I would have to look at this

24   within the perspective of a -- of a

25   complete analysis, but the point is this:

Page 141

```
1    One, seven, one is a fragment.  It would
2    be below any sense of sufficient --
3    sufficiently significant expression to be
4    meaningful.  And so one, seven, one at the
5    end of a 23-note melodic phrase is just
6    simply minimal.  It's fragmentary.  I
7    don't know how else outside of that I
8    would point to it, but whether or not I
9    would call it a musical building block, it
10   isn't the point --
11        Q.    But it's my question.
12        A.    Yeah.  But the point is --
13             MS. LEPERA:  Whoa, whoa, whoa,
14        whoa.  Time out.  Start over.  Let's
15        ask a question.
16        Q.    I apologize.  I'm not trying to
17   be rude.  I'm just trying get answers to
18   my questions.
19        A.    Okay.
20        Q.    So you don't know one way or the
21   other whether one, seven, one would
22   constitute a building block; yes or no?
23             MS. LEPERA:  Objection to form.
24        Mischaracterizes.  Misapprehends.
25             You can answer.
```

Page 142

```
 1        A.     What I'm saying is that if, for
 2    example, one, seven, one was the opening
 3    melodic phrase in a work at issue like
 4    Newton, three notes separated by a half
 5    step, if that were the case -- and that
 6    was what was at issue -- I would say that
 7    that is a commonplace and trite -- which
 8    is my testimony in that case, cited again
 9    by Judge Manela and the ninth circuit --
10    it's commonplace and trite.  If one wanted
11    to call that a musical building block
12    standing by itself, then one certainly
13    might.  I haven't done the research on
14    that particular down and up.
15            But point is:  It's fragmentary
16    and commonplace, and to the extent that
17    commonplace is, again, what musicologists
18    have used and now what courts are calling,
19    in some cases, building block and what I
20    believe other musicologists are now
21    embracing, then one might find that those
22    three notes are a musical building block.
23    The point is that, by themselves, they are
24    simply fragmentary and commonplace.
25            Here, they are just simply a
```

Page 143

```
 1    fragment of an otherwise much longer
 2    melodic phrase.
 3        Q.    But at what point do fragmentary
 4    expressions that might just be building
 5    blocks become original?
 6            MS. LEPERA:  Objection to form.
 7        Incomprehensible question.
 8            MR. BROWN:  I think it's at the
 9        heart of the case here.
10        Q.    Because I'm trying to understand
11    your testimony -- I still don't.
12            At what point -- strike all my
13    preamble.
14            MS. LEPERA:  Yeah.
15            MR. BROWN:  I apologize, but --
16            MS. LEPERA:  It's okay.  I'm
17        trying -- let's get a question we all
18        comprehend.
19            MR. BROWN:  Thank you.
20            MS. LEPERA:  Yeah.
21        Q.    At what point do
22    cobbled-together building blocks become
23    something that's not a building block?
24        A.    That's --
25            MS. LEPERA:  Objection to form.
```

Page 144

1        Speculative.

2        A.    That's speculative.  You're

3    asking me to speculate without a score in

4    front of me.  What I have testified to

5    here is that one, seven, one, at the end

6    of a 23.  That is, those last three

7    notes -- at the end of a 23-note melodic

8    phrase is fragmentary and unremarkable,

9    and I have no doubt that I would be able

10    to find -- given the fact that this is not

11    even a standalone one, seven, one, but

12    just simply part of a larger melodic

13    phrase -- that I would be able to find

14    countless works with melodies that have

15    one, seven, one in them.

16        Q.    And that's what I'm -- if you

17    keep distilling a song into four notes,

18    portions, isn't everything building

19    blocks?

20        MS. LEPERA:  It's been asked and

21        answered this morning.  And

22        speculative.

23        A.    It's not only speculative, it

24    misrepresents my analysis.  That is

25    precisely not what I've done.  I haven't

Page 145

```
 1    taken fours notes; I've taken 20 notes,
 2    and I've shown that those 20 notes in "Don
 3    Diablo" -- which are closer than the notes
 4    in "Wiggle" as compared to "Levitating,"
 5    but not the same -- are identical in
 6    Czerny Opus 299, identical in rhythmic
 7    duration, identical in pitch, identical in
 8    scale degree, identical in melodic
 9    placement.
10            So the point is:  You have a
11    19th century work that is more similar,
12    literally identical where there are
13    differences even between Diablo and
14    "Levitating."  So I have not essentially
15    fractionalized; I've taken that whole
16    20 notes over a 23-note melodic phrase and
17    said, once you take out those 20 notes,
18    there's only one note in the next notes
19    that lines up, and by any standard, by
20    common sense, that one note is not
21    significant.
22       Q.    And what I'm saying is:  If you
23    keep filtering building block after
24    building block, you have nothing left,
25    right?
```

Page 146

```
 1          A.      That misrepresents --
 2                  MS. LEPERA:  Objection to form.
 3          Q.      I'm not saying about this song
 4     in general; I'm saying about the technique
 5     in general.
 6                  MS. LEPERA:  Objection to form.
 7          Misapprehends.  Mischaracterizes.
 8                  You can answer.
 9          A.      It misrepresents the analysis
10     that I, not only just recounted, but
11     that's in my report because it's not
12     building block after building block; it is
13     one building block, a 20-note building
14     block that's in Czerny and then in other
15     prior art and, in some cases, more similar
16     in that prior art than any similarity
17     between even "Don Diablo" and
18     "Levitating."
19                  So what you have said
20     mischaracterizes the analysis.  It's not
21     building block after building block, it is
22     not a -- an infinite regress where you
23     say, well, these three notes are no good
24     and these three notes are no good.  That's
25     not what my analysis has done -- this is
```

Page 147

1    not what my analysis has done, and this

2    certainly misrepresents my testimony.

3         Q.    I'm not trying to misrepresent

4    your testimony.  I'm trying to understand

5    the technique.  And I'll hit it one more

6    time, one last question, and I'll move on.

7              So if you were then additionally

8    filtering and said, let me look to see if

9    one, seven, one is also a building block,

10   how would you be left with anything

11   original at the end of the day?

12             MS. LEPERA:  Objection to form.

13        Outside the context of the analysis

14        with respect to the comparison.

15        A.    It's quite misguided, the

16   presumption -- or the assumption, if you

17   will, in your question.  Once again, I'm

18   repeating testimony -- and forgive me --

19   but those three notes, the first two of

20   which are different from the corresponding

21   notes in beat two of "Wiggle."  So first

22   of all, they're filtered out because

23   they're different.  That's part of the

24   filtering process, not just to filter out

25   notes that are in prior art and, in fact,

Page 148

1   part of the musical building block, the

2   first 20 notes which are clearly there,

3   clearly shown in my report, but the next

4   two notes that you continue to talk about,

5   the next two of the three, are different.

6   They're filtered out.  All that you're

7   left is one.  That's the first part.

8           The second part is:  As a result

9   of that, these three notes are not even at

10  issue.  The only note that is at issue is

11  the final note, A, and from common sense,

12  A is something that is not a significant

13  similarity.  I have not suggested that

14  one, seven, one is anything more than a

15  fragment.  That's it.  But the point is:

16  It's -- the first two notes are different

17  and, therefore, don't require anything

18  more than the filtering process.

19      Q.    Going to drumming, page 21.

20      A.    21 is the drum legend?

21      Q.    The drum legend.

22      A.    Go ahead.

23      Q.    This commonplace and basic --

24  quote, this commonplace and basic rhythmic

25  pattern --

Page 149

1        A.    Oh, I'm sorry.  Where are you?

2   Oh, you're in the middle of paragraph 37.

3        Q.    -- was greatly popularized in

4   disco music of the 1970s before the

5   release of "Wiggle."

6             Is it relevant at all that the

7   creators of "Levitating" were trying to

8   emulate a disco beat?

9             MS. LEPERA:  Objection to form.

10   No foundation.

11        A.    Well, first, let's correct for

12   the record the fact that what you left

13   out -- you started with, this commonplace

14   and basic rhythmic pattern was greatly

15   popularized in disco music of the 1970s --

16   indeed it was, no one can deny -- but what

17   you left out is what I was talking about

18   which is in the previous sentence, and

19   that is that the only rhythmic similarity

20   in the drumbeats and percussion rhythms in

21   "Wiggle" and "Levitating" is four quarter

22   beats per bar on the kick -- also called

23   the bass -- drum termed a, quote, four on

24   the floor, end quote, rhythm as seen in

25   the lower portion of the staffs.  You left

1    that out.

2              So the point is, what I am

3    saying is that:  Four on the floor --

4    which is dum, dum, dum, dum -- and every

5    bar in quarter notes, this is something

6    that was already well known, well used,

7    commonplace in disco music before 1978,

8    before 1979.  Indeed, in "Stayin' Alive,"

9    it's not just in the portion at issue, it

10   is virtually throughout the entire song,

11   four on the floor where the kick drum

12   plays quarter notes in every bar on one,

13   two, three, four.

14       Q.    What I'm asking:  Is it an

15   extrinsic factor that the creators --

16   strike that.

17             Is it an extrinsic factor that

18   the "Levitating" authors try to emulate a

19   disco sound -- is that something extrinsic

20   that has no bearings on your analysis?

21             MS. LEPERA:  Objection to form.

22       No foundation with respect to that

23       contention.

24             But you can answer.

25       A.    To the extent that the overall

                                    Page 151

1    style, in the broadest sense, of
2    "Levitating" would be a kind of pop dance,
3    and dance is a very, very broad category
4    that can include, you know, early disco
5    and dance music and so forth.  To the
6    extent that they did say that -- and I
7    don't know that they said that -- to the
8    extent that they said that, that would be
9    consistent with a -- with the use, at
10   times, of a four on the floor because
11   that's -- you know, that is consistent
12   with dance music.
13            So to the extent that they were
14   in some way interested in that style,
15   well, yes, but that is not even remotely
16   probative of copying "Wiggle" or "Don
17   Diablo" because the rest, as per the
18   transcription which you haven't pointed to
19   on the previous page which puts the
20   percussion music and drums in "Wiggle"
21   over that in "Levitating," shows
22   unequivocally, objectively that they are
23   vastly different, save for this four on
24   the floor commonplace rhythm.
25        Q.    How often is cowbell used in

                              Page 152

1     instrumentation?

2              MS. LEPERA:  Objection to form.

3         A.    In the instrumentation of what?

4         Q.    Pop music.

5              MS. LEPERA:  Oh, not in the

6         context of these songs, just in the

7         world?

8         Q.    In pop music in general?

9         A.    I think it has to have been used

10    in thousands of songs, cowbell.

11        Q.    And is cowbell a common thing in

12    these songs?

13             MS. LEPERA:  Objection to form.

14        A.    I don't understand the question.

15        Q.    Is -- both "Don Diablo" and

16    "Levitating" use a cowbell, correct?

17        A.    Let's go to the explication of

18    instrumentation so that we're absolutely

19    clear --

20        Q.    Let me withdraw the question

21    because I want to try to get through

22    everything we can in time, and when we hit

23    that page, potentially --

24             The different tempos between 103

25    and 106, if -- strike that.

Page 153

```
 1                 I understand your argument that
 2      the phrase at issue is just building
 3      blocks.  Assuming it wasn't building
 4      blocks and "Wiggle" and/or "Don Diablo"
 5      are considered original nonbuilding
 6      blocks, how significant is it that the
 7      beats per minute were 103 versus 106, if
 8      anything?
 9                 MS. LEPERA:  Objection to form.
10          A.     The difference in tempo is not
11      significant.
12          Q.     On page 26, I'm going to read a
13      quote from your report.  I want to read
14      paragraph 56 -- and I want to be
15      completely fair to you; I'm not trying to
16      trick you by reading a portion of a
17      sentence and then leaving out a preamble,
18      but I do have a question.  Did you have a
19      chance to read paragraph 56?
20          A.     I just perused it, yes.
21          Q.     In the second sentence, I --
22      quote, I found ample musicological support
23      that "Levitating" was independently
24      created.
25                 I had asked you earlier about
```

Page 154

```
1    originality, and now we'll go with
2    independently created.  Would it change
3    your analysis at all if one of the alleged
4    authors of "Levitating" admitted to
5    directly copying from "Wiggle" and/or "Don
6    Diablo"?
7              MS. LEPERA:  I believe that was
8         asked and answered as well.
9              But you can answer that again.
10             MR. BROWN:  It wasn't because we
11        used the term "originality" before.
12             MS. LEPERA:  Well, he
13        explained -- whatever.  I'm not going
14        to go.
15             You understand the question?
16             THE WITNESS:  I do.
17        A.    The key, for me, as a
18   musicologist, is not on access or on
19   statements that are purported or not by
20   writers.  This is very plain and clear.
21   When you have so much prior art, when the
22   content of the expression at issue is
23   nothing more than a descending major scale
24   in Plaintiff's work and minor scale in the
25   Defendant's work, when it is that
```

Page 155

```
 1    simplistic, then to the extent that there
 2    is so much prior art widely available to
 3    the writers of both songs, that provides
 4    musicological evidence of that supports
 5    the finding that the writers of
 6    "Levitating" created "Levitating"
 7    independent of "Don Diablo" and simply use
 8    in what is at issue -- just essentially
 9    those 20 notes -- that those 20 notes were
10    already commonplace and widely available
11    to everyone.
12        Q.    But it wouldn't affect your
13    actual report had you known that they
14    admitted -- and I'm not saying they
15    have -- but had you known that they
16    admitted that they copied directly from
17    "Don Diablo," you still would have used
18    the word they "independently created it"?
19            MS. LEPERA:  Objection to form.
20        A.    What I would say is that the --
21    to the extent that the musicological
22    evidence shows that what was available to
23    the writers of "Wiggle" and "Don Diablo"
24    and "Levitating" which was so widespread
25    and, indeed, as I showed here -- and this
```

Page 156

```
 1    is just the tip of the iceberg -- any
 2    number of works post-"Don Diablo" but
 3    pre-"Levitating" that also use a
 4    descending scale and so forth and
 5    repetition of notes -- the point is that
 6    by the time you get to "Levitating," it's
 7    not just all of that 19th and 20th century
 8    prior art to "Wiggle" that's widely
 9    available to the writers of "Wiggle" and
10    the writers of "Don Diablo," but you have
11    now even more prior art prior to
12    "Levitating" -- not prior to "Don Diablo,"
13    as I stated in the report -- that makes it
14    even more widely available to the writers
15    of "Levitating."  When you have that level
16    of substance in prior art, when you have
17    essentially a five, four, three, two, one
18    descending scale -- which is a musical
19    building block by any perspective -- then,
20    indeed, it would be correct
21    musicologically to say that the evidence
22    points, given this wide availability, to
23    independent creation.
24         Q.    So you still would have kept the
25    same language, is that a yes?
```

Page 157

```
 1        A.    I can't say because I haven't
 2   read your purported statement, how it was
 3   worded, what it referred to.  Did they say
 4   anything very specific about the -- about
 5   any part of "Levitating"?  This part of
 6   "Levitating" was copied from this part of
 7   "Don Diablo."
 8            You haven't given -- you've
 9   simply given me a speculation, and
10   therefore, you're forcing me to answer
11   speculatively, but it does not impact on
12   the nature of the methodology that was
13   used in this report which I have used for
14   years, which is accepted.  It's been
15   accepted by courts which is accepted in
16   musicology.  So your speculation is simply
17   beside the point and does not impact at
18   all on the analysis in this report.
19        Q.    You then mention, in
20   paragraph 57, the sole similarity at issue
21   only occurs in portions of the verses.
22            And what do you mean by that?
23        A.    Exactly what it says.  As per
24   the report, the similarities at issue in
25   "Wiggle" and "Don Diablo" are in bars one
```

Page 158

```
 1    through four of the verses.  There are
 2    two verses, and so you have essentially
 3    eight bars at issue.
 4              In "Levitating" the -- instead
 5    of ten-bar verses -- which is the case in
 6    "Don Diablo" and "Wiggle" -- the verses in
 7    "Levitating" are eight bars.  So the
 8    length of the verses is different.  In
 9    "Levitating," the development of the
10    melody, as I showed, that's at issue, the
11    two-bar melody, is quite different.  So in
12    "Levitating," you have the first two bars
13    which are then largely repeated in
14    bars three and four.  Then bars five and
15    six are completely -- are quite
16    different -- not completely, but quite
17    different, and bars seven and eight are
18    identical to bars one and two.
19              So the portion of the verses at
20    issue -- and this is all in my report --
21    the portions of the verses at issue in
22    "Levitating" -- there are two verses --
23    are bars one and two, three and four,
24    seven and eight of an eight-bar verse.
25    Once -- since that repeats, it's 12 bars
```

Page 159

```
1    out of the total number of bars.  That is
2    what this points to.  That essentially --
3    and that's all, of course, explained that,
4    essentially, it's bars one through four at
5    issue in the verses, not bars five through
6    ten; they're different.  Bars one through
7    four and seven and eight in the verses of
8    "Levitating."  That's what this refers to.
9        Q.    Page 29, stylistic question for
10   you.  You, I think, underlined any melodic
11   similarity in "Wiggle" and "Levitating" is
12   insignificant and is a musical building
13   block.
14              Just out of curiosity, why did
15   you decide to underline that and put it by
16   itself?
17       A.    It's underlined because it's a
18   subcategory -- it's a sub -- what is the
19   right word?
20              MS. LEPERA:  Heading?
21              THE WITNESS:  A subheading.
22       Thank you.
23       A.    It is a subheading.  All of the
24   subheadings throughout the report are
25   underlined.
```

Page 160

1        Q.    Did -- strike that.

2              MR. BROWN:  We can take a break.

3              MS. LEPERA:  If the court

4        reporter needs one, we definitely take

5        one.  They get priority on that.

6              THE VIDEOGRAPHER:  Off the

7        record.  The time is 2:47 p.m.

8              (Whereupon, a recess was taken.)

9              THE VIDEOGRAPHER:  Back on the

10       record.  The time is 3:08 p.m.

11       Q.    Doctor, I remind you you're

12   still under oath.

13       A.    Thank you.  Yes.

14       Q.    Is there anything about the

15   first two bars of "Levitating" that's not

16   just a building block?

17             MS. LEPERA:  Objection to form.

18       Verse?

19       Q.    At issue?

20       A.    As per my report and my

21   testimony, at least several times today,

22   the first 20 notes of -- as I recall,

23   23 notes are a musical building block.  So

24   the answer would be:  The following three

25   notes are not part of the musical building

                              Page 161

```
1    block, the first two of which were
2    filtered out, not because they are a
3    building block, but because they were
4    different from corresponding notes, in
5    that case, I think, "Wiggle."
6         Q.    For purposes of today's
7    deposition, we furnished you with an
8    official exhibit that's Plaintiff's
9    Exhibit Number 1 that will be introduced
10   it to the record.  We're also furnishing
11   you with a informal copy of that Exhibit 1
12   so you can look at the different pages
13   that you put where you had transcriptions
14   and to make it easier.  So just so we're
15   all on the same page here about that.
16            And I think the first example
17   that comes up in your report is the -- and
18   forgive me if I can't pronounce it --
19   "Contestación A La Casa En El Aire."  And
20   we look at page 38.
21        A.    Can I just correct the record?
22   It is not the first example in my report.
23   It's probably the first example of prior
24   art.
25        Q.    That's what I'm referring, prior
```

Page 162

1    art.  Actually, let's go to page 40 for
2    "Wiggle."
3                MS. LEPERA:  Okay.  So for the
4         record, you're referring the witness
5         to his musical example eight on
6         page 40.
7                MR. BROWN:  And 116 for "Don
8         Diablo."
9                MS. LEPERA:  And for the record,
10        you're referring the witness to his
11        musical example 44 on page 116; is
12        that correct?
13               MR. BROWN:  Correct.
14               MS. LEPERA:  Okay.
15   A.      Oh, it's interesting.  You don't
16   have red -- excuse me, Counselor.
17               MS. LEPERA:  Oh, he doesn't have
18        the color coding.
19   A.      You don't have red color coding
20   in this marked exhibit.  You must have red
21   color coding.
22               MS. LEPERA:  Here's what we can
23        do.  I saw in review, and you can
24        examine it on a break.  Why don't we
25        substitute my copy which I just gave

Page 163

```
1              him which is what you said to be the
2              informal copy which is color coded,
3              and we can use this as the official
4              Plaintiff's 1, and then he can just
5              separate the major numbers out and
6              just use this by itself and get rid of
7              that, right?  And maybe, if we need an
8              extra copy, we can use it because you
9              do want to see the color coding for
10             both your musical examples.  So if
11             that's okay, let's just put the -- for
12             now.
13                  THE WITNESS:  What I can do is
14             stay with this one copy --
15                  (Whereupon, simultaneous
16             conversation took place disrupting the
17             record, and the court reporter
18             requested one person speak at a time
19             without interruption from anyone
20             else.)
21                  MS. LEPERA:  Yes.  Yes.  Because
22             they're loose.
23                  THE WITNESS:  So tell me again.
24                  MR. BROWN:  Our 116, it wasn't
25             color copied in the PDF.
```

Page 164

1           MS. LEPERA:  Well, there's a red
2      in the 244 so -- you know, but that
3      may be talking about the next page so
4      I don't know --
5           THE WITNESS:  I'm talking about
6      the next page --
7           (Whereupon, simultaneous
8      conversation took place disrupting the
9      record, and the court reporter
10     requested one person speak at a time
11     without interruption from anyone
12     else.)
13          THE WITNESS:  -- musical --
14     starting with musical example 45, you
15     should have red color.  The copy that
16     I received as the -- as the official
17     copy --
18          MS. LEPERA:  Yeah, he doesn't
19     have it.
20          THE WITNESS:  Doesn't have it.
21          MR. BROWN:  That's fine.  I
22     don't know how much this will impact,
23     but.
24          MS. LEPERA:  It's on the same
25     song too.  So that's why I mentioned

Page 165

1        it.  So starting just -- let's make
2        sure the record is clear what we're
3        looking at.  We are looking at -- and
4        we've substituted for the record now
5        the copy -- loose copy of
6        Dr. Ferrara's affirmative report that
7        we made.  I'll represent it's a true
8        and accurate copy of his affirmative
9        report with color coding.  We are
10       looking at musical example eight which
11       is page 40 of his report, and we are
12       looking at musical example 44, at
13       minimum, page 116 of his affirmative
14       report, yes?
15            MR. BROWN:  Yes.
16            MS. LEPERA:  Okay.
17       Q.    And let's also agree when we
18  talk about the works at issue you
19  understand that to mean what, Doctor?
20       A.    In the case of musical
21  example eight, "Wiggle" and "Levitating."
22  In the -- and that's on page 40.  In the
23  case of musical example 44 on page 116,
24  "Don Diablo" and "Levitating."
25       Q.    For "Contestación," the

```
1    turnaround has 16th notes descending one
2    half step for five beats each?
3         A.    How are you using the term
4    "turnaround"?  You mean "pickup"?
5         Q.    Where we start from the -- from
6    the part where those five, five, five,
7    five.
8              MS. LEPERA:  Objection to form.
9         When you say "where we start," there
10        are three notes before that.  Are you
11        eliminating that.
12             MR. BROWN:  For purposes of
13        discussion for now.
14             MS. LEPERA:  Okay.
15        A.    The only place that I see -- I'm
16   looking at musical example eight.  The
17   only place where I see five, five, five
18   are the last five notes of the first
19   score -- the whole score is considered,
20   you know, the three staffs, okay?  So that
21   whole score, that would be the last three
22   notes in "Wiggle" at the end of that staff
23   which are the pickup to the next phrase in
24   "Wiggle."  Is that what you are referring
25   to?
```

Page 167

```
 1        Q.    No.   I apologize.   I'm referring
 2    to "Contestación."
 3        A.    So where do you see five, five,
 4    five, three of them only?
 5        Q.    Five, five, five, five, maybe
 6    four.   I'm sorry.   I apologize.
 7        A.    Okay.  All right.  So --
 8            MS. LEPERA:  Is there a
 9        question, though?
10        A.    Is there a question?  I was just
11    going to ask about that five, five, five,
12    five.
13            (Pause in proceedings.)
14            MS. LEPERA:  While you're --
15        whatever you're doing, I just have a
16        quick question, and maybe for ease
17        with the witness, unless you don't
18        want it, there are two other musical
19        examples regarding "Contestación" with
20        respect to "Wiggle" and "Don Diablo"
21        comparing to "Levitating" which is
22        musical example 9 and musical example
23        45 which have the red designations.
24        Do you want him to, ease of reference,
25        bring those out as well?
```

Page 168

```
 1              MR. BROWN:  If he needs to.  I
 2       don't think he needs to.
 3              MS. LEPERA:  Okay.
 4              MR. BROWN:  Thank you, though.
 5              MS. LEPERA:  It means you can.
 6       Q.    In "Contestación," does the
 7   placement of the final note of the musical
 8   phrase within a measure contribute to the
 9   originality?
10              MS. LEPERA:  Objection to form.
11       A.    It's not clear what you're
12   talking about.  What phrase?  The first
13   phrase?  The second phrase?
14       Q.    The phrase starting with -- the
15   phrase starting with one, one, one, one.
16              MS. LEPERA:  Objection to form.
17              You can answer.
18              Well, maybe, can you repeat the
19       question?  Because I think we've lost
20       the context.  You want to try to read
21       it back?
22              MR. BROWN:  I will ask a
23       different question.
24              MS. LEPERA:  Okay.
25       Q.    Do the 16th notes in the second
```

1   beat of the second bar of "Contestación"

2   contain a melody that appears in

3   "Levitating"?

4           MS. LEPERA:  Objection to form.

5           Do you understand the question?

6           THE WITNESS:  Somewhat.  So I

7       want to make sure that I do.

8           MS. LEPERA:  You can ask for

9       clarification.

10      A.    So in terms of clarification,

11  are you pointing to the four 16th notes

12  with the scale degrees two, one, seven,

13  one on beat two of "Contestación"?

14      Q.    Yes.

15      A.    And what is the question?

16      Q.    Is that a melody that also

17  appears in "Levitating"?

18      A.    No.  And neither does the

19  corresponding melody on that beat in

20  "Wiggle" occur in "Levitating," and of

21  course, it's been -- that's why the first

22  and the third notes that are in beats two

23  and three in "Levitating" are canceled

24  out.

25      Q.    I understand what you're saying

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

1    with other parts of the case and you have
2    your testimony, sir, but what I'm asking
3    is a very particular question:  Between
4    this and "Wiggle"?
5         A.    Okay.  So let me answer it very,
6    very precisely.  In the -- I believe, the
7    Salani report in the transcription of 4A,
8    she puts a rectangle.  She's actually
9    quite correct.  The first 20 notes in that
10   red rectangle, she says, are at issue.  I
11   agree with that.  And so the point is --
12   and what is important in the assumption in
13   your question is that the first 20 notes
14   that precede beat two of "Contestación" on
15   scale degrees two, one, seven, one are
16   what's at issue, not only as far as I'm
17   concerned, but as far as your expert,
18   Salani.  And so yes, of course, those four
19   notes are not the same, but they're not at
20   issue, neither are those notes in the
21   corresponding melodies.
22        Q.    I appreciate that, but that --
23   as long as we answer the questions that I
24   ask, I'd appreciate it moving forward.  I
25   understand what your testimony is.  I

Page 171

```
 1    understand that's in the report.  I
 2    understand what you think is at issue, but
 3    even though, respectfully, you don't think
 4    it's at issue, I'm still going to ask the
 5    question.
 6              MS. LEPERA:  Can I ask you:
 7       Maybe, are you trying to ask him this?
 8       Are you trying to ask him whether
 9       beat two -- beginning in beat two of
10       "Contestación" and beat two of
11       "Levitating" in the second measure
12       from that point forward are the same?
13              MR. BROWN:  I'm asking if
14       they're different.
15              MS. LEPERA:  Okay.  Different or
16       the same?
17       A.    Yes, as "Wiggle" and
18    "Levitating" are as well.  Yes, of course.
19       Q.    Are the notes between
20    "Contestación" and "Levitating" different
21    for the second beat of the second bar?
22              MS. LEPERA:  Second part.
23       A.    Second part, yes.  And asked and
24    answered.  Two, one, seven, one as
25    compared to one, seven, one is different.
```

Page 172

```
 1    They have the same melodic contour.
 2    That's important.  It's not, you know,
 3    terribly significant, but the point is:
 4    It has the same contour as "Levitating."
 5    It goes from scale degree from -- it goes
 6    scale degree two down to one, back up to
 7    scale degree two.  That's what happens in
 8    "Levitating."  It goes down to seven and
 9    up to one; whereas, in "Wiggle," it's the
10    opposite.  But the point is:  While there
11    is similarity in the melodic contour on
12    beat two and going into beat three of
13    "Contestación" and "Levitating," they are
14    not identical.
15              MS. LEPERA:  I thought he said
16        "part."  Did you say "bar"?
17              MR. BROWN:  I did say bar.
18        Q.    Would that make you change your
19    answer at all, if it's bar or part?
20        A.    I'd have to hear the question
21    again.
22        Q.    Would the notes between
23    "Contestación" and "Wiggle" be different
24    from that point?
25              MS. LEPERA:  Objection.  Can you
```

Page 173

```
 1            just clarify, when you say "from that
 2            point," what you mean precisely.
 3            Q.    The second beat of the second
 4      bar of "Contestación."
 5            A.    They are different, yes.
 6            Q.    And what about for the
 7      comparator between "Contestación" and "Don
 8      Diablo"?  Are they different?
 9            A.    The what?
10            Q.    If you were comparing between
11      "Contestación" and "Don Diablo" --
12                  MS. LEPERA:  So we're going to
13            musical example 44 now?
14                  MR. BROWN:  Yes.
15                  THE WITNESS:  Thank you.
16            A.    Okay.
17                  MS. LEPERA:  So the question is
18            clear -- and, Jason, you're making --
19                  MR. BROWN:  I'll rephrase the
20            question.
21                  MS. LEPERA:  Thank you.
22            Q.    Do the 16th notes in the second
23      beat of the second bar of "Contestación"
24      contain the melody that appears in "Don
25      Diablo"?
```

Page 174

1           A.      The answer is -- we can make
2    this much faster if you wish -- insofar as
3    the notes on beats two and three are the
4    same in "Wiggle" and "Don Diablo" -- once
5    again, the notes on beats two and three of
6    bar two are the same in "Don Diablo" and
7    "Wiggle."  All of the answers that I gave
8    previously with respect to "Wiggle,"
9    "Contestación" and "Levitating" fully
10   obtain with respect to musical example 44
11   on page 116, "Don Diablo."
12               Does that help?
13        Q.      I appreciate the answer.  Thank
14   you.
15               Does the musical phrase in the
16   first two bars of "Levitating" end with a
17   quarter note on bar two, beat three?
18               MS. LEPERA:  Okay.  We have
19        documents in front of us.  What
20        document are you referring to?
21               MR. BROWN:  Could refer to
22        either.
23               MS. LEPERA:  Well, musical
24        example eight to start or musical
25        example 44?  Which one do you prefer?

Page 175

```
 1        Q.    Do eight.
 2        A.    Okay.  Please repeat the
 3   question with respect to musical
 4   example eight on page 40.
 5        Q.    Does the musical phrase in the
 6   first two bars of "Levitating" end with a
 7   quarter note on bar two, beat three?
 8        A.    End on a quarter note in bar two
 9   on?
10        Q.    Beat three.
11        A.    Beat three, yes.
12        Q.    Does the musical phrase in the
13   first two bars of "Wiggle and Giggle" end
14   with a quarter note on bar two, beat
15   three?
16        A.    Yes.
17        Q.    Does the musical phrase in the
18   first two bars of "Contestación" end with
19   an eighth note on the end of bar two,
20   beat three?
21        A.    On the second half of beat three
22   in bar two, yes.
23        Q.    Did I ask about "Don Diablo"?
24   Does the musical phrase -- if we go to the
25   other exhibit, does the musical phrase in
```

Page 176

1    the first two bars of "Don Diablo" end

2    with a quarter note on bar two, beat

3    three?

4         A.    Yes.

5         Q.    Let's move to "El Cafetal."

6         A.    May I spell that?  Shall I spell

7    that --

8         Q.    Yeah, sure.

9         A.    -- for the record?

10        Q.    Yes, please.

11        A.    Cafetal, C-A-F-E-T-A-L.

12        Q.    And that would be page 45 and

13   120.

14             MS. LEPERA:  Okay.

15        A.    I have 45.

16             The second set for "Diablo"?

17        Q.    120.

18        A.    120.

19        Q.    Does bar two from "El Cafetal"

20   contain rhythmic differences from

21   "Levitating?"

22        A.    Yes.

23        Q.    Does it contain rhythmic

24   differences from "Wiggle and Giggle"?

25        A.    Yes.

                                    Page 177

1      Q.    Does it contain rhythmic

2   differences from "Don Diablo"?

3      A.    Yes.  In all of those cases, the

4   rhythmic differences begin on beat two of

5   bar two, the first beat of which is part

6   of the 20 notes that are at issue in

7   "Levitating" and "El Cafetal."

8      Q.    Would you say bar two of

9   "El Cafetal" is unique?

10      A.    In and of itself?

11           MS. LEPERA:  Objection to form.

12      Q.    In and of itself.

13      A.    I haven't done an analysis of

14   it.  I can't say whether it's unique or

15   not.

16      Q.    Does "El" --

17      A.    Let me just make sure that the

18   answer is clear.  I haven't done an

19   analysis of that outside of the full

20   phrase which is, you know, 20 -- one, two,

21   three, four -- about 24 or 25 notes.  But

22   you've separated the last part, and I

23   haven't done an analysis of that portion

24   in and of itself.

25      Q.    I'm going to ask to you move to

                              Page 178

1    "Ging Gang Goolie" on page 71 and 144.

2              How many beats are there in the

3    descending 16th -- I'm sorry.  Do you need

4    a second doctor?

5         A.    I'm sorry.  You said page 141?

6    That's "Stayin' Alive."

7         Q.    144.  144.

8              MS. LEPERA:  And 71.

9         Q.    71 and 144.

10        A.    Okay.

11        Q.    How many beats of descending

12   16th notes are there in "Ging Gang

13   Goolie"?

14        A.    Four.  A total of 16 descending

15   notes and 16ths on scale degrees.

16        Q.    How many beats are there in

17   "Levitating"?

18              MS. LEPERA:  How many beats are

19        there in "Levitating"?

20        Q.    How many beats are there in the

21   first two bars of the comparison?

22              MS. LEPERA:  How many beats in

23        the first two bars?

24        A.    I think what you mean is in the

25   first phrase, excluding the pickup to the

                              Page 179

```
 1    next phrase, and that's what we've been
 2    discussing, 23.
 3         Q.    Are there five beats of
 4    distending 16ths?
 5         A.    Correct.  Five beats of
 6    descending 16ths for a total of 20 notes
 7    descending on scale degrees five, four,
 8    three, two, one.
 9         Q.    And how about in "Don Diablo"?
10         A.    In "Don Diablo," there are also
11    five, but instead of starting on scale
12    degree five, it starts on scale degree
13    three.  So it's three, two, one, seven,
14    six.
15         Q.    And what about "Wiggle"?
16              MS. LEPERA:  When you say "what
17         about 'Wiggle,'" can you be precise
18         what your question is?  Thank you.
19              MR. BROWN:  Sure.
20         Q.    How many beats are there in the
21    first two bars of "Wiggle"?
22              MS. LEPERA:  How many beats are
23         there in the first few bars --
24              MR. BROWN:  Two bars.  Two bars.
25              MS. LEPERA:  Two bars, or are
```

Page 180

```
 1        you asking him with respect to the
 2        16th notes?
 3              MR. BROWN:  With respect to the
 4        16th notes.
 5              MS. LEPERA:  Comparative to
 6        "Levitating."
 7        A.    As shown in my report, in
 8   "Wiggle," you don't have the steady
 9   decline.  There's a real difference
10   between "Wiggle" and "Levitating" in the
11   descending scale and between "Wiggle" and,
12   of course, "Don Diablo" so -- and you can
13   see it right in the heart of your
14   question.  In "Don Diablo," three, three,
15   three, three, two, two, two, two, one,
16   one, one, one, seven, seven, seven, seven,
17   six, six, six.  By way of difference in
18   "Wiggle," three, three, three, three, two,
19   but then a change of direction back up to
20   three, then down to two and then on scale
21   degree one early.  It is a syncopation so
22   that one doesn't occur on beat three as it
23   does in "Don Diablo," but it occurs on the
24   last 16th of beat two.  Then the next beat
25   is tied over.  It does not iterate it at
```

Page 181

1    all.  Then you have one, one, one, one

2    instead of seven, seven, seven, seven on

3    beat four of "Don Diablo."  You have

4    seven, seven, seven with an 8th note in

5    the third.

6               So the answer is that, as per my

7    report, there are several differences in

8    the descending notes between "Wiggle" and

9    "Don Diablo" and, of course, between

10   "Wiggle" and "Levitating."

11       Q.    I'm going to ask to you to go to

12   "Stayin' Alive," page 65 and 139.

13       A.    So we're backing up?

14       Q.    We're backing up.  Thank you.

15       A.    Okay.

16       Q.    So we can dance.

17             MS. LEPERA:  139 and 65, musical

18       examples 25 and 59, I assume?

19             MR. BROWN:  Yes.

20             THE WITNESS:  And the second

21       set, I have 65 --

22             MS. LEPERA:  139.

23             THE WITNESS:  139.  Thank you.

24             MS. LEPERA:  Musical example 59.

25             THE WITNESS:  Thank you.

Page 182

1     A.     Please go ahead.

2     Q.     Does "Stayin' Alive" have a

3  unique descending 16th-note melody that

4  differs from "Levitating"?

5          MS. LEPERA:  Objection to form.

6     A.     First, I wouldn't call a

7  descending melody necessarily distinct.

8  There are differences between the

9  descending melody in "Stayin' Alive" --

10 obviously, the same scale degrees, also in

11 a minor key like "Levitating" -- one of

12 the -- you can call it a distinctive

13 change -- is that the ninth note is tied

14 over, and that also is the case in

15 "Wiggle."  The ninth note is tied over.  I

16 have a red arrow in musical example 25 on

17 page 65, and that then occurs again at the

18 end of bar one on scale degree two.  So

19 what we have is a descent from scale

20 degrees five, four, three, two, but then a

21 movement back up to scale degree three.

22    Q.     Does it -- strike that.

23          Does "Stayin' Alive" have a

24 unique descending 16th-note melody from

25 "Don Diablo"?

Page 183

1            MS. LEPERA:  Objection to form.

2       A.    Your characterization of

3    "distinct" I'm not quite comfortable with.

4    What I would say is that there are

5    similarities and differences between the

6    descending melody at issue, the opening of

7    the chorus in "Stayin' Alive" and in "Don

8    Diablo."  There are similarities

9    between -- and differences between the

10   melody of the opening of "Stayin' Alive"

11   that's at issue, the descending 16ths, and

12   that in "Wiggle."  So they all have --

13   that is, "Wiggle" to Diablo -- there are

14   differences.  "Wiggle" to "Stayin' Alive,"

15   in the descending 16ths, there are

16   similarities and differences, and "Don

17   Diablo" and "Stayin' Alive," similarities

18   and differences in the descending part.

19            The point of my analysis is that

20   the portion -- the part that is similar,

21   the decent of repeating 16th notes on a

22   scale, is a musical building block.

23       Q.    What about the differences -- I

24   don't know if you mentioned -- between

25   "Wiggle" and "Stayin' Alive"?

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

```
 1        A.    I did.  If you would read my
 2   answer, I did.
 3        Q.    I'm not certain that you did
 4   because you just went through a whole
 5   different permutation, but I don't think
 6   you hit that permutation.
 7             MS. LEPERA:  He did.  He talked
 8        about the tie in the third beat.
 9             MR. BROWN:  I think that was to
10        the similarity, but not the
11        difference.
12        A.    Then let me give you a
13   conclusionary answer so that it will all
14   be scooped up in one.  I think this is
15   consistent with what I said.
16             There are similarities and
17   differences in the descending scale with
18   16th notes at issue in "Don Diablo" and
19   "Stayin' Alive."  There are similarities
20   and differences in the descending scales
21   in "Wiggle" and "Stayin' Alive."  There
22   are similarities and differences in the
23   descending scale in "Stayin' Alive" in
24   "Levitating."
25             I think that pairs them all.
```

Page 185

1    Q.    Does the second bar of "Stayin'

2    Alive" contain four 16th notes tied to an

3    eight note on beat two and then an

4    eighth-note rest?

5    A.    No.

6    Q.    Does --

7    A.    Beat two is a tied eighth note

8    followed by an eighth rest.

9    Q.    Do any of the three other works

10   have that?

11   A.    Three eighth notes -- three 16th

12   notes tied wherein the third 16th is tied

13   to an eighth, that's beat one.  Yeah.  I

14   think you might be confused, and perhaps I

15   can clarify your question.  I think you

16   might be talking about beat three in

17   "Stayin' Alive" where there are four 16ths

18   wherein the fourth one is tied over to an

19   eighth followed by an eighth.  Is that

20   what you were referring to?  Beat three

21   rather than beat two for "Stayin' Alive"?

22   Q.    What about with measure two?

23   A.    That is measure two.

24        MR. BROWN:  Can we take a quick

25        five-minute break?

Page 186

Lawrence Ferrara Ph.D.
January 30, 2024

```
 1                    MS. LEPERA:  Okay.
 2                    THE VIDEOGRAPHER:  Off the
 3          record.  The time is 3:41 p.m.
 4                    (Whereupon, an off-the-record
 5          discussion was held.)
 6                    THE VIDEOGRAPHER:  Back on the
 7          record.  The time is 4:45 p.m.
 8                    MS. LEPERA:  Just for the
 9          record, we took your binder which had
10          Plaintiff's Exhibit 1, Dr. Ferrara's
11          affirmative report, and substituted it
12          for a color copy, whole-punched in
13          identical format to what you
14          previously had.  If you want to
15          inspect it to double-check so that we
16          are -- no confusion on the record,
17          it's the same thing you intended to
18          mark, okay?
19                    MR. BROWN:  And that was by
20          agreement.  Thank you.
21                    MS. LEPERA:  Yes.  Thank you so
22          much.
23          Q.    Doctor, first of all, I thank
24     you for your patience.  Second of all, I
25     remind you you're still under oath.
```

Page 187

```
 1        A.    Yes, and thank you.
 2        Q.    Are you familiar with the name
 3   of the album that "Levitating" is on?
 4        A.    I was at one time.  I don't know
 5   that I remember it right now, sitting
 6   here.
 7        Q.    The album was called Future
 8   Nostalgia, and I take it that that has no
 9   impact upon your opinion whatsoever, does
10   it?
11             MS. LEPERA:  Objection to form.
12        A.    The title of the album does not
13   impact on my musicological analysis.
14        Q.    I'm going to hand you an article
15   from Agora entitled "Dua Lipa combines
16   past and modern pop on Future Nostalgia."
17             MS. LEPERA:  Thank you.
18        Q.    And feel free to read the whole
19   article.  It's not very lengthy.
20             MS. LEPERA:  Do you want to mark
21        this at all or --
22             MR. BROWN:  Mark this
23        Plaintiff's Exhibit 2 for purposes of
24        today's deposition.
25             (Whereupon, Agora article "Dua
```

Page 188

```
 1          Lipa combines past and modern pop on
 2          Future Nostalgia" was marked as
 3          Plaintiff's Exhibit 2 for
 4          identification.)
 5          A.    Okay.  I've just perused it,
 6     four pages.
 7          Q.    The gist of the article is, the
 8     artist -- and I'll quote from the
 9     article -- the artist says she took
10     inspiration from the '70s to 2000s when
11     making the album, and this is apparent
12     throughout each song.
13               That's a quote.  I take it that
14     has no impact on your opinion one way or
15     the other, Doctor; is that correct?
16               MS. LEPERA:  Just let me make an
17          objection for the record.  This is a
18          hearsay document.  Obviously, there's
19          no quotation here on the document
20          which speaks for itself.
21          A.    So first, I was going to mention
22     that the article, a good portion of it,
23     seems to talk about the lyrics -- which
24     are not at issue -- and I didn't see --
25     but I might have the missed it because I
```

Page 189

```
 1   only perused it -- any reference to the
 2   melodies at issue in the verse.  They do
 3   talk about the chorus, but let me finish
 4   out.  And so within that, two things:  The
 5   first is they mention -- in prior
 6   testimony, perhaps this morning, when we
 7   were talking about four on the floor which
 8   is a disco pattern.  In fact, I mentioned
 9   that word in my report and showed that
10   disco pattern named such in the Pain
11   Student Drum Method book, and I said that
12   that is consistent.  You mentioned
13   something like there was an influence of
14   disco, something like that.  And I said,
15   if that is the case, if, indeed, Dua Lipa
16   said that there was an influence or a
17   nostalgia for '70s music, that that's
18   consistent with a literally commonplace
19   four on the floor.  I also note that it
20   doesn't say nostalgia for the '70s, stop;
21   it says, according to the quote -- and I
22   don't know that it is an accurate quote
23   from Dua Lipa -- '70s to the 2000s.
24   That's a lot of songs.
25              And so, no, I don't find this
```

Page 190

```
 1    particularly important.  The point is my
 2    musicological analysis is that of the
 3    music and what is at issue including that
 4    four on the floor disco pattern is simply
 5    nothing that is significant.
 6         Q.    You could set that aside.  We're
 7    going to hand you an exhibit that we will
 8    mark as Plaintiff's Exhibit 3 for purposes
 9    of today's deposition.  It's an article
10    entitled "Dua Lipa talks INXS writing
11    credit on 'Break My Heart' that brought
12    Nostalgia to the forefront."
13              MS. LEPERA:  Thank you.
14              (Whereupon, NME article "Dua
15         Lipa talks INXS writing credit on
16         'Break My Heart' that brought
17         Nostalgia to the forefront" was marked
18         as Plaintiff's Exhibit 3 for
19         identification.)
20              MS. LEPERA:  It's just a
21         three-page article by a Nick Riley.
22         Unclear the source -- oh, nme.com,
23         April 22nd, 2020.
24              You want him to read it or --
25              MR. BROWN:  Yeah.
```

Page 191

```
 1        Q.    If you could, please, take the
 2   time to read the article?
 3        A.    So this is apparently about a
 4   different song altogether, "Break My
 5   Heart," but from the Nostalgia album.  Is
 6   that what's being represented here?
 7        Q.    Yes, Doctor.  I have a question
 8   about that.  During the allegedly creative
 9   process of composing the Future Nostalgia
10   album, based upon this article, Dua Lipa
11   had written something, and then after the
12   fact, realized -- or that it sounded
13   similar to an INXS song.  Were you aware
14   of that?
15             MS. LEPERA:  Objection to form.
16        A.    No, I was not.
17        Q.    Now that you're aware of it,
18   does it change your opinion in your
19   reports at all?
20             MS. LEPERA:  Same objection.
21             You can answer.
22        A.    That's really quite strange as
23   the question, as a musicologist, because
24   you're talking about music in a completely
25   different song.  This is not about
```

Page 192

```
 1      "Levitating"; this is about the music in
 2      "Break My Heart."  So I don't see how what
 3      she had to say about the expression in
 4      "Break My Heart" has to do with the
 5      musicological analysis of the expression
 6      in "Levitating."
 7          Q.    So the answer is:  No, it
 8      wouldn't change your opinion at all?
 9          A.    This, what you just presented to
10      me, was not for the reasons I've just
11      given.
12          Q.    Thank you.
13              MR. BROWN:  No further
14          questions.
15              MS. LEPERA:  Okay.  We're good.
16              MR. BROWN:  Doctor, thank you
17          very much.  It's nice to meet you.
18              THE WITNESS:  Thank you.
19              MS. LEPERA:  I'm just going to
20          ask him couple of just -- there were a
21          couple of YouTube links in his report,
22          one of which appeared to have
23          disappeared and one of which may not
24          have actually been there with respect
25          to some of the prior art.  We just
```

Page 193

1          wanted him to put them on the record

2          for his report as substitute YouTube

3          links.  That's all.

4               MR. BROWN:  Can we get a copy of

5          that, please?

6               MS. LEPERA:  Yes.  I was just

7          going to have him look at it, and then

8          we can mark it as --

9               THE WITNESS:  I'll do the second

10         first.

11              MS. LEPERA:  As Ferrara 4 -- or

12         as Exhibit 4, you're using.

13         A.     So in the YouTube link for "Ging

14    Gang Goolie," recently, in reviewing my

15    report, I went to that YouTube site, and

16    it was down.  And so I found the identical

17    performance of "Ging Gang Goolie" which, I

18    say in my report, I used for my

19    transcription, and that's what you have

20    there.  So that is the updated YouTube --

21    exactly the same YouTube -- exactly the

22    same performance and composition.  It's

23    just that now you can actually access it.

24              If the court were to try to

25    access what was in the report, it would

1    see that it's down, that it's no longer

2    available, and so I brought this to the

3    attention.

4           The second, in "Cafetal," I

5    noticed that I didn't provide the YouTube

6    that I used, and so I now add that here to

7    this exhibit so that, to the extent you

8    want to look at the YouTube performance

9    that I used in my transcription analysis,

10   it's there.

11      Q.    So Plaintiff's Exhibit 4, these

12   YouTube links supplants the YouTube links

13   from your affirmative report?

14      A.    As described a moment ago in my

15   testimony.

16           MS. LEPERA:  Yeah.  And I think

17      one is actually doesn't supplant but

18      supplies, and the other one

19      substitutes from the one that was

20      taken down, if I'm getting that

21      correctly.

22           MR. BROWN:  Counsel, if you

23      could forward this via email too so I

24      could -- somebody --

25           MS. LEPERA:  An email on what

Page 195

```
 1          this is, is that what you'd like?
 2               MR. BROWN:  Yeah.  That way, we
 3          can click on the links.
 4               MS. LEPERA:  Yes.  And could you
 5          just mark this as Exhibit 4 for us so
 6          it's part of the record?
 7               (Whereupon, YouTube links were
 8          marked as Plaintiff's Exhibit 4 for
 9          identification.)
10               MS. LEPERA:  Thank you.
11               MR. BROWN:  Anything else,
12          Counsel?
13               MS. LEPERA:  And you'll send him
14          the links?
15               THE WITNESS:  Yes.
16               MS. LEPERA:  Perfect.
17               MR. BROWN:  No further
18          questions.
19               MS. LEPERA:  I think that's it.
20          Yeah.  Thank you so much.
21               MR. BROWN:  Thank you.
22               MS. LEPERA:  Okay.  Great.
23               MR. BROWN:  Off the record.
24               THE VIDEOGRAPHER:  We are off
25          the record at 4:56 p.m., EST.  This
```

Page 196

1        concludes today's testimony given by

2        Professor Lawrence Ferrara.  The total

3        number of media units used is five and

4        will be retained by Veritext.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 197

```
 1        I have read the foregoing transcript
 2        of my deposition, and find it to be
 3        true and accurate to the best of my
 4        knowledge and belief.
 5

 6

 7     _____
 8      LAWRENCE FERRARA, Ph.D.
 9

10     Sworn and subscribed to before me,
11     On this _____ day
12     of _____ 2024.
13

14

15

16     Notary_____
17     My Commission Expires_____
18

19

20

21

22

23

24

25
```

Page 198

```
 1                    I N D E X
 2
 3
 4    WITNESS              EXAMINATION BY        PAGE
 5    LAWRENCE FERRARA, Ph.D.     MR. BROWN      6
 6
 7      E X H I B I T S
 8    PLAINTIFF'S        DESCRIPTION            PAGE
 9    Exhibit 1          Ferrara report and CV  21
10    Exhibit 2          Agora article "Dua     188
                         Lipa combines past
11                       and modern pop on
                         Future Nostalgia"
12
      Exhibit 3          NME article "Dua Lipa  191
13                       talks INXS writing
                         credit on 'Break My
14                       Heart' that brought
                         Nostalgia to the
15                       forefront"
16    Exhibit 4          YouTube links          196
17
18              INSERTIONS
19         Page          Line
20         None
21
22              RULINGS
23         Page          Line
24         None
25    INDEX CONTINUED ON NEXT PAGE
```

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

1                    I N D E X (cont'd)

2               R E Q U E S T S

3          Page              Line

4           17              19

            194              4

5           195              22

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   CERTIFICATION

 2

 3        I, Garry J. Torres, a Notary Public

 4    for and within the State of New York, do

 5    hereby certify:

 6        That, Lawrence Ferrara, Ph.D., the

 7    Expert witness whose testimony as herein

 8    set forth, was duly sworn by me; and that

 9    the within transcript is a true record of

10    the testimony given by said witness.

11        I further certify that I am not

12    related to any of the parties to this

13    action by blood or marriage, and that I am

14    in no way interested in the outcome of

15    this matter.

16        IN WITNESS WHEREOF, I have hereunto

17    set my hand this 13th day of February,

18    2024.

19

20

21        GARRY J. TORRES

22                *       *       *

23

24

25    signature requested
```

Page 201

```
1                    E R R A T A   S H E E T
          V E R I T E X T / N E W   Y O R K   R E P O R T I N G ,   L L C
2
      CASE NAME: LARBALL PUBLISHING COMPANY,
3     INC. and SANDY LINZER PRODUCTIONS, INC.
      -v- DUA LIPA, CLARENCE COFFEE JR., et al.
4     DATE OF DEPOSITION: January 30, 2024
      WITNESS' NAME: LAWRENCE FERRARA, Ph.D.
5
      PAGE/LINE(S)/     CHANGE           REASON
6     ____/_____/_____/_____
      ____/_____/_____/_____
7     ____/_____/_____/_____
      ____/_____/_____/_____
8     ____/_____/_____/_____
      ____/_____/_____/_____
9     ____/_____/_____/_____
      ____/_____/_____/_____
10    ____/_____/_____/_____
      ____/_____/_____/_____
11    ____/_____/_____/_____
      ____/_____/_____/_____
12    ____/_____/_____/_____
      ____/_____/_____/_____
13    ____/_____/_____/_____
      ____/_____/_____/_____
14    ____/_____/_____/_____
      ____/_____/_____/_____
15    ____/_____/_____/_____
      ____/_____/_____/_____
16    ____/_____/_____/_____
      ____/_____/_____/_____
17    ____/_____/_____/_____
      ____/_____/_____/_____
18    ____/_____/_____/_____
      ____/_____/_____/_____
19    ____/_____/_____/_____
20          _____
            LAWRENCE FERRARA, Ph.D.
21
      SUBSCRIBED AND SWORN TO
22    BEFORE ME THIS_____DAY
      OF_____, 2024.
23
      _____
24      NOTARY PUBLIC
25    MY COMMISSION EXPIRES_____
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

1    CHRISTINE LEPERA, ESQ.

2    ctl@msk.com

3                                    February 15, 2024

4    RE: Larball Publishing Company, Inc. v. Dua Lipa

5    January 30, 2024, Lawrence Ferrara, Ph.D., 6409897

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    ___ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   ___ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, noting the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20   ___ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23   ___ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25

1    _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2        Transcript - The witness should review the transcript and

3        make any necessary corrections on the errata pages included

4        below, notating the page and line number of the corrections.

5        The witness should then sign and date the errata and penalty

6        of perjury pages and return the completed pages to all

7        appearing counsel within the period of time determined at

8        the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10       requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 204

```
 1   Larball Publishing Company, Inc. v. Dua Lipa

 2   Lawrence Ferrara, Ph.D. (#6409897)

 3                E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Lawrence Ferrara, Ph.D.              Date

25
```

Page 205

**[& - 20]**

| & |
| --- |
| **&**   1:12 2:11 5:16,20 25:24 26:1,9,10 203:23 204:9 |

| 0 |
| --- |
| **01872**   1:6
**07310**   2:5 |

| 1 |
| --- |
| **1**   20:19 21:14 21:18 86:19 127:17,20 162:9,11 164:4 187:10 199:9 204:1
**1,400**   79:12
**1,600**   79:10
**10**   36:22,23,24 102:17 132:15
**100**   105:12
**10022**   2:15
**103**   153:24 154:7
**106**   153:25 154:7
**10:13**   1:15 4:3
**11**   22:5,6,6,13 23:7 24:4,18 36:14,22,23,24 102:13,18 131:8
**111**   2:5
**116**   163:7,11 164:24 166:13 |

166:23 175:11
**11:11**   55:5
**11:32**   55:10
**11th**   7:22 80:3
**12**   22:7,9 24:4 36:14 79:23 131:18 132:23 134:16 135:5,8 135:13 159:25
**120**   177:13,17 177:18
**122cv01872lpf**   4:20
**12:30**   106:18 106:20
**13**   79:11 113:22
**139**   182:12,17 182:22,23
**13th**   201:17
**14**   6:23 132:23
**141**   179:5
**144**   179:1,7,7,9
**14994**   201:20
**15**   39:18 43:12 124:25 131:9 131:10 132:24 203:3
**16**   6:24 7:4,6 78:16 79:6 100:19 101:10 102:11 131:18 131:19 132:15 135:13 179:14

**16th**   51:16,23 101:20 102:3 127:9 130:12 133:14 138:8 138:11,11,13 167:1 169:25 170:11 174:22 179:3,12 181:2 181:4,24 183:3 183:24 184:21 185:18 186:2 186:11,12
**16ths**   138:20 179:15 180:4,6 184:11,15 186:17
**17**   131:20 132:2,7,17 133:6,8 135:14 200:4
**17th**   73:24
**18**   135:14,15
**1808**   113:19
**188**   199:10
**1899**   113:18
**19**   200:4
**191**   199:12
**1920**   124:16
**1930s**   74:5
**194**   200:4
**1940s**   74:3
**195**   200:5
**1958**   123:15
**196**   199:16

**1969**   67:21
**1970**   67:15
**1970s**   6:22 8:3 150:4,15
**1975**   67:19
**1977**   122:20
**1978**   67:14 122:20 151:7
**1979**   151:8
**1980s**   8:3
**1986**   60:16
**1990s**   79:1 125:3
**1995**   79:2
**1998**   66:11,20
**19th**   73:8,23 76:9 121:25 122:6,13 146:11 157:7
**1:22**   1:6
**1:43**   107:15

| 2 |
| --- |
| **2**   132:15 188:23 189:3 199:10
**20**   43:13 50:23 51:15,23 52:13 61:1 76:12 95:15 101:19 101:21,24 102:2,7,15,22 103:4,6,10 104:11 106:2 107:5 121:15 132:15 136:24 |

Page 1

**[20 - 8th]**

137:3,18,22
139:2,3 140:14
146:1,2,16,17
147:13 149:2
156:9,9 161:22
171:9,13 178:6
178:20 180:6
**2000s** 189:10
190:23
**2004** 44:24
61:9
**2005** 61:8,11
**2012** 79:22
**2016** 23:12
24:6 25:25
29:4 30:2 33:9
**2020** 26:8
191:23
**2021** 10:19
16:23 17:1,9
17:13 24:16,21
26:9 88:3
**2022** 24:19
**2023** 16:22
17:1 28:24
**2024** 1:14 4:4
198:12 201:18
202:4,22 203:3
203:5
**2025.520** 203:9
203:12
**20s** 7:8
**20th** 157:7
**21** 149:19,20
199:9

**22** 104:6
128:16 131:13
200:5
**22nd** 191:23
**23** 128:17
131:12,14,17
131:21 132:7
135:15 142:5
145:6,7 146:16
161:23 180:2
**24** 132:15,16,25
135:15 178:21
**244** 165:2
**25** 178:21
182:18 183:16
**25th** 2:14
**26** 26:6,18
27:11 36:11
154:12
**29** 160:9
**299** 76:11
102:4 146:6
**2:47** 161:7

**3**

**3** 132:24 191:8
191:18 199:12
**3,000** 79:18
**30** 1:14 18:8
22:19 50:25
52:14 202:4
203:5 204:1
**30's** 74:4
**30s** 7:3 74:3
**30th** 4:4

**31** 128:7
**32** 129:4 138:6
**325b** 141:7
**37** 150:2
**38** 162:20
**3:08** 161:10
**3:41** 187:3
**3a** 102:14

**4**

**4** 132:23
135:13 194:11
194:12 195:11
196:5,8 199:16
200:4
**40** 17:1 163:1,6
166:11,22
176:4
**400** 2:5 79:8,19
**40s** 7:3 74:5
**437** 1:13 2:14
**44** 163:11
166:12,23
174:13 175:10
175:25
**45** 165:14
168:23 177:12
177:15
**46** 133:7
**47** 133:7
**48,000** 16:22
17:2
**4:45** 187:7
**4:56** 196:25
**4a** 171:7

**5**

**5** 107:25
113:17
**50** 51:1 52:14
71:9 88:21
**546-7703** 2:15
**56** 154:14,19
**561-0000** 2:6
**57** 158:20
**59** 182:18,24
**5a** 128:10
**5b** 129:4 138:6
140:3

**6**

**6** 24:7,18
130:13 132:15
199:5
**60** 17:25 71:9
**6409897** 203:5
205:2
**65** 182:12,17,21
183:17
**69** 67:17

**7**

**70s** 9:16 189:10
190:17,20,23
**71** 179:1,8,9

**8**

**8** 132:23
**80** 51:8 52:15
**80s** 9:16
**877** 2:6
**8th** 130:22
138:13,21,21

Page 2

**[8th - ambrosetti]**

| | | | |
|---|---|---|---|
| 182:4 | **action** 1:19 5:3 | **advising** 79:9 | 32:15 38:19 |

**9**

**9** 132:15,25
168:22
**917** 2:15

**a**

**a.m.** 1:15 4:3
55:5,10
**able** 42:15 76:2
92:8 145:9,13
**above** 1:19,19
203:6
**abrogate**
137:15
**absolute** 67:22
**absolutely**
114:18 125:16
127:10 153:18
**academic** 59:21
59:23,24,25
60:5,20
**accepted** 32:17
44:11 158:14
158:15,15
**access** 74:11
95:6,8,21,24
96:3,4 155:18
194:23,25
**account** 36:1,2
36:3
**accurate** 21:11
166:8 190:22
198:3

**action** 1:19 5:3
201:13
**active** 62:25
**actively** 63:2
**actual** 17:23
18:11 117:4
156:13
**actually** 19:14
22:12 34:23
58:23 63:2
77:15 91:18
93:22 110:18
130:22 163:1
171:8 193:24
194:23 195:17
**add** 140:13
195:6
**added** 70:22
114:1,3
**addition** 67:6
119:17
**additional**
16:13
**additionally**
148:7
**administer** 5:2
**admitted** 155:4
156:14,16
**adopted** 137:12
**advance** 78:1
**advanced** 64:4
64:18
**adverse** 120:18
**advice** 13:10

**advising** 79:9
**advocate** 63:19
**affect** 156:12
**affiliated** 23:6
**affiliation** 5:6
**affirmative**
20:24 21:1,12
26:4,15 47:22
48:4 84:3
86:20 123:8
126:18,23
128:9 129:15
138:7 166:6,8
166:13 187:11
195:13
**afield** 53:2
**ago** 14:16
36:12,22 37:1
39:17,18 40:7
79:23 195:14
**agora** 188:15
188:25 199:10
**agree** 4:9 12:18
43:2 70:11
75:12 139:24
166:17 171:11
**agreed** 3:2,7,11
**agreement**
103:6 187:20
**ah** 88:25
**ahead** 22:3
149:22 183:1
**aire** 162:19
**al** 4:17 23:21
29:6 31:13

32:15 38:19
202:3
**album** 14:14
188:3,7,12
189:11 192:5
192:10
**aligned** 71:18
**alive** 122:19
123:2,10,23
151:8 179:6
182:12 183:2,9
183:23 184:7
184:10,14,17
184:25 185:19
185:21,23
186:2,17,21
**alleged** 123:3
155:3
**allegedly** 192:8
**almondrode**
2:9 5:14
**altogether**
192:4
**amazing** 67:16
**amazon** 61:9
**ambiguous**
24:12 63:25
74:19 94:22
100:24 101:19
108:5,12 110:4
111:2 113:10
**ambrosetti**
24:7 25:4,5
31:25

**[amechi - approximately]**

| | | | |
|---|---|---|---|
| **amechi** 40:13 | 151:20 155:3 | 100:25 105:24 | **apart** 44:23 |
| 40:17 | 158:18 178:13 | 106:23 107:1 | **apologize** 8:25 |
| **amend** 87:12 | 178:19,23 | 108:14 114:2,3 | 78:1 106:11 |
| **america** 124:8 | 184:19 188:13 | 116:1 117:20 | 112:12 142:16 |
| **american** 7:5 | 191:2 193:5 | 118:7,10,13 | 144:15 168:1,6 |
| 57:2 | 195:9 | 119:19 120:20 | **apparent** |
| **amount** 36:7 | **analyzed** 22:18 | 122:24 123:23 | 189:11 |
| 49:16 50:7 | 140:8 | 127:8 128:25 | **apparently** |
| 52:4 | **andrew** 66:9 | 134:25 136:4,6 | 71:6 124:13 |
| **ample** 93:19 | 67:8,14,24 | 136:7,22 | 192:3 |
| 154:22 | **angeles** 32:14 | 140:12 142:25 | **appeal** 32:19 |
| **analyses** 23:3 | **anomalous** | 147:8 151:24 | 66:18 |
| 47:10 93:7 | 109:11,23 | 155:9 158:10 | **appear** 40:21 |
| **analysis** 14:17 | 110:1 | 161:24 169:17 | 48:2 |
| 30:23 37:6,10 | **anomaly** | 171:5,23 | **appearance** 5:6 |
| 37:13,25 40:10 | 108:15 | 173:19 175:1 | 5:18 |
| 45:5 46:11 | **answer** 9:12 | 175:13 178:18 | **appearances** |
| 47:7,9,12 | 10:10 12:10 | 182:6 185:2,13 | 2:1 |
| 54:18 56:13 | 14:11 15:8 | 192:21 193:7 | **appeared** |
| 58:1 62:16 | 16:18 24:1 | **answered** | 193:22 |
| 63:7 64:11,15 | 28:13 29:22 | 13:22 15:7 | **appearing** 2:20 |
| 66:21 67:3 | 34:8 35:7 | 16:17 33:13 | 203:18 204:7 |
| 68:13,17,21 | 37:17 40:5 | 41:21 111:16 | **appears** 170:2 |
| 69:4 70:4,21 | 41:16 42:20 | 117:18,19,22 | 170:17 174:24 |
| 70:23 81:4 | 43:24 46:5 | 145:21 155:8 | **applicants** |
| 94:5,6 100:13 | 49:22 50:6,12 | 172:24 | 78:19 |
| 100:14 101:8 | 52:11 53:16,24 | **answering** | **appreciate** |
| 116:19 117:10 | 57:7,20 60:18 | 115:11 | 114:25 127:25 |
| 117:24 118:10 | 62:10 68:12 | **answers** 45:20 | 171:22,24 |
| 118:12 126:19 | 69:9 74:7 75:3 | 53:3 97:19 | 175:13 |
| 126:24 127:10 | 75:22 77:12 | 136:10 142:17 | **appreciated** |
| 130:7 141:25 | 82:19 83:12 | 175:7 | 6:15 |
| 145:24 147:9 | 85:2 90:8 | **anybody** 57:3 | **approximately** |
| 147:20,25 | 91:15 94:2 | 57:11 | 17:8 34:19,22 |
| 148:1,13 | 95:10 99:6,15 | | 80:15 |

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[april - back]**

april  191:23
apropos  124:23
arban  73:6,10
　73:13 122:4,7
　124:23 125:15
　126:9,14
architecture
　43:1
arenzano  7:23
argument
　154:1
argument's
　136:14
arranged  62:2
　62:6
arrangement
　10:7
arrangements
　9:25 10:3
　15:13
arranger  62:14
arrow  183:16
art  47:13 67:1
　67:4,6 69:13
　69:19,21 70:17
　97:10 100:14
　102:2 103:10
　121:3,3,24
　131:23 147:15
　147:16 148:25
　155:21 156:2
　157:8,11,16
　162:24 163:1
　193:25

article  37:4,9
　37:14,24
　188:14,19,25
　189:7,9,22
　191:9,14,21
　192:2,10
　199:10,12
articles  38:1,7
　59:10
articulated
　82:6 139:10
artist  189:8,9
artists  23:10
arts  68:10
　69:23 79:9
　117:25 123:3,7
ascending  41:4
　46:21
aside  191:6
asked  13:22
　15:7 16:16
　33:13 41:21
　46:6 56:13
　58:7 97:11
　117:17 145:20
　154:25 155:8
　172:23
asking  11:2
　13:5 26:13
　35:9 36:19
　53:4,5 77:7
　90:2 91:6
　97:16 101:5
　102:21 105:22
　106:23 117:25

118:8 127:17
　127:19 136:12
　145:3 151:14
　171:2 172:13
　181:1
associated
　38:15
assume  19:16
　34:15 35:6
　42:22 96:13
　182:18
assuming  23:13
　154:3
assumption
　148:16 171:12
attached  61:23
　72:11
attention  195:3
attorney  2:3,11
　5:10 11:1
　26:12
attorneys  26:11
attributable
　17:17
attributed
　70:13
audio  4:7
author  125:7
authority  45:24
authorized  5:1
authors  151:18
　155:4
authorship
　42:4

availability
　157:22
available  87:15
　156:2,10,22
　157:9,14 195:2
avenue  1:13
　2:14
average  18:5,8
aware  10:15,23
　11:16,18 15:15
　32:1 38:23
　41:18,19 46:8
　46:9 74:20
　93:21 95:17
　99:7 104:25
　192:13,17

**b**

b  50:25 73:6
　125:25,25,25
　125:25 128:19
　128:19 138:11
　199:7 204:1
baccalaureate
　79:11
bachelor's
　78:15
back  6:14
　12:22 15:21
　16:23 21:22
　22:6 25:21
　29:25 33:9
　36:16 38:21
　43:19 44:23
　47:12 50:4
　54:24 55:9

Page 5

**[back - believe]**

60:16 67:7
68:6,23 69:5
72:2 73:23,24
77:13 78:5,7
84:8,21,24
85:3,16 87:5
90:15 91:8
98:13 106:22
107:14 115:19
116:12 121:24
134:24 161:9
169:21 173:6
181:19 183:21
187:6

**background**
8:3 65:7 86:5
124:6

**backing** 182:13
182:14

**bad** 107:20

**banc** 33:21
43:8,10,15
44:5 45:4 47:1

**band** 6:21 7:10
8:18 9:2,19,24
86:9

**bands** 6:24
9:13 15:4

**bar** 52:22
102:9,11,13,16
102:17,18
128:15 129:10
130:15 131:10
132:24 134:17
135:6,8,9

138:5 139:3
141:5 150:22
151:5,12 159:5
159:11,24
170:1 172:21
173:16,17,19
174:4,23 175:6
175:17 176:7,8
176:14,19,22
177:2,19 178:5
178:8 183:18
186:1

**barbara** 61:15
65:7

**bars** 52:21
76:10 128:23
132:10,11
158:25 159:3,7
159:12,14,14
159:17,18,23
159:25 160:1,4
160:5,6 161:15
175:16 176:6
176:13,18
177:1 179:21
179:23 180:21
180:23,24,24
180:25

**base** 126:4

**based** 15:11
20:4 47:5,6,8
65:12 69:14
70:4 75:25
76:4,5 87:23
100:10 132:5

132:19 137:11
137:16 192:10

**basic** 39:3,16
41:8 43:2
48:21 98:5
126:16 149:23
149:24 150:14

**basically** 59:12
80:9

**basis** 31:9
56:14 68:20
69:6,9 87:14
105:3 123:19

**bass** 150:23

**bearings**
151:20

**beastie** 44:9,15

**beat** 102:13,18
129:9 130:15
134:18 139:3
139:18 140:16
140:17 148:21
150:8 170:1,13
170:19 171:14
172:9,9,10,21
173:12,12
174:3,23
175:17 176:7
176:10,11,14
176:20,21
177:2 178:4,5
181:22,24,24
182:3 185:8
186:3,7,13,16
186:20,21

**beats** 72:14
116:20,20
137:2,18 138:3
139:8 150:22
154:7 167:2
170:22 175:3,5
179:2,11,16,18
179:20,22
180:3,5,20,22

**bee** 122:20

**beethoven**
107:25 109:10
110:8 111:9,24
112:21 113:1,3
113:16 114:16
114:22 125:8

**beethoven's**
112:20

**beginning**
71:15,15,16
115:2 172:9

**beginnings**
71:13

**begins** 136:15

**begun** 87:11
91:9

**behalf** 10:18
23:8,9,20 24:6
24:8 32:15
44:10 66:8,13

**belief** 198:4

**believe** 16:2
32:13,18 43:10
46:23 51:9
56:2 78:6 81:5

Page 6

**[believe - brown]**

90:18 102:9,24
110:19 143:20
155:7 171:6
**berkeley** 5:19
5:19
**berkley** 2:18
**beset** 140:15
**best** 10:17
40:15 43:7
102:12 110:19
198:3
**beyond** 31:16
34:2 45:20
**bieber** 23:13,14
23:20
**big** 51:1
**bills** 86:14
**binder** 187:9
**bit** 24:9 39:22
86:17 95:12
105:10 127:2
**black** 103:24
**block** 30:11
33:21 39:1,3,7
39:19 40:1,25
41:5 42:18
43:6 45:1,10
45:17 46:16
49:1,4,7,15,15
49:19 50:9,19
51:2,13,24
52:5,16,19,25
53:6,7,10,20
54:8 72:19
76:24 77:1,6

93:11 96:20,24
97:5,23 98:3,6
98:11,16 99:10
99:21 101:25
103:19 106:2,7
107:4,9 109:19
117:7,16 118:2
121:23 126:2
137:8,11,23
138:10 139:4
139:16 141:21
142:9,22
143:11,19,22
144:23 146:23
146:24 147:12
147:12,13,14
147:21,21
148:9 149:1
157:19 160:13
161:16,23
162:1,3 184:22
**blocks** 29:19
33:2,6,10 34:4
37:15 38:3,8
38:13,16,20
40:17,20 41:9
41:14 42:2,14
43:3,22 46:1,9
47:17,18,24
49:11 52:7
97:13 102:8
108:1 119:4
144:5,22
145:19 154:3,4
154:6

**blood** 201:13
**board** 59:9
63:11
**book** 36:13
58:6,6 60:12
60:17,24 61:10
72:12 73:2,6,9
73:14 97:21
125:16 126:9
190:11
**books** 57:15
59:2 60:7,14
72:10 73:4
125:10,24
**boom** 8:10,10
8:10,10,11,11
8:11,11,11,11
8:11,12,12,12
8:12,12,12,12
8:13,13,14,14
8:14,14,14,14
72:20,20,20,20
**border** 45:21
**borrowed**
67:25
**bother** 105:8
**bowie** 118:16
**box** 103:4
**boys** 44:9,15
**break** 54:20
55:14,15,17
106:15,19
161:2 163:24
186:25 191:11
191:16 192:4

193:2,4 199:13
**brief** 26:1
**bright** 79:21
**bring** 168:25
**bringing** 25:21
**broad** 75:6
120:25 121:7
122:9 152:3
**broadest** 152:1
**broke** 7:9
**brought** 191:11
191:16 195:2
199:14
**brown** 2:2,7
5:9,10,11,24
6:7 13:25 14:9
16:15 19:19
20:22 21:1,13
35:7 54:22
55:2 64:1
77:18 84:13,21
85:13 86:23
106:12,15
112:12 115:16
127:19 144:8
144:15,19
155:10 161:2
163:7,13
164:24 165:21
166:15 167:12
169:1,4,22
172:13 173:17
174:14,19
175:21 180:19
180:24 181:3

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

[brown - case]

182:19 185:9
186:24 187:19
188:22 191:25
193:13,16
194:4 195:22
196:2,11,17,21
196:23 199:5
**brunson**   32:3
32:11
**building**   29:19
30:11 33:2,6
33:10,21 34:4
37:15 38:2,7
38:13,16,20
39:1,2,7,19
40:1,16,20,25
41:4,9,14 42:2
42:14,18 43:3
43:6,21 45:1
45:10,17 46:1
46:9,16 47:17
47:18,24 49:1
49:3,7,11,14,15
49:18 50:9,18
51:2,13,24
52:5,7,16,19,25
53:6,7,10,20
54:8 72:19
76:24 77:1,6
93:11 96:20,23
97:5,12,23
98:3,6,11,16
99:10,21
101:25 102:8
103:19 106:1,6

107:4,9 108:1
109:19 117:7
117:16 118:2
119:3 121:23
126:1 137:8,11
137:23 138:10
139:4,15
141:21 142:9
142:22 143:11
143:19,22
144:4,22,23
145:18 146:23
146:24 147:12
147:12,13,13
147:21,21
148:9 149:1
154:2,3 157:19
160:12 161:16
161:23,25
162:3 184:22
**built**   39:4
98:12 99:19
**bunch**   52:6
**burning**   6:19
**business**   7:15
7:18 78:18
**busy**   13:11

**c**

**c**   6:1 44:22,22
45:9,10 50:24
100:20 123:13
123:13 124:2,7
125:24,24,24
125:25 130:16
130:21 177:11

**ca**   203:9,12,20
**cafetal**   123:25
177:5,11,19
178:7,9 195:4
**calello**   61:18
63:16,20 65:2
65:11 92:2,16
92:19 102:10
102:15 104:1
136:11 137:21
139:23
**calello's**   61:21
64:14
**california**
31:19 32:14
44:7
**call**   45:9 60:19
72:19 126:1
137:9,10 139:5
140:6 142:9
143:11 183:6
183:12
**called**   9:19 40:9
42:1 44:19
45:5 46:8
47:18 58:5
68:23 71:3
94:12 100:6
108:25 121:2
150:22 188:7
**calling**   46:12
103:18,19
143:18
**callisia**   7:22

**calls**   102:16
**canceled**
170:23
**candid**   27:3
**capital**   124:1,7
**capitol**   32:3
**cards**   7:18
**career**   34:13
**careful**   141:11
**carey**   43:11
**casa**   7:22
162:19
**case**   4:19 11:8
11:17,18,23
12:2,6,20 13:7
13:19,25 14:8
16:21 17:4
18:10 20:5,6,9
24:10,15,24
25:3,3,8,15,17
25:22 28:24
29:3 30:12
31:6,11,14
32:16 38:14
39:14 42:9,12
44:4,24 45:7
46:18 47:21
50:2,5 52:18
54:18 56:1,6
61:13,14 67:2
68:4 72:9 73:1
73:4 78:8
80:17,20,25
91:12 110:23
111:10 112:1

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[case - clarification]**

112:24 114:8
114:18,21
118:22 119:3
119:20 120:12
143:5,8 144:9
159:5 162:5
166:20,23
171:1 183:14
190:15 202:2
**cases** 18:1,3,4,5
19:21 22:8
23:4,5,9 24:3
30:13,17 32:25
34:3,24 38:15
40:11,15 47:9
73:23 100:5
119:8,15
143:19 147:15
178:3
**categories**
122:9
**category** 121:1
152:3
**catering** 79:18
**catholic** 25:6
**caution** 17:19
**ccp** 203:9,12
**cello** 126:4
**central** 31:18
32:13
**centro** 7:23
**centuries** 48:23
94:10 99:11,15
100:18

**century** 73:8,23
73:24 76:9
121:25 122:6
122:13,18
146:11 157:7
**certain** 27:10
56:3 86:25
87:1 92:5
105:4 185:3
**certainly** 7:8
16:10 17:1
26:18 38:23
39:5,12 43:4
43:15,17 45:1
45:9 47:1
54:17 57:25
58:8,20,24
59:2 60:11
62:12 64:11
65:9 66:23
67:4 68:7,17
73:22 74:5
79:2,20 91:22
91:25 96:1,6
97:4,18 105:2
113:25 122:6
125:15 127:21
143:12 148:2
**certification**
3:5 201:1
**certify** 201:5,11
**chagrin** 26:8
**chagrined**
26:10

**chair** 78:16
79:2
**chance** 61:20
154:19
**change** 9:22
51:25 68:6
91:12 93:24
155:2 173:18
181:19 183:13
192:18 193:8
202:5 205:4,7
205:10,13,16
205:19
**changes** 59:15
88:24 89:11,22
89:24 91:4
**chapters** 36:13
**characterizati...**
120:8 184:2
**characterizes**
133:8
**charles** 65:11
**charlie** 61:17
**check** 38:12
40:23 187:15
**children** 86:15
**chippet** 71:14
**chippets** 71:12
**chord** 30:3,6,10
33:19 43:2,5
43:14,20 44:13
45:14
**chords** 137:12
137:14

**chorus** 184:7
190:3
**christ** 67:15
**christine** 2:17
5:15 203:1
**chromatic** 42:6
47:2
**circle** 68:25
69:2
**circuit** 31:15,22
32:19 38:18
39:23 40:9
44:5 66:18
143:9
**circuits** 100:3
**cited** 30:23
40:12 43:11,13
44:4,12 45:4
47:8 66:17
72:10 143:8
**cites** 73:19
**citing** 48:3
**city** 2:5 25:25
**civil** 1:23
203:19,20
**claimed** 25:4
**clap** 116:2
117:5
**clapping** 115:1
115:9,13,17
**clarence** 1:8
2:12 202:3
**clarification**
81:12 170:9,10

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[clarify - composers]**

clarify   16:7
18:12 174:1
186:15
classes   79:5,14
classic   73:5
classical   63:23
112:19 121:3
clear   40:24
67:22 153:19
155:20 166:2
169:11 174:18
178:18
clearly   33:19
42:1 73:24
76:7 99:16
104:12 139:2
149:2,3
click   196:3
client   22:24
clientele   9:17
clients   7:13
22:21
close   18:8 20:2
closer   146:3
club   7:21
clubs   7:20
cobbled   52:7
144:22
code   203:9,12
203:19,20
coded   164:2
coding   163:18
163:19,21
164:9 166:9

coffee   1:8 2:12
202:3
colleague   79:6
colleagues   80:6
collection
122:17
color   32:12
163:18,19,21
164:2,9,25
165:15 166:9
187:12
combination
135:22
combines
188:15 189:1
199:10
come   54:24
72:2 75:18
91:24
comes   38:13
126:11 162:17
comfortable
184:3
commenced
13:20 14:1
61:14
commentary
11:25 105:14
comments
11:23
commission
198:17 202:25
commissions
71:10

common
127:12 146:20
149:11 153:11
commonplace
39:16 45:6
54:16 72:18,21
98:10 99:11,14
99:18,18 100:8
100:17,22
103:20,21
104:12 106:7,8
107:10,11
126:5 137:10
137:16 139:5,6
139:16 140:14
141:16 143:7
143:10,16,17
143:24 149:23
149:24 150:13
151:7 152:24
156:10 190:18
communicated
12:5 83:9
communicating
21:25
communicati...
17:11
community
124:14,16
company   1:4
2:3 4:15 44:17
60:22 202:2
203:4 205:1
comparative
181:5

comparator
174:7
compared
130:10,11,12
138:21 140:20
146:4 172:25
comparing
168:21 174:10
comparison
148:14 179:21
compendium
39:9 41:23,25
42:2 46:22
complaint
18:11 19:4
70:8,9
complete   89:9
108:15 141:25
completed
25:25 67:19
89:1 203:7,17
204:6
completely
109:16 129:7
129:11 135:12
154:15 159:15
159:16 192:24
completion
204:10
composed
10:12 110:18
composer
12:13 125:7
composers   97:6
112:25 113:3

**[composers - contour]**

113:24
**composing**
192:9
**composition**
44:14,20 93:17
194:22
**compositions**
22:18 74:8
**compound**
113:10
**comprehend**
144:18
**comprehensive**
45:25
**concept** 95:21
95:24
**concerned**
171:17
**concerning**
118:15
**concluded** 28:9
56:19,20
**concludes**
197:1
**conclusion** 77:2
**conclusionary**
185:13
**conclusions**
27:17,25 82:3
82:9 92:25
94:20
**concomitant**
9:14,23
**concrete** 45:19

**conditions**
117:22
**conducted**
105:2
**confident** 15:9
**confidential**
82:7
**confirming**
115:12
**conflated** 116:3
141:12
**conflating**
127:15
**confused**
186:14
**confusion**
187:16
**connection**
12:12
**consider** 22:23
23:1 47:13
49:2 51:1,12
64:25 65:2
95:25 117:6
136:18
**considered**
43:21 45:25
49:18 50:9
57:16 60:21
73:6 95:9
97:22 98:15
100:22 124:9
135:24 154:5
167:19

**consistent**
26:22 47:19,20
97:2,25 98:18
101:25 113:12
114:3 139:1
152:9,11
185:15 190:12
190:18
**consists** 41:13
52:5
**consonant** 45:6
137:13
**constitute**
142:22
**constituted**
129:16
**constitutes**
53:7 117:15
**consult** 18:2,16
18:23,24
**consultant**
16:24 18:25
19:2,3 88:10
**consulted** 17:4
**consulting**
22:16 88:6
**cont'd** 200:1
**contact** 23:10
203:9
**contain** 170:2
174:24 177:20
177:23 178:1
186:2
**contained**
123:6,7

**content** 90:10
155:22
**contention**
151:23
**contestación**
123:12 162:19
166:25 168:2
168:19 169:6
170:1,13
171:14 172:10
172:20 173:13
173:23 174:4,7
174:11,23
175:9 176:18
**context** 38:25
40:2,2,8 43:24
50:21 53:15,15
69:20 91:14
101:4 117:11
136:3,5,7
148:13 153:6
169:20
**continue** 4:8
128:25 131:6
139:19 149:4
**continued** 9:15
56:6 125:1
199:25
**continues**
108:18 129:21
**continuing**
89:20 121:22
**contour** 138:15
138:22 173:1,4
173:11

Page 11

**[contradict - currently]**

contradict
  46:12
contribute
  169:8
conversation
  4:7 77:20 82:7
  90:3 98:21
  108:7 112:5
  164:16 165:8
conversations
  11:3 82:25
  83:1 84:8 85:3
  85:9,24 87:18
  89:23
copeland  23:13
  30:19
copied  67:10
  156:16 158:6
  164:25
copies  21:4,7
copy  21:20
  83:20 93:24
  162:11 163:25
  164:2,8,14
  165:15,17
  166:5,5,8
  187:12 194:4
copying  69:17
  94:16 96:5
  152:16 155:5
copyright
  39:10 41:24
  44:18 74:6
  100:5

copyrightable
  33:22 39:11
  42:3 43:15
corporation
  1:9 2:13
correct  15:14
  18:14 23:15
  29:13 57:5
  75:13 88:6
  92:24 93:1
  122:25 150:11
  153:16 157:20
  162:21 163:12
  163:13 171:9
  180:5 189:15
corrected  91:1
corrections
  203:14,15
  204:3,4
correctly
  195:21
corresponding
  137:2 140:11
  148:20 162:4
  170:19 171:21
cost  74:11
counsel  1:24
  3:3 4:14 5:5,16
  5:17,21 11:9
  11:13,14 17:9
  17:12 81:22
  82:11,25 84:18
  85:9,15,20,24
  87:19 89:23
  90:3 195:22

196:12 203:18
  203:21 204:7
counselor
  141:11 163:16
counsels  11:11
  11:12
count  131:1
countless
  145:14
country  121:6
couple  10:5
  193:20,21
course  31:12
  42:16 49:12,14
  49:14 63:6
  64:9 114:21
  123:1 128:21
  130:19 160:3
  170:21 171:18
  172:18 181:12
  182:9
court  1:1 3:15
  4:18,25 5:7
  25:10,14 27:4
  27:16,25 28:4
  28:9,16,19
  30:21 31:18,24
  32:1,12,16
  43:9,9,10,16
  44:6 45:4,8
  77:21 98:22
  108:8 112:6
  128:1 161:3
  164:17 165:9
  194:24

courts  100:11
  143:18 158:15
covers  123:17
cowbell  152:25
  153:10,11,16
crafted  65:23
crazy  90:19
create  8:18 9:2
created  7:9
  10:7 39:4 63:8
  67:14 95:1
  106:10 107:13
  154:24 155:2
  156:6,18
creates  63:2
creation  9:10
  67:12 157:23
creative  63:6
  192:8
creators  150:7
  151:15
credentials
  56:24 62:8,13
  62:15
credit  191:11
  191:15 199:13
cross  25:12
crux  33:14,19
ctl  2:16 203:2
cumbia  8:1,8
curiosity
  160:14
current  65:8
currently  18:19

Page 12

**[cv - deposition]**

| | | | |
|---|---|---|---|
| **cv** 1:6 20:1,12 20:23 21:17,21 22:6 24:18 26:16 36:6 54:24 59:3 61:22 199:9 **czerny** 76:9,10 76:11,15,16 102:3 122:4,8 124:21 125:5,6 126:15 146:6 147:14 **czerny's** 125:13 | **dances** 7:1,14 7:21,25 **dancing** 20:7 **data** 124:10 **database** 71:8 71:19 72:5,6 **databases** 72:3 72:7 73:15 **date** 16:21 202:4 203:16 204:5 205:24 **dates** 81:7 **dating** 121:24 **david** 118:16 | 47:1 **decisions** 38:19 38:21 39:23 45:9 47:4 **decline** 181:9 **defendant** 2:11 5:17 66:8 68:8 **defendant's** 30:22 31:8,19 31:21 32:17 66:15 155:25 **defendants** 1:10 5:21,23 | 140:21 146:8 173:5,6,7 180:12,12 181:21 183:18 183:21 **degrees** 51:20 71:18,21 76:14 101:22 109:8 129:6,10 130:2 130:18 139:12 140:22 170:12 171:15 179:15 180:7 183:10 |

**d**

| | | | |
|---|---|---|---|
| **d** 31:7 44:22 45:10 50:22,22 50:22,22,22 100:20,20 108:18 124:7 129:25 130:10 130:11,15 199:1 200:1 **da** 109:14,15 109:15,15,15 109:15,15,15 109:15 125:17 125:17,18,18 **dad** 35:17 **dance** 6:20 7:23 8:9,16,17 86:9 121:4 152:2,3 152:5,12 182:16 **danced** 8:16 | **day** 148:11 198:11 201:17 202:22 **de** 7:17 9:20 35:9 **debuted** 113:19 **decades** 10:5 18:18 46:10,10 46:10 68:5 71:7 72:24 **decent** 76:4,5 184:21 **decide** 26:19 70:2,4 160:15 **decided** 25:10 26:24 **decision** 25:13 30:23 31:10,13 31:23 32:2,9 38:18 43:8 45:3 46:23 | 10:19 11:1 23:20 24:6 27:2 29:5,14 29:15 44:10 66:13 93:21 **defense** 23:24 **define** 47:23,24 120:24 **defined** 41:1,9 62:20 97:1,2 139:25 **definitely** 161:4 **definition** 9:9 129:13,21 **degree** 64:4,18 76:23 103:13 109:1 114:12 114:17 125:22 128:15,18 129:8 130:5 131:3 134:3 135:18 140:19 | 183:20 **demain** 73:16 **denied** 28:18 **deny** 150:16 **department** 78:16 **depend** 33:5 **depending** 114:12 **deposed** 32:5 34:12,23 56:3 **deposition** 1:17 3:5,12 4:12,21 6:17 21:15 23:11 24:5,17 34:25 35:4 91:25 92:2,11 92:14,17,20 162:7 188:24 191:9 198:2 202:4 203:19 203:22,24 |

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[deposition - direct]**

204:8,10
**depositions**
92:3
**depth** 66:21
**descending**
41:4,11 46:12
46:20,21,25
47:2 51:22
52:1,2 76:1,3
76:20 94:8
100:19 101:10
101:23 102:3
126:6 133:9
135:21,23
136:16 141:8
141:16 155:23
157:4,18 167:1
179:3,11,14
180:6,7 181:11
182:8 183:3,7
183:9,24 184:6
184:11,15,18
185:17,20,23
**descent** 183:19
**describe**
115:23
**described**
51:12,14 60:8
60:18 76:22
195:14
**description**
102:22 199:8
**desert** 95:7
**designations**
168:23

**detailed** 14:17
27:8
**details** 56:8
**determine** 68:9
**determined**
203:18,22
204:7
**determining**
110:24
**development**
109:16 159:9
**dexterity**
125:11
**diablo** 14:24
15:1,5,13
42:10 51:18
52:2,19,23
72:17 74:25
75:8,19 76:5
76:16 93:24
101:21 102:5
103:21,25
104:21 105:15
106:10 107:13
114:8,18 128:4
146:3,13
147:17 152:17
153:15 154:4
155:6 156:7,17
156:23 157:2
157:10,12
158:7,25 159:6
163:8 166:24
168:20 174:8
174:11,25

175:4,6,11
176:23 177:1
177:16 178:2
180:9,10
181:12,14,23
182:3,9 183:25
184:8,13,17
185:18
**diamond** 44:4,8
44:8
**dice** 124:6,7
**dictionary** 48:3
48:15 62:21
130:3
**difference**
51:19 95:18
113:11 128:22
138:19,20,22
139:7,8 140:18
154:10 181:9
181:17 185:11
**differences**
76:21 77:10
102:6 103:12
103:13,15
139:10 140:16
140:16 146:13
177:20,24
178:2,4 182:7
183:8 184:5,9
184:14,16,18
184:23 185:17
185:20,22
**different** 10:18
13:10 25:23

35:3 42:11,13
51:20 56:6,9
56:18 69:8,24
70:1 71:23
76:13,14 77:7
77:8 90:6
93:13,14 96:25
97:12 101:22
102:19 104:7,8
104:10 109:17
109:21 128:14
128:20 129:7
129:11 130:1,9
130:17,18,20
131:8 135:12
139:12 141:1
148:20,23
149:5,16
152:23 153:24
159:8,11,16,17
160:6 162:4,12
169:23 172:14
172:15,20,25
173:23 174:5,8
185:5 192:4,25
**differently** 66:3
130:2
**differs** 183:4
**difficult** 19:14
51:11 65:4
**digitally** 44:15
**dinner** 7:1,14
**dionne** 114:18
**direct** 23:10
87:8

Page 14

**[direction - draft]**

| | | | |
|---|---|---|---|
| **direction** 71:23 | **dismiss** 31:14 | **district** 1:1,2 | 76:16 93:24 |
| 104:7 108:23 | **dismissed** | 4:18,19 25:9 | 103:21,25 |
| 181:19 | 31:10 32:16 | 25:14 29:8 | 104:20 105:15 |
| **directly** 13:5 | **dispositive** | 31:17,18,23 | 106:9 107:13 |
| 87:1 155:5 | 28:10 | 32:1,13,16 | 128:3 146:2 |
| 156:16 | **dispute** 13:13 | 66:11 | 147:17 152:16 |
| **director** 78:23 | **disregard** | **dizzying** 25:11 | 153:15 154:4 |
| **disagree** 92:23 | 133:25 134:2 | **doctor** 35:18,19 | 155:5 156:7,17 |
| **disagreed** 82:4 | 140:22 | 55:11 78:21 | 156:23 157:2 |
| **disappeared** | **disregarding** | 107:16 161:11 | 157:10,12 |
| 193:23 | 135:17,17 | 166:19 179:4 | 158:7,25 159:6 |
| **disco** 72:22 | **disregards** | 187:23 189:15 | 163:7 166:24 |
| 150:4,8,15 | 52:11 | 192:7 193:16 | 168:20 174:7 |
| 151:7,19 152:4 | **disrupting** | **document** | 174:11,24 |
| 190:8,10,14 | 77:20 98:21 | 175:20 189:18 | 175:4,6,11 |
| 191:4 | 108:7 112:5 | 189:19 | 176:23 177:1 |
| **discovered** | 164:16 165:8 | **documents** | 178:2 180:9,10 |
| 26:8,11 | **dissect** 47:12 | 175:19 | 181:12,14,23 |
| **discovery** | 69:3 | **doing** 62:16 | 182:3,9 183:25 |
| 24:20 87:11,14 | **distance** 63:9 | 69:19,20 71:20 | 184:7,16 |
| 91:9 92:2,4 | 63:14,17 | 87:7 100:13 | 185:18 |
| **discuss** 12:2 | **distending** | 118:1,11 | **double** 187:15 |
| 80:17,19 | 180:4 | 131:19 132:12 | **doubt** 120:4 |
| **discussed** 11:8 | **distilling** | 168:15 | 145:9 |
| 37:15 80:22 | 145:17 | **dollars** 17:23 | **dozen** 34:23 |
| 84:18 | **distinct** 183:7 | **domain** 67:7 | 72:13 |
| **discussing** | 184:3 | 73:21,25 74:10 | **dr** 6:8 78:4 |
| 81:17 180:2 | **distinctive** | 97:10 100:9 | 166:6 187:10 |
| **discussion** | 114:5 183:12 | 104:12 106:9 | **draft** 58:7 |
| 12:20 19:12 | **distinguish** | 107:12 | 60:24 88:23 |
| 33:1 55:7 | 76:2 | **don** 14:24 15:1 | 89:1,5,9,12,12 |
| 89:21 167:13 | **distinguishing** | 15:5,13 42:10 | 89:15,16,17,24 |
| 187:5 | 121:20 | 52:2,19,22 | 90:14,14,23 |
| **discussions** | **distributed** | 72:17 74:25 | 91:4,4 |
| 81:22 | 123:20 | 75:8,18 76:4 | |

**[drafts - entire]**

**drafts** 89:17,22 89:23 90:6,12 90:12 91:3
**draws** 78:19
**dreamcoat** 67:17
**drum** 72:10,14 149:20,21 150:23 151:11 190:11
**drumbeats** 72:9 150:20
**drumming** 149:19
**drums** 152:20
**dua** 1:8 2:12 4:16 188:15,25 190:15,23 191:10,14 192:10 199:10 199:12 202:3 203:4 205:1
**dually** 44:15
**duly** 6:2 201:8
**dum** 107:20,20 107:20,20 116:24,24,24 116:24,24,25 125:18,18,18 125:18,18,18 125:19,19,19 125:19,19,19 151:4,4,4,4
**duration** 129:17,18,20

130:6,20 131:4 133:5,13 134:5 134:18 135:16 146:7
**dying** 109:6

**e**

**e** 6:1,1,1 12:16 31:7 78:12 108:16 112:20 123:13 124:1,2 124:6,7,13 129:25,25,25 129:25 130:11 130:12 177:11 199:1,7 200:1 203:9,12 204:1 205:3,3,3
**earlier** 7:9 9:17 27:6 30:8 33:16,18 41:9 66:12 67:11 82:15 83:12 87:3 88:15,23 89:1,5,8,12 97:11 98:1 118:19 131:12 131:14 136:9 136:22,22 139:13 154:25
**early** 7:3 55:22 97:7 129:14 152:4 181:21
**ease** 168:16,24
**easier** 9:18 162:14

**easiest** 127:24
**ed** 23:8 29:5
**edit** 81:10,12
**edited** 81:23
**edition** 58:13 61:7
**editions** 57:25 58:2,19 60:14
**editor** 59:12
**editorial** 59:9
**educated** 63:22
**education** 58:19 61:7
**effect** 3:14
**eight** 24:6 26:2 76:10 108:19 108:20 109:3 114:4 123:17 159:3,7,17,24 159:24 160:7 163:5 166:10 166:21 167:16 175:24 176:1,4 186:3
**eighth** 101:9 133:13 176:19 186:4,7,8,11,13 186:19,19
**either** 11:10,12 15:4 36:13 84:5,11 85:1 85:11 120:14 120:15 122:4 175:22

**el** 123:25 162:19 177:5 177:19 178:7,9 178:16
**elaine** 2:17 5:22
**element** 134:1
**elements** 39:4 68:22 69:7,8 98:12 99:19 100:8,9 139:16
**elevator** 80:5
**elicit** 84:17
**eliminating** 167:11
**email** 2:6,16 36:1 195:23,25
**emails** 35:22
**embracing** 143:21
**emulate** 150:8 151:18
**en** 33:21 43:7 43:10,15 44:5 45:4 47:1 162:19
**engaged** 16:23 23:5 32:15 55:21,23
**engages** 22:24
**english** 41:8 95:3
**ensembles** 79:14
**entire** 52:16 151:10

**[entirety - experts]**

| | | | |
|---|---|---|---|
| **entirety** 68:14 | **est** 4:3 196:25 | 95:4 99:20 | **exhibit** 20:19 |
| 93:14 118:5 | **established** | 100:13 102:14 | 21:14,18 72:11 |
| **entitled** 1:19 | 6:25 45:2 70:6 | 103:1 105:14 | 86:19 162:8,9 |
| 188:15 191:10 | 103:9 | 108:24 122:3 | 162:11 163:20 |
| **entry** 24:7 | **estimate** 19:17 | 128:2,10,25 | 176:25 187:10 |
| 48:11,14 49:4 | 19:19 34:14,16 | 129:4 138:6 | 188:23 189:3 |
| 49:10 98:1 | **et** 4:17 23:21 | 140:3 143:2 | 191:7,8,18 |
| **enumerable** | 29:6 31:13 | 162:16,22,23 | 194:12 195:7 |
| 71:8 | 32:15 38:19 | 163:5,11 | 195:11 196:5,8 |
| **enumerate** | 202:3 | 165:14 166:10 | 199:9,10,12,16 |
| 125:4 | **everybody** | 166:12,21,23 | **exist** 74:20 |
| **equation** 63:21 | 112:10 | 167:16 168:22 | 103:10 |
| **eric** 2:8 5:12 | **evidence** 67:23 | 168:22 174:13 | **existed** 95:6 |
| **errata** 202:1 | 67:23 156:4,22 | 175:10,24,25 | 99:10 |
| 203:14,16 | 157:21 | 176:4 182:24 | **existent** 69:15 |
| 204:3,5 | **evolved** 88:20 | 183:16 | **exists** 72:22 |
| **españa** 7:22 | **exactly** 46:7 | **examples** 72:13 | **expect** 26:18 |
| **especially** | 56:7 66:25 | 164:10 168:19 | **expectation** |
| 111:14 | 68:3 118:21 | 182:18 | 100:3,11 |
| **esq** 2:7,8,8,17 | 122:16 158:23 | **excelsior** 58:23 | **expectations** |
| 2:17,18 203:1 | 194:21,21 | **except** 3:8 | 27:10 47:11 |
| **essential** 39:3 | **exam** 22:2 | 129:7 | 63:9,14 118:9 |
| **essentially** 27:4 | **examination** | **excerpt** 117:15 | **expected** |
| 37:2,23 49:25 | 6:6 199:4 | **exchange** 26:15 | 108:23 |
| 57:4,13 59:11 | **examine** | 27:9 | **experience** |
| 62:22 67:10,24 | 163:24 | **excluding** | 104:20 105:18 |
| 68:2,15 72:15 | **examined** 6:4 | 179:25 | **expert** 1:18 |
| 72:25 79:9,17 | **example** 23:6 | **excuse** 163:16 | 13:6,10 17:17 |
| 89:1,8 90:14 | 28:23 37:3 | **exercise** 76:10 | 30:5 33:1,15 |
| 91:1 93:10 | 38:17 39:13,14 | 122:5 125:20 | 34:5 56:18 |
| 108:21 129:7 | 44:2 48:13,14 | 126:16 | 73:8 100:5,12 |
| 129:16 146:14 | 50:1,2,14 54:3 | **exert** 65:19 | 119:9,16 |
| 156:8 157:17 | 58:4 59:20 | **exhaustive** | 171:17 201:7 |
| 159:2 160:2,4 | 64:10 72:8 | 97:20 | **experts** 105:1 |
| | 74:1 76:17 | | |

Atkinson-Baker, A Veritext Company
(818) 551-7300                                    www.veritext.com

**[expires - filtering]**

**expires** 198:17
202:25
**explained**
141:14 155:13
160:3
**explication**
153:17
**explicit** 118:20
**explicitly** 10:21
**expression**
106:8 107:11
109:22 142:3
155:22 193:3,5
**expressions**
144:4
**extensive** 36:7
**extent** 27:9
28:14,17 30:3
30:6 33:6
41:22 45:2
46:19 62:8
68:18 70:8,11
70:22 82:5
88:20 92:3,6
94:7 95:11
98:1 103:9,16
103:22 115:11
143:16 151:25
152:6,8,13
156:1,21 195:7
**external** 58:5
**extra** 21:4,7
164:8
**extrinsic** 40:10
47:8,11 69:4

94:4,17 95:25
96:1 104:18
151:15,17,19
**eye** 129:5

**f**

**f** 6:1 108:18,18
108:18 124:2
177:11
**facilitate** 45:8
**fact** 25:24
40:15 43:9
46:15 47:15,17
50:17 51:13
52:21,24 56:3
67:8 73:10
76:13 80:1
87:10 91:9,20
92:1,4,7,10
93:9,12 105:25
106:3,5 107:2
107:6,7 114:2
133:6 137:19
145:10 148:25
150:12 190:8
192:12
**factor** 151:15
151:17
**facts** 91:10,24
96:2
**faculty** 79:1,8
79:19,22 80:1
80:2,7
**failure** 64:14
65:13

**fair** 154:15
**familiar** 14:8
14:19,21,23,25
15:22 16:1
55:20 61:14,17
61:24 62:1
74:14 115:2,19
118:14,23
188:2
**family** 35:21
**famous** 44:6
112:18
**far** 14:2 25:9
25:12 53:2
60:16 123:14
130:14 131:1
171:16,17
**faster** 175:2
**fathom** 41:6
**fault** 41:7 82:8
**favorite** 86:6
**february**
201:17 203:3
**federal** 1:23
30:21 204:1,8
204:9
**federation** 7:5
**feel** 6:14 15:9
188:18
**fees** 26:17
**felt** 56:8,18
**ferrara** 1:18
4:13 6:8 7:10
7:16,17 9:15
9:20,21 21:16

35:10,15,16
112:17,24
194:11 197:2
198:8 199:5,9
201:6 202:4,20
203:5 205:2,24
**ferrara's** 166:6
187:10
**ferret** 76:7
**fever** 122:21
**fifth** 57:24 58:2
58:12,19 60:13
61:7 109:3,25
110:8 112:20
113:19 114:22
**figure** 90:20
113:22 117:4
**figures** 110:9
113:2
**filed** 4:17 18:3
18:4,5,10,11
**filing** 3:4 19:4
**filter** 100:6,8
100:14 103:22
104:5,9,10,11
139:14 148:24
**filtered** 50:19
99:13,17
100:16 132:4
137:23 148:22
149:6 162:2
**filtering** 99:22
99:25 146:23
148:8,24
149:18

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[filtration - forgive]**

| | | | |
|---|---|---|---|
| **filtration** 100:7 | 34:3 56:20 | 189:21 190:5 | **flattering** |
| 103:8,17 104:4 | 60:17 62:19 | 194:10 | 114:24 |
| 104:16 | 65:22 66:20 | **five** 48:20 54:5 | **floor** 2:14 |
| **final** 55:23 81:1 | 71:2 75:5 | 54:5,7 56:25 | 72:13,20 80:3 |
| 81:6 83:20 | 89:15,17 90:13 | 71:21,23 76:10 | 80:4,7 150:24 |
| 149:11 169:7 | 94:24 95:3 | 88:21 108:17 | 151:3,11 |
| **finally** 69:12 | 102:11,18 | 108:17,17 | 152:10,24 |
| **financially** 5:4 | 104:6 108:16 | 109:1,1,4,4,4,8 | 190:7,19 191:4 |
| **find** 36:8 41:7 | 108:20 109:18 | 109:11,11,11 | **flutist** 44:6 |
| 45:24 47:14 | 110:7,7,13 | 110:9,9,10,10 | **fly** 45:20 97:17 |
| 63:16 96:2,3,3 | 113:15 120:5 | 110:10,11,17 | 131:19 132:13 |
| 97:21 98:14 | 120:10 128:4,6 | 110:17,17 | **folk** 72:5 73:19 |
| 99:8 113:2 | 128:13,16,23 | 113:25,25,25 | 73:20 74:1,2 |
| 143:21 145:10 | 129:6 130:3,8 | 114:9,10 120:1 | **follow** 103:5 |
| 145:13 190:25 | 132:9,16,22 | 130:4,8 131:17 | 135:21 140:14 |
| 198:2 | 134:13,14 | 131:18 134:15 | 141:16 |
| **finder** 72:5 | 135:1,2,8,9,14 | 135:4 137:3,3 | **followed** 5:7 |
| 73:19,20 74:1 | 136:24 137:3 | 137:3,3,18 | 47:11 100:20 |
| **finding** 82:8 | 137:18,18,22 | 140:5,5,5,19 | 101:10 186:8 |
| 156:5 | 138:4,8 139:2 | 157:17 159:14 | 186:19 |
| **findings** 19:13 | 139:3,15 140:4 | 160:5 167:2,6 | **following** 26:18 |
| 27:7 28:10 | 141:14 148:19 | 167:6,6,7,17,17 | 161:24 |
| **fine** 17:22 | 148:21 149:2,7 | 167:17,18 | **follows** 6:5 |
| 19:20 34:15 | 149:16 150:11 | 168:3,3,4,5,5,5 | 138:2 203:8 |
| 54:22 106:12 | 159:12 161:15 | 168:5,11,11,11 | **footnote** 139:22 |
| 165:21 | 161:22 162:1 | 168:12 180:3,5 | **force** 3:14 |
| **finish** 53:22 | 162:16,22,23 | 180:7,11,12 | **forcing** 158:10 |
| 56:23 105:11 | 167:18 169:12 | 183:20 186:25 | **forefront** 33:23 |
| 190:3 | 170:21 171:9 | 197:3 | 191:12,17 |
| **finished** 90:14 | 171:13 175:16 | **flat** 44:22 45:10 | 199:15 |
| **firm** 10:18,21 | 176:6,13,18 | 46:13 51:15,16 | **foregoing** |
| 10:23 25:23 | 177:1 178:5 | 51:23 54:6 | 198:1 |
| **first** 6:2 9:1,13 | 179:21,23,25 | 76:21 108:16 | **forget** 114:4 |
| 10:15 11:16 | 180:21,23 | 109:13 112:20 | **forgive** 134:22 |
| 15:15,19 23:7 | 183:6 187:23 | 128:19 | 148:18 162:18 |

Page 19

**[form - front]**

**form**  3:8 8:7,20
9:5 10:9 12:9
14:10 16:6
18:17 19:23
20:10 22:22
23:25 24:11,25
25:20 27:18
28:12 29:2,20
33:3,12 34:6
36:18 37:16
38:9 40:3
41:15 42:19
43:23 45:18
46:3 48:5,8
49:20 50:10
51:3 52:8
53:11,23 57:19
58:7 60:2,9
62:9 63:4,24
64:21 65:17
66:4 68:11,20
70:16 73:17
74:18 75:1,20
77:3 81:2,11
88:2,7,17 93:3
94:1 96:13,21
97:14,24 98:17
99:4,23 101:14
105:19 108:4
110:3 111:1,12
115:4,9,25
116:18,22
117:8 118:4,17
118:25 119:5
119:18 120:7

120:19 121:12
122:15 123:5
126:21 127:14
133:16 135:25
136:20 141:22
142:23 144:6
144:25 147:2,6
148:12 150:9
151:21 153:2
153:13 154:9
156:19 161:17
167:8 169:10
169:16 170:4
178:11 183:5
184:1 188:11
192:15
**format**  56:7
187:13
**formatting**
90:17,20,23,24
**formed**  6:22
**forth**  7:2,18 8:2
23:8 24:21
37:7 53:16
58:10 66:23
70:5 71:25
88:22 90:15
101:4 125:11
152:5 157:4
201:8
**forward**  55:17
56:6 91:24
171:24 172:12
195:23

**found**  28:4,19
63:18 105:4
121:8,10,24,25
127:17 154:22
194:16
**foundation**
34:7 46:4
49:21 55:19
63:5 75:2,21
82:18 86:8,11
88:8 99:4
104:23 105:20
111:3,13
118:18 150:10
151:22
**founder**  73:7
**four**  19:9 38:21
48:20 52:22
53:9,12,14
54:6 71:21,24
72:13,19 80:12
91:8 102:13
103:1 107:24
108:16,20
109:1,4,4,5,8
109:12,12,13
109:18 110:13
110:17,17,17
112:18 114:9
114:10 125:21
126:6 130:10
131:9 134:17
135:6,9 137:4
137:4,4,4
138:8 145:17

150:21,23
151:3,11,13
152:10,23
157:17 159:1
159:14,23
160:4,7 168:6
170:11 171:18
178:21 179:14
180:7 182:3
183:20 186:2
186:17 189:6
190:7,19 191:4
**fours**  146:1
**fourth**  57:24
58:1,12,19
60:13 186:18
**fractionalized**
146:15
**fragment**  142:1
144:1 149:15
**fragmentary**
142:6 143:15
143:24 144:3
145:8
**frame**  19:24
**framed**  46:7
53:1
**france**  71:6
**franz**  125:8
**frcp**  204:1
**free**  188:18
**french**  71:5
**friends**  35:21
**front**  86:22
87:2 140:1

**[front - grams]**

145:4 175:19
**full** 79:22 87:23
117:23 178:19
**fuller** 26:23
**fully** 175:9
**function** 48:19
130:2 134:3
**functional**
99:12
**fundamental**
39:17 49:9
98:2,6 134:1
**furnished**
162:7
**furnishing**
162:10
**further** 3:7,11
193:13 196:17
201:11
**future** 188:7,16
189:2 192:9
199:11

**g**

**g** 12:16,16
77:17 78:12
108:16,16,16
112:20,20,20
124:12,12,12
124:12,13
125:25,25,25
125:25 140:23
**gadgetry** 74:15
**gaga** 23:9
**gang** 124:11,12
179:1,12

**garry** 1:20 4:25
6:3 201:3,21
**gees** 122:20
**geluso** 77:14,16
78:4,4,11,21,23
80:23 119:9,11
119:12,16
120:18
**geluso's** 81:13
81:14
**general** 147:4,5
153:8
**generally** 35:2
95:2
**generic** 59:1
126:5
**genre** 126:10
**german** 44:17
**getting** 195:20
**giggle** 176:13
177:24
**gilbert** 97:8
**ging** 124:11
179:1,12
194:13,17
**gist** 189:7
**give** 20:13,17
21:7 95:4
132:13 185:12
**given** 20:12
22:8 79:16
81:1,2 88:5
102:6 108:23
145:10 157:22

158:8,9 193:11
197:1 201:10
**giving** 45:19
124:25 125:1
**gmail** 36:2,3
**gmail.com.**
36:5
**go** 4:9 6:14
21:9,23 22:3
26:20 28:11
35:11,13 38:21
41:22 45:20,23
50:24,25 51:17
55:2 60:7 68:6
69:19 70:24
71:22 77:13
78:5,7 83:17
104:7 106:16
116:12 128:3
128:24 149:22
153:17 155:1
155:14 163:1
176:24 182:11
183:1
**goes** 22:7
102:19,19
138:17,18,23
138:24 173:5,5
173:8
**going** 4:2 10:22
12:22 15:21
16:22 20:18
23:11 26:20
34:1 43:19
45:3 54:20,23

56:23 71:24,24
73:22,24 80:6
84:7 85:3 87:7
89:4 90:18
91:8 96:12
98:13 101:13
107:19 115:19
116:7 131:10
133:25 134:2,4
138:15,16
139:2,9 149:19
154:12 155:13
168:11 172:4
173:12 174:12
178:25 182:11
188:14 189:21
191:7 193:19
194:7
**good** 4:1 5:9
6:8,10 7:11
54:20 64:12
77:25 83:19
147:23,24
189:22 193:15
**google** 74:23
75:16
**goolie** 124:11
124:12 179:1
179:13 194:14
194:17
**grade** 73:10
**grammatical**
90:16
**grams** 81:4

**[grandpa - identifying]**

**grandpa** 35:17
**grant** 29:9 31:1
  31:3,7
**granted** 30:21
  31:19,20 32:17
  44:11 66:15
**granting** 28:21
**gray** 31:5,12
  38:18 46:24
**great** 86:24
  196:22
**greatest** 125:9
**greatly** 6:15
  150:3,14
**greenwood**
  57:23 60:11,23
**griffin** 28:23
  32:20,23 33:16
**group** 6:25 7:2
**grove** 62:21
  139:25
**grows** 40:8
**gs** 140:18
**guan** 2:8 5:13
**guess** 78:25
**guest** 87:6
**guide** 58:18
  60:14 61:6

**h**

**h** 199:7 205:3
**half** 44:22
  129:9 143:4
  167:2 176:21
**hall** 31:17

**hand** 42:14
  51:14 188:14
  191:7 201:17
**handled** 203:8
**happened** 29:1
**happens** 173:7
**happenstance**
  80:8
**happy** 10:1
  20:13 136:8
**hard** 41:5
  77:17
**harder** 110:23
  111:10,25
  112:24
**harmony** 58:22
  60:16 66:22
  68:18 103:14
**harvard** 48:2
  48:12,15 49:4
  49:10,12 62:22
  139:25
**hate** 105:8
**heading** 160:20
**hear** 10:20 14:5
  17:11 78:9
  81:9 82:10
  109:5,6 173:20
**heard** 13:16,18
  13:24 14:3
**hearsay** 189:18
**heart** 144:9
  181:13 191:11
  191:16 192:5
  193:2,4 199:14

**held** 1:19 4:21
  55:7 130:21
  187:5
**help** 22:1 45:8
  175:12
**helped** 86:13
**hereto** 3:4
**hereunto**
  201:16
**hermeneutic**
  68:24 69:2
**hermeneutics**
  68:25
**highly** 64:8
  78:18
**highness**
  129:22
**hired** 7:13
  25:23
**hit** 10:8,13
  122:11,20,22
  122:23 123:13
  123:21,22
  124:4,9,20,22
  124:22,23
  125:13 126:9
  126:12 148:5
  153:22 185:6
**hits** 121:10
  123:1,4,8
**home** 73:14
**hopefully** 56:24
**house** 72:22
**hudson** 1:8
  2:12

**huge** 7:23
**hum** 74:23
  75:15
**humanities**
  63:13
**hundreds** 10:4
**hymn** 25:5
**hypothetical**
  93:23

**i**

**i.e.** 139:16
**ice** 118:15
**iceberg** 157:1
**iconic** 73:5
  109:20 125:15
  125:16
**idea** 75:17,24
  91:2 105:17
  124:21
**identical** 76:16
  102:2 133:3,4
  133:4,5 137:1
  146:5,6,7,7,8
  146:12 159:18
  173:14 187:13
  194:16
**identification**
  21:18 189:4
  191:19 196:9
**identified** 69:6
**identifies** 70:10
**identify** 127:9
**identifying**
  76:20

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[illinois - issue]**

| | | | |
|---|---|---|---|
| **illinois** 59:7 | **incomprehen...** | 84:17 87:15 | **interesting** |
| 61:4 | 46:17 144:7 | **informed** 10:25 | 25:22 31:6 |
| **imagine** 139:23 | **independent** | 40:8 85:18,19 | 163:15 |
| **impact** 95:22 | 23:2 156:7 | **infringement** | **international** |
| 158:11,17 | 157:23 | 25:3,5 96:4 | 124:15 |
| 165:22 188:9 | **independently** | **initial** 19:11 | **interrupt** 99:2 |
| 188:13 189:14 | 95:1 154:23 | 87:25 88:3 | 99:3 |
| **implicated** | 155:2 156:18 | **initially** 25:23 | **interrupted** |
| 119:3 | **index** 199:25 | 56:13 | 32:4 |
| **important** | **indiana** 59:6 | **injecting** 34:4 | **interruption** |
| 38:24 63:15 | 61:3 | **insert** 91:18 | 77:23 98:24 |
| 73:9 92:7 | **indicate** 74:24 | **insertions** | 108:10 112:8 |
| 171:12 173:2 | **indicated** 87:3 | 199:18 | 164:19 165:11 |
| 191:1 | 88:5 | **insignificant** | **intrinsic** 47:6 |
| **importantly** | **indicating** | 160:12 | **introduce** |
| 51:8 121:16 | 13:11 105:15 | **insofar** 175:2 | 20:18 |
| **improv** 58:23 | **indices** 71:3 | **inspect** 187:15 | **introduced** |
| **improved** | **indirectly** | **inspiration** | 162:9 |
| 65:16,19 | 84:17 | 189:10 | **invoicing** 16:25 |
| **inaccurate** | **individual** | **instance** 42:7 | **involved** 10:6 |
| 82:15 | 63:22 64:3 | **instances** 28:15 | 14:7 56:17 |
| **inappropriate** | 68:21 | 39:23 74:1 | 61:13 81:9 |
| 17:24 | **individuals** | **instrumental** | **inxs** 191:10,15 |
| **inclination** | 22:14,15,17,20 | 124:3 | 192:13 199:13 |
| 109:8 | 61:13 | **instrumentati...** | **island** 95:7 |
| **include** 70:17 | **industry** 17:18 | 9:25 10:2 | **isolate** 54:4 |
| 121:5,6 152:4 | **infinite** 147:22 | 153:1,3,18 | **issue** 12:1 |
| **included** 27:11 | **influence** | **intended** | 20:16 30:4,7 |
| 27:12 203:14 | 190:13,16 | 187:17 | 33:5,7 42:14 |
| 204:3 | **inform** 26:20 | **interchangable** | 43:5 44:3 |
| **includes** 129:19 | **informal** | 96:17 | 46:14 47:3 |
| **including** 45:11 | 162:11 164:2 | **interest** 57:5 | 49:25 50:16 |
| 117:5 191:3 | **information** | **interested** 5:4 | 52:18,23 56:15 |
| **income** 17:16 | 27:3 35:12 | 152:14 201:14 | 58:10 62:17 |
| | 36:7 70:20 | | 67:1,4,25 |

Atkinson-Baker, A Veritext Company
(818) 551-7300                                  www.veritext.com

**[issue - know]**

68:10 69:15
70:19 72:16
75:13,16 77:5
90:20 93:9,12
93:14 94:7
99:12 101:19
102:23 103:3,7
109:22 118:21
118:24 121:22
126:25 127:4,5
127:6,13 128:5
129:2 132:21
133:1 138:9
143:3,6 149:10
149:10 151:9
154:2 155:22
156:8 158:20
158:24 159:3
159:10,20,21
160:5 161:19
166:18 171:10
171:16,20
172:2,4 178:6
184:6,11
185:18 189:24
190:2 191:3
**issued** 85:7
120:6,11,17
**issues** 56:17
68:19 92:7,8
**it'll** 74:24
**italy** 97:7
**iterate** 181:25
**iteration** 82:15
87:25 88:15

**j**

**j** 1:20 6:3 201:3
201:21
**james** 5:19 44:6
**january** 1:14
4:4 24:19
202:4 203:5
**jason** 2:7 5:10
174:18
**jazz** 44:6
**jersey** 2:5,5
**jesus** 67:15
**jim** 2:18
**jobs** 7:24
**joe** 2:21 4:23
**join** 57:3,8,11
**joined** 6:25 7:4
79:22
**joining** 6:9
**joseph** 67:16
**journal** 37:5
**journals** 59:5
59:18,19 61:1
**jr** 1:8 2:12
202:3
**jtb** 2:6
**jtblawgroup....**
2:6
**judge** 25:10,14
26:20 29:7,9
30:21 31:1,2,6
31:18 32:1
44:10 45:3
66:15 143:9

**judgement**
28:17,22 29:7
29:10,18 30:14
30:18,22 31:3
31:8,16,21
32:5,8,10,18
44:12 66:14,16
**jumping**
135:19
**jury** 28:11
31:10
**justin** 23:14

**k**

**k** 43:11 66:15
**keep** 48:3 82:11
145:17 146:23
**keeping** 69:4
**kept** 157:24
**key** 48:25 49:2
49:10,15 50:15
50:16 54:4
98:2,2 102:4,5
104:25 129:20
155:17 183:11
**keyboard**
46:25 58:22
60:16 125:23
**keys** 46:25 49:1
49:4,5,8,9
50:18 98:5
101:24 128:13
129:3,25 140:9
**kick** 72:14
150:22 151:11

**kind** 32:8 63:16
72:3 79:21
80:8,9 102:20
152:2
**kinds** 90:21
**klausner** 31:2
**knew** 26:19
**know** 8:1,17
10:2 12:8,11
14:2 16:21
19:10,13 21:23
25:2,7,9,13
26:22,23 28:1
33:20 37:14
38:6 39:6,8
45:22 52:12,14
54:12,16 55:16
57:17,23 58:22
59:1 60:4,19
61:8 65:21
68:4,6 71:22
71:25 79:4,14
81:20,21,22
82:1,12,21
83:23 84:2,5
84:11,25 85:5
85:10,17,20
88:21 89:10
90:9,11,19
95:4 98:5
101:3 103:12
107:22 110:7
111:14 114:12
116:17,23,25
117:3,14 118:1

Atkinson-Baker, A Veritext Company
(818) 551-7300                         www.veritext.com

**[know - lepera]**

| | | | |
|---|---|---|---|
| 118:19,22 | **la** 7:16 9:19 | **lawyer** 11:5 | 23:25 24:11,25 |
| 119:2,15 | 35:9 123:15 | 81:8 | 25:20 27:18,23 |
| 122:18 123:4,9 | 162:19 | **lay** 105:23,23 | 28:12 29:2,20 |
| 123:14 124:2,3 | **label** 21:13 | 106:24,25 | 33:3,12 34:6 |
| 124:17 132:11 | **lady** 23:9 | **learn** 91:11 | 34:14,17 35:5 |
| 142:7,20 152:4 | **land** 104:8 | **learned** 77:16 | 36:18 37:16 |
| 152:7,11 165:2 | **lands** 104:3 | **leaving** 154:17 | 38:4,9 40:3 |
| 165:4,22 | **language** | **led** 30:25 33:20 | 41:15,21 42:19 |
| 167:20 173:2 | 157:25 | 38:17 43:8 | 42:25 43:23 |
| 178:20 184:24 | **larball** 1:4 2:3 | 47:4 | 45:18 46:3 |
| 188:4 190:22 | 4:15 202:2 | **left** 103:23 | 48:5,8 49:20 |
| **knowledge** | 203:4 205:1 | 104:13 138:3 | 50:10 51:3 |
| 84:12 85:25 | **large** 122:17 | 139:18 146:24 | 52:8 53:11,21 |
| 110:19 198:4 | **largely** 63:18 | 148:10 149:7 | 54:19,25 56:10 |
| **known** 7:20 | 95:25 116:2 | 150:12,17,25 | 57:19 58:16 |
| 39:8 73:13 | 159:13 | **legal** 40:1,7 | 60:2,9 62:9 |
| 124:8,13 | **larger** 145:12 | 95:19 96:7 | 63:4,24 64:6 |
| 125:14,15 | **larry** 7:10,16 | 203:7 | 64:21 65:17,20 |
| 126:14 151:6 | 7:17 9:14,20 | **legally** 22:25 | 66:4 68:11 |
| 156:13,15 | 9:21 35:9,20 | **legend** 149:20 | 69:24 73:17 |
| **knows** 42:8 | **latin** 7:14,19,25 | 149:21 | 74:18 75:1,20 |
| 108:22 | 124:8 | **length** 130:22 | 77:3,15,25 |
| **knupp** 1:12 | **law** 10:18,21,23 | 159:8 | 81:11,19 82:17 |
| 2:11 4:22 5:16 | 25:23 27:15 | **lengthy** 86:19 | 82:24 83:2,9 |
| 5:20 | 31:11 38:14 | 188:19 | 83:16,19,25 |
| **kozmeniuk** 1:8 | 45:7 47:21 | **lepera** 2:17 | 84:10,20 85:8 |
| 2:12 | 94:25 95:10 | 5:15,15 8:7,20 | 85:22 86:3,7 |
| **kpf** 1:6 | **lawrence** 1:17 | 9:4,7,9,12 10:9 | 86:10,21,24 |
| **kram** 66:15 | 4:13 35:15,16 | 11:2 12:9,25 | 87:18 88:2,7 |
| **l** | 197:2 198:8 | 13:22 14:10 | 88:12,17 89:3 |
| **l** 6:1 12:16 | 199:5 201:6 | 15:6 16:6,16 | 89:7,19 90:8 |
| 13:25 14:9 | 202:4,20 203:5 | 17:19 18:3,17 | 91:13 93:2 |
| 16:15 78:12 | 205:2,24 | 19:16,23 20:10 | 94:1,21 96:12 |
| 124:1,2,13 | **lawrence.ferr...** | 20:15,20,24 | 96:21 97:14,24 |
| 177:11 | 35:25 | 21:3 22:22 | 98:17 99:1,23 |

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[lepera - lipa]**

100:23 101:13
104:22 105:8
105:19 106:11
106:13 107:23
108:4,12 110:3
111:1,12,21
112:10,14
113:7 115:4,7
115:18,25
116:9,18,22
117:8,17 118:4
118:17,25
119:5,11,18
120:7,13,19
121:12 122:15
123:5 126:21
127:14,23
128:8 133:16
133:21,24
135:25 136:19
141:22 142:13
142:23 144:6
144:14,16,20
144:25 145:20
147:2,6 148:12
150:9 151:21
153:2,5,13
154:9 155:7,12
156:19 160:20
161:3,17 163:3
163:9,14,17,22
164:21 165:1
165:18,24
166:16 167:8
167:14 168:8

168:14 169:3,5
169:10,16,24
170:4,8 172:6
172:15,22
173:15,25
174:12,17,21
175:18,23
177:14 178:11
179:8,18,22
180:16,22,25
181:5 182:17
182:22,24
183:5 184:1
185:7 187:1,8
187:21 188:11
188:17,20
189:16 191:13
191:20 192:15
192:20 193:15
193:19 194:6
194:11 195:16
195:25 196:4
196:10,13,16
196:19,22
203:1
**lessons**   79:14
124:25 125:1
**level**   157:15
**levitating**   15:16
42:12 51:19
52:3 72:17,18
74:23 75:17
76:6 92:25
93:6,8,17
101:21 103:25

104:21 105:16
114:8,19
128:11,16,20
129:3 130:16
130:24 131:11
131:13,15
132:1 133:18
134:14,16
135:3,5 136:13
136:15,25
137:21 138:12
138:18 140:10
140:25 141:2
141:13 146:4
146:14 147:18
150:7,21
151:18 152:2
152:21 153:16
154:23 155:4
156:6,6,24
157:3,6,12,15
158:5,6 159:4
159:7,9,12,22
160:8,11
161:15 166:21
166:24 168:21
170:3,17,20,23
172:11,18,20
173:4,8,13
175:9,16 176:6
177:21 178:7
179:17,19
181:6,10
182:10 183:4
183:11 185:24

188:3 193:1,6
**lf2nyu**   36:5
**library**   72:10
**license**   44:20
**licensed**   44:16
44:16
**light**   79:21
**limited**   100:4
**line**   89:20
105:11 128:21
129:1,15 130:4
130:13 132:17
132:18 133:8
133:15,17
199:19,23
200:3 202:5
203:15 204:4
205:4,7,10,13
205:16,19
**lines**   100:21
129:9 146:19
**lining**   133:3
**link**   194:13
**links**   193:21
194:3 195:12
195:12 196:3,7
196:14 199:16
**linzer**   1:4 2:4
4:16 12:8,11
12:24 13:4,17
13:19 14:9,14
14:18 202:3
**lipa**   1:8 2:12
4:17 188:15
189:1 190:15

Atkinson-Baker, A Veritext Company
(818) 551-7300                                    www.veritext.com

**[lipa - manner]**

190:23 191:10
191:15 192:10
199:10,12
202:3 203:4
205:1
**list** 22:14 34:2
36:6 41:12
42:5 45:25
46:8 47:16
62:5 97:12,13
**listed** 24:3
57:15 61:8
**listen** 47:7
82:19
**listened** 14:12
16:14 117:1
**listener** 105:17
105:23,23
106:3,24,25
107:6
**listener's**
104:20
**listening** 106:1
107:3
**listing** 26:16
**lists** 39:10 61:9
**liszt** 125:8
**literally** 10:4
44:22 100:7
121:1 136:21
137:17 146:12
190:18
**litigated** 44:25
**litigation** 10:16
10:24 12:12

14:4,20,22,24
15:2,24 16:14
17:5,6 55:22
55:24 65:23
118:15
**little** 7:8 24:9
25:11 95:12
105:10 127:2
**littlefield** 58:21
60:23
**lived** 95:7
**llc** 1:9 2:2,13
5:11 202:1
**lloyd** 66:9 67:8
67:14,24
**llp** 1:12 2:11
4:22
**locked** 203:12
204:1
**loeb** 25:24,24
26:1,1,9,9,10
26:10
**long** 12:18
22:14 39:5,8
40:7 50:17
59:3 109:12,13
110:11 117:2
171:23
**longer** 26:11
50:8 144:1
195:1
**look** 20:1,12
21:25 45:23
46:2 48:11,14
68:15,17 69:23

70:3,7 71:14
72:7,8 87:5
94:13 134:5
137:25 138:4
140:2 141:23
148:8 162:12
162:20 194:7
195:8
**looking** 11:4
54:2 65:7
70:25 132:12
133:2 138:5
166:3,3,10,12
167:16
**looks** 94:6
129:2
**loose** 164:22
166:5
**los** 32:14
**lost** 169:19
**lot** 21:23
105:14 190:24
**lower** 150:25
**lowness** 129:22
**lunch** 106:13
106:15,19
**lyrics** 68:19
189:23
**löschhorn**
122:4,7 124:22
125:14

**m**

**m** 66:15 71:4
**made** 30:14
59:16 71:10

82:21 89:22
166:7
**madison** 1:13
2:14
**main** 49:5
**major** 37:5
42:5,8 48:17
49:1,2,6,8,10
49:15 50:15,15
50:18 51:17
52:1 54:4 61:1
76:3,4,8,14
78:14 102:4
114:10 137:6
155:23 164:5
**majority** 74:8
**majors** 79:10
79:12
**make** 9:17
21:10 40:24
82:20,22 83:3
92:5 115:14
162:14 166:1
170:7 173:18
175:1 178:17
189:16 203:14
204:3
**makes** 157:13
**making** 45:8
174:18 189:11
**manela** 44:10
143:9
**manela's** 45:3
**manner** 35:3
50:1 99:11

Page 27

**[mark - minute]**

**mark** 187:18
188:20,22
191:8 194:8
196:5
**marked** 21:17
163:20 189:2
191:17 196:8
**marriage**
201:13
**mask** 6:12,13
**masses** 25:6
**master** 44:18
**master's** 78:15
**material** 39:11
**matter** 4:14
15:20 28:11
31:11 50:16
87:11 91:10
201:15
**matters** 37:2
**maximum** 50:7
**mean** 13:2 16:8
18:25 28:1
42:22 59:24
62:14 69:2
77:9 84:14
88:19 96:5,6
96:15 111:11
111:11 113:4
133:11 158:22
166:19 167:4
174:2 179:24
**meaning** 39:19
71:14 96:14
110:6

**meaningful**
47:15 76:19
104:16 142:4
**meaningfully**
52:1
**means** 26:4
169:5
**measure**
130:17 169:8
172:11 186:22
186:23
**media** 4:11
11:19,22,24
197:3
**meet** 193:17
**meeting** 80:2,8
80:9
**meetings** 80:1
80:13,16
**melodic** 121:21
121:21 128:17
129:18 132:16
138:15,22
139:15 140:1
141:14 142:5
143:3 144:2
145:7,12 146:8
146:16 160:10
173:1,11
**melodies** 30:4
33:17,24,24,25
71:13 128:5
129:2 139:17
145:14 171:21
190:2

**melody** 53:15
66:22 68:18
74:23 75:7
129:14 134:2
135:19 136:2
159:10,11
170:2,16,19
174:24 183:3,7
183:9,24 184:6
184:10
**members** 7:2
44:9
**membership**
57:1
**memorable**
114:15
**memorization**
87:4
**memory** 20:16
22:1 25:21
28:6
**meno** 37:12
**mention** 158:19
189:21 190:5
**mentioned** 43:6
139:12 165:25
184:24 190:8
190:12
**mentoring**
79:10
**merely** 44:22
46:13 51:17
121:23 133:9
**merengue** 8:1,5
8:8,13

**met** 79:3,5
**method** 72:10
73:2,5 125:24
132:6 190:11
**methodology**
28:4 37:24
158:12
**metric** 129:19
130:6 131:5
133:5 134:5,19
**michael** 44:8
**microphones**
4:5
**mid** 7:8 125:3
**middle** 73:11
150:2
**millions** 122:17
**mind** 12:17
21:4 56:12
83:7
**mine** 10:4
111:23
**minimal** 142:6
**minimum**
49:16 52:4
166:13
**minor** 42:5,10
48:18 49:6,11
51:18 52:2
61:5 76:5,8,15
109:9 114:11
114:11 137:6
155:24 183:11
**minute** 154:7
186:25

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[minutes - musical]**

| | | | |
|---|---|---|---|
| **minutes**  56:25 | **modify**  87:13 | **mozart**  97:6 | 40:2 45:10 |
| **misapprehends** | **moment**  21:19 | **msk**  5:23 | 46:16 47:16,18 |
| 118:5 142:24 | 40:7 121:17 | **msk.com**  2:16 | 48:25 49:3 |
| 147:7 | 195:14 | 203:2 | 51:12,24 52:24 |
| **mischaracteri...** | **money**  16:20 | **music**  1:8,9 | 54:8 61:25 |
| 29:21 40:4 | 17:14 74:11 | 2:13,13 8:18 | 72:19 76:24 |
| 46:4 53:23 | **monopolize** | 9:2,24 10:12 | 77:1,6 93:10 |
| 113:8 142:24 | 42:15 | 16:5,9 17:18 | 97:23 98:3 |
| 147:7,20 | **monthly**  80:16 | 37:3,5,6 39:2 | 99:9,20 101:25 |
| **miscounted** | **months**  85:17 | 41:5,25 42:22 | 102:7 103:19 |
| 132:12 | **morning**  4:1 | 42:23 43:22 | 106:1,6,7 |
| **misguided** | 5:9 6:8,10 | 46:1 48:2,22 | 107:3,9,10 |
| 148:15 | 145:21 190:6 | 53:18 54:2 | 116:6 121:23 |
| **misnomer** | **motif**  108:24,25 | 57:10,13 58:1 | 126:1 128:2,10 |
| 90:13 126:10 | 109:16 115:14 | 58:2,13,13,18 | 128:24 129:4 |
| **misremember** | **motion**  28:16 | 59:5 61:1,7 | 129:23 130:3 |
| 78:2 | 28:18,21 29:6 | 62:21,23,25 | 137:8,11,22 |
| **misrepresent** | 29:9 30:22 | 63:3 64:4,11 | 138:4,6 139:4 |
| 148:3 | 31:3,8,16,19,21 | 64:18 65:6,10 | 139:15 140:3,6 |
| **misrepresents** | 32:4,7,10,17 | 72:22 78:14,17 | 141:19 142:9 |
| 34:7 145:24 | 44:11 66:14,16 | 78:18 79:8,13 | 143:11,22 |
| 147:1,9 148:2 | **motions**  25:12 | 100:4 112:19 | 149:1 157:18 |
| **missed**  189:25 | 32:6 | 120:23,24,25 | 160:12 161:23 |
| **misspoke** | **move**  76:11 | 121:2,3,3,3,5,5 | 161:25 163:5 |
| 131:14 | 91:7 114:20 | 121:9,10 122:1 | 163:11 164:10 |
| **misstates**  113:8 | 132:10 148:6 | 122:3,6,7,8,11 | 165:13,14 |
| **mistake**  102:17 | 177:5 178:25 | 122:12,13 | 166:10,12,20 |
| **mitchell**  1:12 | **moved**  7:11 | 123:11 125:13 | 166:23 167:16 |
| 2:11 4:22 5:16 | **movement** | 150:4,15 151:7 | 168:18,22,22 |
| 5:20 | 124:19 183:21 | 152:5,12,20 | 169:7 174:13 |
| **modality**  76:22 | **moving**  55:17 | 153:4,8 190:17 | 175:10,15,23 |
| 103:14 | 114:15 125:22 | 191:3 192:24 | 175:24 176:3,5 |
| **modern**  73:7 | 126:7 132:3,19 | 193:1 | 176:12,17,24 |
| 122:14 188:16 | 132:20 138:11 | **musical**  37:4,10 | 176:25 182:17 |
| 189:1 199:11 | 138:12 171:24 | 37:13 39:7 | 182:24 183:16 |

**[musical - note]**

184:22
**musicals**  67:11
67:22
**musicians**  7:4,5
**musicological**
16:11 25:18
46:11 57:2
64:15 67:23
69:12 92:8
94:5,5 98:19
110:6,20 118:9
118:11 132:5
154:22 156:4
156:21 188:13
191:2 193:5
**musicologica...**
157:21
**musicologist**
27:2 39:6 41:1
41:2,7 42:7,16
62:16,18,24
63:23 64:5,25
65:3 70:23
80:21 94:18
95:13 96:8
104:5 108:22
155:18 192:23
**musicologists**
40:19 49:13
57:6 63:11
70:24 91:19
95:18 110:12
143:17,20
**musicology**
47:5,19 57:5

62:20,20 70:9
95:2 96:1
137:9,15,16
158:16

**n**

**n**  6:1 31:7 73:6
123:13,13
124:12,12
199:1 200:1
**name**  4:23 9:1
14:3 66:5,6
78:2 188:2
202:2,4
**named**  26:3
67:1,3,3
190:10
**names**  8:15
35:14 41:25
**natural**  48:18
109:7,7 128:19
**nature**  158:12
**nearly**  27:7
136:25
**necessarily**
22:21 54:9,17
60:5 62:14
71:16 72:1
96:5 109:19,20
183:7
**necessary**
203:14 204:3
**need**  49:17
55:15 59:16
87:5 105:9
127:1 164:7

179:3
**needed**  28:11
**needless**  24:19
**needs**  99:13,16
161:4 169:1,2
**neither**  170:18
171:20
**never**  14:3
15:12
**new**  1:2,13,13
1:22 2:5,15,15
4:19 25:24
26:12 29:8
56:16,17 66:11
78:12 87:15
91:22 124:1
140:1 201:4
202:1
**newton**  44:4,6
143:4
**nguyen**  2:17
5:22,22
**nice**  193:17
**niche**  7:11
**nick**  191:21
**night**  122:21
**nine**  23:22 24:3
58:16 120:22
131:7
**ninth**  31:14,22
32:19 38:17
39:23 40:9
44:5 130:24
143:9 183:13
183:15

**nme**  191:14
199:12
**nme.com**
191:22
**non**  39:11
79:12
**nonbuilding**
154:5
**nope**  83:16
**normally**  27:8
**nostalgia**  188:8
188:16 189:2
190:17,20
191:12,17
192:5,9 199:11
199:14
**notary**  1:21
3:13 6:3
198:16 201:3
202:24
**notating**
203:15 204:4
**note**  4:4 44:3
45:15 48:16
94:8,11,12
96:18 97:4
100:19 101:10
104:3,3,9,13
112:18 130:8,9
130:11,22,24
130:24 131:20
133:13,14,14
133:14 135:10
138:13,13
139:11,18

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[note - objection]**

140:10,17,20
140:24 142:5
145:7 146:16
146:18,20
147:13 149:10
149:11 169:7
175:17 176:7,8
176:14,19
177:2 182:4
183:3,13,15,24
186:3,4,7
190:19
**noted**   44:13
67:6
**notes**   44:23
46:13 49:17
50:8,24 51:8
51:15,16,23,24
52:5,13,14,14
52:15 53:9,12
53:14 54:5,7
76:12,13 101:2
101:2,9,10,19
101:20,21,24
101:24 102:2,3
102:7,12,15,19
102:22,22
103:4,5,6,7,10
104:6,7,10,11
106:2 107:5,24
108:16,19
109:3,19
110:13 114:4
117:4 118:23
125:21,22

126:6,20,22,25
127:3,9,12
128:16,17
129:15 130:13
130:14 131:2
131:12,13,14
131:17,19,20
131:25 132:2,4
132:7,14,16,22
133:1,3,7,8
135:9,10,15,22
135:24 136:17
136:24 137:1,3
137:18,22
138:8,9 139:2
139:3,21,24,25
140:13,14,23
141:13,15
143:4,22 145:7
145:17 146:1,1
146:2,3,16,17
146:18 147:23
147:24 148:19
148:21,25
149:2,4,9,16
151:5,12 156:9
156:9 157:5
161:22,23,25
162:4 167:1,10
167:18,22
169:25 170:11
170:22 171:9
171:13,19,20
172:19 173:22
174:22 175:3,5

178:6,21
179:12,15
180:6 181:2,4
182:8 184:21
185:18 186:2
186:11,12
**notice**   1:23
140:8
**noticed**   195:5
**noting**   90:24
**notion**   34:4
**number**   4:19
7:24 24:7,18
25:10,12 33:16
59:10 71:2
90:9 105:4
127:16,20
130:13 132:14
134:12 135:1
157:2 160:1
162:9 197:3
203:15 204:4
**numbers**   164:5
**nyu**   86:15
125:2
**nyu.edu**   35:25

**o**

**o**   78:12 123:13
124:13,13
**oak**   15:24
**oath**   5:2 55:12
107:17 161:12
187:25
**object**   46:15
96:12 99:4

101:13
**objection**   8:7
8:20 9:4 10:9
12:9 14:10
15:6 16:6,16
18:17 19:23
20:10 22:22
23:25 24:11,25
25:20 27:18
28:12 29:2,20
33:3,12 34:6
35:5 36:18
37:16 38:4,9
40:3 41:15
42:19 43:23
45:18 46:3
48:5,8 49:20
50:10 51:3
52:8 53:11,21
53:23 57:19
60:2,9 62:9
63:4,24 64:6
64:21 65:17,20
66:4 68:11
73:17 74:18
75:1,20 77:3
81:11 82:17
83:25 86:7
88:2,7,17
89:20 91:13
93:2 94:1,21
96:21 97:14,24
98:17 99:23
100:23 104:22
104:25 105:19

**[objection - original]**

108:4 110:3
111:1,12,21,22
113:7 115:4,7
115:8,15,25
116:18,22
117:8,17 118:4
118:17,25
119:5,18 120:7
120:19 121:12
122:15 123:5
126:21 127:14
127:16 133:16
135:25 136:1
136:19 141:22
142:23 144:6
144:25 147:2,6
148:12 150:9
151:21 153:2
153:13 154:9
156:19 161:17
167:8 169:10
169:16 170:4
173:25 178:11
183:5 184:1
188:11 189:17
192:15,20
**objections** 3:8
**objective** 41:12
47:10
**objectively**
152:22
**objectivity** 63:9
63:14
**obtain** 56:21
175:10

**obviously**
17:20 21:9
31:1 35:24
101:15 117:4
130:9,25
183:10 189:18
**occasion** 80:24
**occur** 170:20
181:22
**occurred** 13:14
91:5 92:1,5
**occurs** 158:21
181:23 183:17
**offhand** 19:7
33:4 113:23
**office** 39:10
41:24 80:3,4
203:11
**official** 162:8
164:3 165:16
**oh** 11:10 54:25
86:1 98:2
150:1,2 153:5
163:15,17
191:22
**okay** 9:7 21:3,7
27:23 50:6
55:1 69:25
78:5,9 82:24
86:21 101:12
121:19 127:8
129:23 133:24
135:8 142:19
144:16 163:3
163:14 164:11

166:16 167:14
167:20 168:7
169:3,24 171:5
172:15 174:16
175:18 176:2
177:14 179:10
182:15 187:1
187:18 189:5
193:15 196:22
**old** 15:23
**ology** 37:12
**once** 40:23
46:20 48:9
69:13 78:2
98:18 99:6
119:24 123:10
129:5,8 132:25
133:2 138:5
139:14 146:17
148:17 159:25
175:4
**one's** 76:7,8
**opening** 107:24
109:2,25
112:19 114:22
115:20,24
116:15 117:1
143:2 184:6,10
**opera** 67:9 68:1
97:6
**operettas** 97:8
**opine** 69:16
96:8 105:22
106:24

**opinion** 16:11
62:7 93:25
132:5 188:9
189:14 192:18
193:8
**opinions** 16:4,8
23:2 91:12
**opportunity**
93:20
**opposed** 19:17
115:12 121:2
**opposite**
109:17 138:16
138:23 173:10
**opus** 76:11
102:3 113:22
146:6
**orchestra** 7:10
7:16,17 9:15
9:20,22 35:9
**order** 70:15
77:5
**org** 72:4
**organizations**
57:2
**original** 9:23
93:1,6,17
94:25 95:1,8,9
95:14,16 108:2
108:3 110:2,5
110:12,21
111:25 112:22
116:15 135:24
136:18 144:5
148:11 154:5

Atkinson-Baker, A Veritext Company
(818) 551-7300                                    www.veritext.com

**[original - pdf]**

203:10,21
**originality**
94:20,22
110:22 111:17
155:1,11 169:9
**originally**
67:17
**originated** 40:1
**outcome** 5:4
201:14
**outside** 142:7
148:13 178:19
**overall** 17:14
68:20 101:4
129:17 151:25
**overbroad**
113:10
**overcome**
55:19
**overemphasi...**
17:10
**overlay** 103:25
104:2
**oversaw** 79:17
**overtly** 39:24
**overturned**
31:22 66:18
**own** 5:18 7:9
9:2
**owned** 44:18

**p**

**p.m.** 106:18,20
107:15 161:7
161:10 187:3,7
196:25

**page** 20:2 22:5
22:6,6,7,9,13
23:7 24:18
87:9 88:20,21
88:21 116:8
120:22 128:7
129:4 138:6
141:7 149:19
152:19 153:23
154:12 160:9
162:15,20
163:1,6,11
165:3,6 166:11
166:13,22,23
175:11 176:4
177:12 179:1,5
182:12 183:17
191:21 199:4,8
199:19,23,25
200:3 202:5
203:15 204:4
205:4,7,10,13
205:16,19
**pages** 21:24
24:4 26:2
162:12 189:6
203:14,17,17
204:3,6,6
**paid** 16:21
18:15,23 19:9
**pain** 72:12
190:10
**pairs** 185:25
**paradigm** 50:2
99:20

**paragraph**
54:13 87:8
91:8 121:14,15
150:2 154:14
154:19 158:20
**parallel** 128:13
**part** 8:2 14:15
27:13,14,15
28:16 30:24
35:13 46:23
53:19,20 55:22
55:23 56:20
59:8,17 60:18
66:23 75:15
76:23,25 86:16
92:1,4 100:21
102:21 104:24
105:25 107:1
122:5 127:10
138:10 140:5,7
141:3,4,8,19
145:12 148:23
149:1,7,8
158:5,5,6
161:25 167:6
172:22,23
173:16,19
178:5,22
184:18,20
196:6
**particular** 8:10
9:17 36:19
48:19 87:8
143:14 171:3

**particularly**
191:1
**parties** 3:4 4:9
201:12
**parts** 48:21
70:5 75:7
127:4,6 137:2
171:1
**party** 5:3 22:23
23:6,16
**passage** 113:13
**past** 30:14,17
88:5 188:16
189:1 199:10
**pathétique**
113:16,18,21
**patience**
187:24
**patrick** 2:9
5:13
**patter** 94:10,12
94:13 96:9,10
96:16,16,23,25
97:13,22 98:9
98:9,15 99:8,9
100:15,16
**pattern** 135:21
135:23 149:25
150:14 190:8
190:10 191:4
**paul** 78:11
**pause** 168:13
**pay** 86:13
**pdf** 164:25
203:12 204:1

Page 33

## [peer - planet]

**peer** 36:8,10,13
36:20,21 37:5
38:7 57:16
58:11,25 59:1
59:4,8,16,21,23
60:21,22,24
**penalty** 203:16
204:5
**pending** 116:13
**people** 57:4,13
78:8 105:3
124:17,18
**perceive**
104:20
**percent** 17:25
105:12
**percentage**
17:22
**percussion**
150:20 152:20
**perfect** 108:24
196:16
**perform** 86:6
**performance**
194:17,22
195:8
**performing**
79:9
**period** 71:4,4,4
71:5 97:7
203:18 204:7
**perjury** 203:17
204:6
**permutation**
185:5,6

**permutations**
77:9
**perry** 31:5,12
38:19
**person** 77:22
80:21 98:23
108:9 112:7
124:24 164:18
165:10
**personal** 84:12
**perspective**
110:6,20
141:24 157:19
**perused** 154:20
189:5 190:1
**ph.d.** 1:18 6:1
64:10 65:8
78:15,22 79:11
198:8 199:5
201:6 202:4,20
203:5 205:2,24
**phantom** 67:9
67:9 68:1
**pheno** 37:12
**phenomenolo...**
37:11,12
**philosophy**
57:25
**phrase** 75:13
75:16 128:17
129:18 132:17
134:13 135:1
136:16 138:4
139:15 140:1,6
140:7 141:15

141:19 142:5
143:3 144:2
145:8,13
146:16 154:2
167:23 169:8
169:12,13,13
169:14,15
175:15 176:5
176:12,17,24
176:25 178:20
179:25 180:1
**phrases** 141:12
**pianists** 125:9
**piano** 113:1,21
124:24,25
125:1,12
**pick** 4:6
**pickup** 132:22
135:22,23
136:17 138:2
139:21,24
140:7,11,19,20
140:22,24
167:4,23
179:25
**piece** 51:2
**pieces** 67:18
**pitch** 126:7
128:20 129:16
129:21 130:6
131:3 133:4
134:1 135:17
140:23,24
146:7

**pitches** 128:12
128:14 129:12
130:1,18 134:4
135:13
**place** 1:20 4:8
7:23 72:23
77:20 98:21
108:7 112:5
164:16 165:8
167:15,17
**placed** 70:18
**placement**
129:19 130:7
131:5 133:5
134:6,19 146:9
169:7
**places** 7:21
**plain** 155:20
**plaintiff** 23:23
24:8,22 56:16
**plaintiff's**
20:18 21:14,17
30:5 67:13
86:19 105:1
155:24 162:8
164:4 187:10
188:23 189:3
191:8,18
195:11 196:8
199:8
**plaintiffs** 1:5
2:3 5:11 12:6
15:22
**planet** 38:10

Page 34

**[planets - previous]**

planets  109:17
play  50:22,24
    50:25 74:15
    126:5
played  7:1,19
    7:20,25 15:5
    49:17 112:17
playing  6:23
    72:14 73:12
    125:17
plays  151:12
please  4:4 5:25
    11:6 22:3 55:3
    55:16 84:22
    92:24 93:16
    119:14 134:7
    176:2 177:10
    183:1 192:1
    194:5
plug  71:18 72:1
    76:18
plus  132:24
    135:13
point  6:13 40:6
    52:17 54:11
    55:15 60:20
    64:9 66:25
    68:5 70:14
    71:17 79:3
    85:7,12 90:17
    91:23 92:10
    93:8,15 94:13
    102:7,17
    103:15,20
    106:4 107:6

114:1,14
121:13 126:2
128:1 136:9,17
137:7 138:25
139:6 141:25
142:8,10,12
143:15,23
144:3,12,21
146:10 149:15
151:2 157:5
158:17 171:11
172:12 173:3
173:10,24
174:2 184:19
191:1
pointed  152:18
pointing
    170:11
points  121:1
    157:22 160:2
poor  115:17
pop  152:2
    153:4,8 188:16
    189:1 199:11
popular  120:23
    120:24,25
    121:2,5,9
    122:1,7,8,11,12
    122:23 123:11
popularized
    150:3,15
portion  7:12,15
    41:25 44:3,21
    52:20 77:5
    81:23 84:23

85:18 132:1,20
132:21 134:23
137:17 150:25
151:9 154:16
159:19 178:23
184:20 189:22
portions  81:2
    81:10,12,16
    93:9,11 94:6
    145:18 158:21
    159:21
possible  77:9
    90:22
possibly  49:2
post  19:5 157:2
posture  24:23
potentially
    153:23
practiced
    126:15,16
practices  39:9
    41:23
pre  17:6 19:4,5
    19:8 36:15
    157:3
preamble  27:22
    35:12 93:3
    136:1 144:13
    154:17
precede  171:14
precedence
    32:7
precise  180:17
precisely
    145:25 171:6

174:2
preclude  63:1
predate  113:3
    117:12 123:18
predated  67:12
predates
    113:17 122:1
preface  27:19
prefer  50:3
    175:25
preliminary
    19:11 26:3,13
    26:21
prepared  21:8
preschool
    86:15
present  73:3
    74:15
presentations
    40:18
presented  14:4
    129:14 193:9
press  58:21
    59:6,7 61:3,4
presume  96:15
presumption
    52:9,10 148:16
presumptions
    53:1
pretty  123:19
prevailed  29:13
    29:14,15 68:8
previous  11:1
    26:16 150:18
    152:19

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

January 30, 2024

## [previously - punched]

**previously**
175:8 187:14
**primarily** 8:3
9:18
**primary** 36:1
**prior** 11:13
17:9 47:13
67:1,4,6 68:10
69:13,19,21,23
70:17 97:10
100:13 102:1
103:10,21
110:8 117:25
121:24 123:3,7
131:23 147:15
147:16 148:25
155:21 156:2
157:8,11,11,12
157:16 162:23
162:25 190:5
193:25
**priority** 161:5
**prism** 101:8
**private** 4:6
**privately** 125:2
125:3
**privilege** 90:1
**privileged**
88:11
**prize** 45:12
**probably** 19:8
21:23 35:2,8
57:12 113:18
122:17 126:2
162:23

**probative**
152:16
**problem** 78:11
90:17,24,25
103:18
**problems** 21:22
**procedure** 1:23
203:19,20
**proceedings**
168:13
**process** 27:13
60:7 63:6 72:3
100:7 103:8,17
104:5,16
148:24 149:18
192:9
**produce** 47:16
**produced** 62:3
62:6
**producer** 62:13
**production**
4:16
**productions**
1:4 2:4 202:3
**professional**
57:1
**professionally**
35:23 36:4
**professor** 4:13
35:17 78:12,21
78:23 80:23
81:13,14 197:2
**proffer** 26:5
27:9

**proffered**
26:12,14 29:17
40:13,14 66:12
**proffering**
37:24
**program** 78:14
**programs**
78:17,24
**progresses**
12:20
**progression**
30:3,6,10
33:20 43:5
**progressions**
43:3,14,21
45:14
**pronounce**
162:18
**proof** 64:12
**proper** 23:1
103:17 118:11
128:2
**properly** 58:15
**protection** 74:6
**provide** 20:2,9
23:18 25:18
195:5
**provided** 19:10
22:15 24:4,13
32:2 56:4,9
119:9,16
203:19 204:8
**provides** 23:2
71:12 156:3

**providing**
119:21 122:9
**public** 1:21
3:13 6:4 67:7
73:16,21,25
74:9 97:9
100:9 104:12
106:9 107:12
201:3 202:24
**publication**
36:20 59:11
60:6 61:6
**publications**
36:9,10,11,21
36:24 57:17
60:1,4
**published**
41:13 47:16
58:8 59:5,6,13
59:14,14 61:2
73:9
**publisher** 58:4
**publishers**
57:23 58:6
59:18
**publishing** 1:4
1:9 2:3,13 4:15
44:19 60:22
202:2 203:4
205:1
**pudding** 64:13
**pulitzer** 45:12
**punched**
187:12

Page 36

**[purely - read]**

| | | | |
|---|---|---|---|
| **purely** 51:10 | 12:22 24:2 | 171:13 172:5 | 189:8,13 |
| 77:10 101:1 | 27:19,20,21 | 173:20 174:17 | 190:21,22 |
| 105:7 | 29:23,24 35:6 | 174:20 176:3 | **quotes** 112:14 |
| **purported** | 35:13 43:19 | 180:18 181:14 | **quoting** 112:15 |
| 70:10,12 94:16 | 46:6 50:13 | 186:15 192:7 | **r** |
| 155:19 158:2 | 52:11 53:1,8 | 192:23 | |
| **purposes** 6:16 | 53:22,24 57:7 | **question's** | **r** 6:1,1,1,1 31:7 |
| 21:15 162:6 | 61:5 63:21 | 105:7 | 43:11 66:15 |
| 167:12 188:23 | 64:2 69:18,24 | **questioning** | 71:4 73:6 |
| 191:8 | 70:1,2 74:7 | 105:12 | 205:3,3 |
| **pursuant** 1:22 | 75:4,6,9 77:11 | **questionnaire** | **r&s** 204:1,9 |
| **put** 30:4 47:12 | 83:2,5 84:22 | 105:6 | **raguso** 2:21 |
| 64:22 68:22 | 84:25 85:4 | **questions** 52:12 | 4:23 |
| 69:5 71:21 | 86:5 88:18,25 | 54:23 116:12 | **ranked** 78:18 |
| 101:23 112:14 | 89:13 96:13 | 142:18 171:23 | **rap** 72:22 |
| 116:8 160:15 | 98:13 99:5 | 193:14 196:18 | 121:5 |
| 162:13 164:11 | 101:14,18 | **quick** 168:16 | **rapid** 94:11 |
| 194:1 | 106:21 107:23 | 186:24 | 97:3 |
| **puts** 103:3 | 111:5,16 115:9 | **quite** 15:9 36:6 | **rapidly** 96:18 |
| 152:19 171:8 | 115:10,12 | 39:22 46:17 | **rarely** 79:25 |
| **q** | 116:9 117:19 | 47:20 53:2 | 80:11 |
| | 119:13 129:1 | 86:17 93:14 | **rather** 63:18 |
| **quality** 65:15 | 133:22 134:8 | 101:18 109:23 | 110:23 112:16 |
| 65:18,25 | 135:19 136:6,7 | 109:24 111:4 | 186:21 |
| **quarter** 72:14 | 136:20 138:1 | 124:17 148:15 | **reached** 11:22 |
| 133:14 150:21 | 139:20,20 | 159:11,15,16 | **reaching** 11:25 |
| 151:5,12 | 140:12 142:11 | 171:9 184:3 | 13:5 |
| 175:17 176:7,8 | 142:15 144:7 | 192:22 | **read** 49:13 68:5 |
| 176:14 177:2 | 144:17 148:6 | **quotation** | 84:21,24 92:13 |
| **quarterly** 37:4 | 148:17 153:14 | 189:19 | 92:19 106:22 |
| **queen** 115:3 | 153:20 154:18 | **quote** 70:7 99:9 | 113:13,24 |
| 117:2,12 | 155:15 160:9 | 112:17,23 | 121:17,20 |
| 118:16 | 168:9,10,16 | 124:4 149:24 | 134:21,24 |
| **queen's** 115:20 | 169:19,23 | 150:23,24 | 154:12,13,19 |
| **question** 3:9 | 170:5,15 171:3 | 154:13,22 | 158:2 169:20 |
| 6:19 8:22 11:6 | | | 185:1 188:18 |

Atkinson-Baker, A Veritext Company
(818) 551-7300                                    www.veritext.com

**[read - reflective]**

191:24 192:2
198:1
**reader** 58:5
101:17 128:1
**reading** 124:5
154:16 203:23
204:9
**reads** 54:5
**real** 181:9
**realized** 192:12
**really** 46:17
53:2 56:21
94:17 101:6,18
108:19 109:22
192:22
**reason** 39:20
44:20 74:22
202:5 205:6,9
205:12,15,18
205:21
**reasons** 118:13
126:8 193:10
**rebuttal** 24:14
26:25 27:1
63:15 66:24
67:5 70:16
83:14,15 84:6
85:1,6,11
**rebuttals** 20:25
24:20
**recall** 11:20,21
11:24 12:4,7
12:23 13:3,4,8
13:9,12,21,23
14:12,21,25

15:3,17 16:19
16:25 17:3,13
24:14,16 29:3
29:4 30:13,16
30:20 32:25
33:14 34:2,10
37:8 38:5,14
38:20 45:13
47:23 55:21
60:12,15 65:22
66:17,21 79:23
80:2 81:17
82:8 89:11
93:5,15 97:15
116:25 119:1
120:5,10,21
127:11 134:11
137:20 161:22
**recalled** 45:2
**received**
165:16
**receiving** 90:25
**recent** 19:21,25
22:9 45:7
47:20
**recently** 18:7,9
194:14
**recess** 55:8
161:8
**recited** 141:18
**recognize** 41:3
**recognizing**
114:24
**recollect** 11:15

**recollection**
10:17 15:12
20:4 38:2
40:16 43:7
87:6 93:7
102:12
**reconciled**
111:20
**reconstruct**
56:12
**record** 4:2,10
5:7 40:25
44:17 55:3,5,6
55:10 77:21
84:24 97:18
98:22 101:16
106:16,18
107:15 108:8
112:6 134:22
134:24 150:12
161:7,10
162:10,21
163:4,9 164:17
165:9 166:2,4
177:9 187:3,4
187:7,9,16
189:17 194:1
196:6,23,25
201:9
**recorded** 1:17
4:12
**recording** 4:8
44:14,17
**records** 1:9
2:14

**recounted**
147:10
**rectangle** 171:8
171:10
**rectangular**
103:4
**red** 103:3,24
163:16,19,20
165:1,15
168:23 171:10
183:16
**reduced** 33:17
**redundant**
48:10,12 49:8
139:9
**refer** 8:15
73:15 86:25
127:22 175:21
**reference** 38:2
168:24 190:1
**referenced** 37:9
45:16 203:6
**references**
33:10 93:3
**referred** 30:10
81:15 158:3
**referring** 8:6
24:17 59:22
162:25 163:4
163:10 167:24
168:1 175:20
186:20
**refers** 160:8
**reflective** 91:5

Atkinson-Baker, A Veritext Company
(818) 551-7300                                    www.veritext.com

**[refresh - representing]**

| | | | |
|---|---|---|---|
| **refresh** 87:5 | 131:22 188:5 | 27:8,11 28:15 | 171:7 172:1 |
| **regarding** | **remembers** | 28:19 29:17 | 181:7 182:7 |
| 168:19 | 127:18,20 | 30:8 33:1,11 | 187:11 190:9 |
| **regress** 147:22 | **remind** 55:11 | 33:23 34:25 | 193:21 194:2 |
| **regular** 7:21 | 107:16 161:11 | 44:12,13 47:22 | 194:15,18,25 |
| **rejected** 27:16 | 187:25 | 48:4 56:4,14 | 195:13 199:9 |
| 27:25 28:2 | **remotely** 5:13 | 56:20 61:21,23 | **reported** 65:18 |
| **relate** 41:10 | 97:20 152:15 | 63:16,18 64:14 | **reporter** 4:25 |
| **related** 5:2 | **repeat** 11:6 | 65:12,22 66:3 | 5:7 77:21 |
| 15:19 27:10 | 84:20 119:13 | 66:5,6,7,8,12 | 98:22 108:8 |
| 37:2 59:25 | 139:9 169:18 | 66:17,20 67:5 | 112:6 161:4 |
| 201:12 | 176:2 | 77:14 80:25 | 164:17 165:9 |
| **relationship** | **repeated** 51:23 | 81:3,6,13,14,17 | **reporting** |
| 78:3,24 | 94:8 132:4 | 82:4,16 83:7 | 110:16 202:1 |
| **relative** 101:23 | 159:13 | 83:14,15,21,24 | **reports** 19:14 |
| 129:3,25 140:9 | **repeating** | 84:3 85:6 | 24:20 28:20 |
| **release** 122:1 | 148:18 184:21 | 86:20 87:13,23 | 33:18 34:5 |
| 150:5 | **repeats** 46:13 | 88:1,6,13,16 | 40:11,13,14 |
| **released** 15:18 | 117:3 159:25 | 92:23 93:19 | 65:15,19 66:24 |
| 123:15 203:21 | **repertoire** | 95:22 96:14 | 84:6 85:1,6,7 |
| **relevant** 17:21 | 125:13 | 100:1 102:1,25 | 85:11 91:19 |
| 150:6 | **repetition** | 103:2 119:16 | 102:11 119:9 |
| **relished** 86:16 | 157:5 | 120:6,17,22 | 119:21 120:11 |
| **remains** 104:15 | **repetitive** | 123:6,8,16 | 192:19 |
| 118:12 | 76:20 | 126:18,23 | **repp** 66:9 68:16 |
| **remanded** | **rephrase** | 127:22 128:9 | **represent** |
| 31:23 66:19 | 174:19 | 129:15 131:24 | 23:17 52:24 |
| **remarks** 18:13 | **replication** | 138:7 147:11 | 166:7 |
| **remember** 17:8 | 21:11 | 149:3 154:13 | **representative** |
| 20:7 24:23 | **report** 19:10,12 | 156:13 157:13 | 115:13 |
| 56:7 66:25 | 20:21,23,24 | 158:13,18,24 | **represented** |
| 79:21 81:6,24 | 21:2,12,16,21 | 159:20 160:24 | 192:6 |
| 83:10,13,18 | 24:13,14 25:18 | 161:20 162:17 | **representing** |
| 85:16 87:16,17 | 26:1,3,4,13,15 | 162:22 166:6,9 | 21:10 |
| 87:21 127:21 | 26:21,24 27:1 | 166:11,14 | |

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[represents - sandy]**

represents 106:6 107:8
reputation 13:19
requested 35:1 77:22 98:23 108:9 112:7 164:18 165:10 201:25 204:1,9 204:10
requests 200:2
require 149:17
research 37:6 58:2,13,18 60:14 61:6 143:13
reserve 87:12
reserved 3:9
resolution 114:7,17,20
respect 32:11 38:18 56:22 64:15 148:14 151:22 168:20 175:8,10 176:3 181:1,3 193:24
respectfully 61:2 172:3
respective 3:3
respond 60:25 70:15 92:9
rest 26:6 47:14 79:15 83:4 110:11 152:17 186:4,8

restroom 54:21 105:10
result 25:7 70:21 149:8
retained 67:21 197:4
return 203:17 204:6
review 21:19 36:13 58:6,11 59:1,8,9,12,16 59:21,23 60:12 60:13,17,19,20 60:21,25 61:20 163:23 203:8 203:10,13 204:2
reviewed 36:8 36:10,20,21 37:5 38:7 57:16 58:3,20 58:25,25 59:4
reviewing 62:5 194:14
rework 116:14
rhetorical 35:6
rhythm 8:10 46:14 51:16,16 54:6 66:22 68:18 73:2 109:14 115:17 138:20 150:24 152:24
rhythmed 76:21

rhythmic 50:23 126:19,24 127:3,12 129:17,18,20 130:6,19 131:4 133:4,10,12,13 134:5,6,18 135:11,16 146:6 149:24 150:14,19 177:20,23 178:1,4
rhythms 72:16 101:3 150:20
ribbon 15:23
rid 164:6
right 9:1 21:8 72:2 87:12 88:12 90:5 107:19 122:16 131:2 134:10 146:25 160:19 164:7 168:7 181:13 188:5
riley 191:21
rism 71:4,11,12 73:21
robbed 114:6
robbing 114:16
rock 115:3,21
role 45:22 77:12
roles 100:12
romantic 97:7

room 5:5,12
rosa 123:15
rowman 58:21 60:23
rude 142:17
rule 26:6,18 27:11 36:11 80:19
rules 1:23 89:25 204:8
rulings 199:22
russell 13:25 14:9 16:15

**s**

s 31:7 43:11,11 71:4 78:12 123:13 124:6 199:7 202:5 205:3
sake 136:14
salani 61:15 64:20,24 91:25 92:11,13 102:10,25 103:2,2,23 136:10 137:21 139:23 171:7 171:18
salani's 65:7
sam 20:6 32:15
sampled 44:15 44:21
sands 2:8 5:12
sandy 1:4 2:4 4:16 12:8,11

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[sandy - sentence]**

12:24 13:4,16
13:18 14:9,14
14:18 202:3
**sang** 108:19
**sarah** 1:8 2:12
**sat** 59:19
**saturday**
  122:21
**save** 128:14
  152:23
**saw** 81:15
  83:23 84:2,5
  85:1,5,10
  163:23
**saying** 27:4
  43:14 65:10,12
  82:11 85:23
  95:23 117:22
  120:13 121:8
  143:1 146:22
  147:3,4 151:3
  156:14 170:25
**says** 42:2 61:10
  99:8 158:23
  171:10 189:9
  190:21
**scale** 41:11
  46:13 47:3
  48:17,18 49:18
  51:17,18,20,22
  52:1,2 54:5
  71:18,20 76:1
  76:3,4,6,14,21
  76:23 94:9
  100:20 101:22

103:13 109:1,8
109:9 114:12
114:17 125:22
125:23 126:6
128:14,18
129:6,8,10,23
130:1,5,17
131:3 132:3,19
133:9 134:2
135:17 139:12
140:18,20,22
141:16 146:8
155:23,24
157:4,18
170:12 171:15
173:5,6,7
179:15 180:7
180:11,12
181:11,20
183:10,18,19
183:21 184:22
185:17,23
**scales** 33:25
  39:7,10,13
  41:3 42:5,6,6,8
  42:10,13,17
  43:20 45:14
  46:20 48:11,15
  50:22 98:8
  185:20
**scalicly** 126:7
**schedule**
  203:10
**scholar** 23:2

**scholarly** 58:5
  59:4 60:3
  62:23,25 65:9
**scholars** 71:11
**scholarship**
  37:3 63:10,17
  65:6
**school** 73:8,10
  73:11 78:13
  125:10,10
**science** 63:12
**sciences** 63:13
  68:24
**scooped** 185:14
**score** 145:3
  167:19,19,21
**scouting**
  124:14,15,19
**se** 39:2 68:25
  124:6,7
**sealing** 3:4
**search** 69:13,19
  70:17
**second** 9:2
  56:22 66:17
  104:24 129:9
  135:9 138:5
  141:18 149:8
  154:21 169:13
  169:25 170:1
  172:11,21,21
  172:22,23
  174:3,3,22,23
  176:21 177:16
  179:4 182:20

186:1 187:24
194:9 195:4
**section** 131:24
**see** 26:21 30:19
  53:13 58:14
  67:20 79:25
  80:24 83:20
  91:20 102:9
  128:12 129:6
  141:4 148:8
  164:9 167:15
  167:17 168:3
  181:13 189:24
  193:2 195:1
**seek** 44:19
**seem** 38:22
**seems** 32:6
  189:23
**seen** 65:5,5
  91:18,18
  150:24
**semester** 79:16
**send** 60:24
  71:11 196:13
**sense** 57:22
  58:11 63:23
  142:2 146:20
  149:11 152:1
**sensitive** 4:5
**sent** 22:19 89:2
  90:23
**sentence** 64:23
  121:16,18
  150:18 154:17
  154:21

Page 41

**[separate - six]**

separate  164:5

separated
143:4 178:22

separately
100:22 133:19

sequence  45:15
112:18

serve  63:23
64:5,7

service  22:24

services  22:16

serving  79:18

set  177:16
182:21 191:6
201:8,17

seven  26:2
48:16,17,20
123:17 128:15
128:18 129:8
131:18 134:14
135:3,11
138:17,18
141:3,6,8,12,20
142:1,4,21
143:2 145:5,11
145:15 148:9
149:14 159:17
159:24 160:7
170:12 171:15
172:24,25
173:8 180:13
181:16,16,16
181:16 182:2,2
182:2,2,4,4,4

several  66:12
161:21 182:7

sheeran  23:8
28:24 29:6,12
30:12 32:20,24
43:4,18

sheet  53:18
54:2 202:1

short  54:14,20
108:25

shortened
12:17

show  67:18,20
73:1 97:18
104:2

showed  156:25
159:10 190:9

shown  103:16
146:2 149:3
181:7

shows  152:21
156:22

sic  71:5 114:19

side  33:15
70:24 91:20
120:14

sidelined  32:9

sign  203:16
204:5

signature
201:20,25
203:21,23,23
204:9

signed  3:12,14

significance
70:12 77:2

significant
59:15 69:11
94:16 104:17
142:3 146:21
149:12 154:6
154:11 173:3
191:5

silberberg  1:12
2:11 4:22 5:16
5:20

similar  51:21
104:21 105:16
131:25 146:11
147:15 184:20
192:13

similarities
69:11,14,17
70:10,12,13,18
75:18 103:11
106:2 107:4
158:24 184:5,8
184:16,17
185:16,19,22

similarity  69:7
72:15 96:7
104:15 106:4,5
107:7,8 121:21
121:22 139:11
147:16 149:13
150:19 158:20
160:11 173:11
185:10

simple  33:25
108:22

simplistic
156:1

simply  9:20
26:20 51:16,25
71:20 76:23
77:4 91:5
103:19 104:14
110:16 122:9
132:19 139:5
142:6 143:24
143:25 145:12
156:7 158:9,16
191:4

simultaneous
77:19 98:20
108:6 112:4
164:15 165:7

sing  75:7

singing  94:11
96:18 97:3
107:20

single  129:15
139:11,18
140:9,17

sir  171:2

sit  59:3

site  71:3 194:15

sites  74:9,12

sitting  188:5

six  26:2 48:20
130:14 131:2,7
131:18 138:17
159:15 180:14

**[six - start]**

181:17,17,17
**sixth**  80:3,4
**skidmore**  30:25
    47:3
**slow**  112:10
**small**  52:20
**smith**  20:6
    32:15
**snyder**  31:7
**social**  63:12
    68:24
**society**  6:25
    57:3,10
**software**  76:2,6
**sole**  158:20
**solution**  127:24
**solutions**  203:7
**somebody**  63:1
    63:2 195:24
**somewhat**
    90:13 170:6
**son**  73:10
    125:17
**sonata**  113:2
    113:16,21
**song**  14:19,23
    15:1,16,23
    16:1 50:14
    52:15,17,21
    53:9,19 54:3,3
    67:9 72:5 74:2
    74:4,15,16,16
    86:6 94:13
    96:16 98:9
    99:9 100:15

110:25 116:16
    117:2 126:22
    145:17 147:3
    151:10 165:25
    189:12 192:4
    192:13,25
**songs**  14:13,18
    15:21 16:12,13
    50:15,17 52:6
    53:5 62:2,6
    93:13 126:25
    127:3 153:6,10
    153:12 156:3
    190:24
**sony**  1:8 2:13
    29:5
**soon**  15:18
**sorry**  8:23 9:6
    36:25 53:22
    57:21 150:1
    168:6 179:3,5
**sort**  20:8 22:15
    25:17 88:6
    121:11
**sound**  32:12
    44:14,16 76:12
    104:21 105:16
    129:23 132:5
    151:19
**sounded**
    192:12
**sounds**  74:17
    74:24
**source**  99:8
    191:22

**southern**  1:2
    4:18 29:8
    66:11
**spanish**  9:19
**speak**  77:22
    79:24 98:23
    108:9 112:7
    164:18 165:10
**speaking**  12:24
**speaks**  189:20
**special**  108:21
**specific**  158:4
**specifically**
    42:5 53:4
**spectral**  81:3,3
    81:4
**speculate**  56:10
    77:8 84:10,11
    101:5 117:9
    145:3
**speculating**
    53:17
**speculation**
    19:18 34:17
    45:21 50:11
    66:7 91:14
    105:25 107:2
    111:13 158:9
    158:16
**speculative**
    64:8 77:4,11
    101:1 105:7
    136:2 145:1,2
    145:22,23

**speculatively**
    51:11 158:11
**spell**  177:6,6
**spoke**  9:19
    12:15 17:9
    116:5,11
**spring**  29:11
**square**  2:5
**staff**  132:23
    140:2,4,4
    141:17 167:22
**staffs**  150:25
    167:20
**stage**  19:6
    67:18
**stand**  27:6
**standalone**
    145:11
**standard**
    125:20,24
    137:8 146:19
**standing**  80:5
    85:14 143:12
**standpoint**
    69:12 140:15
**stands**  68:2
    71:5
**stanton**  29:7,9
**stark**  128:22
    140:18
**starkly**  140:25
**start**  6:20 18:4
    22:12 34:3
    35:2 69:2
    114:13 133:19

Atkinson-Baker, A Veritext Company
(818) 551-7300                        www.veritext.com

**[start - substitutes]**

142:14 167:5,9
175:24
**started** 9:14
16:15 29:4
30:2 124:24
150:13
**starting** 86:14
101:22 124:16
165:14 166:1
169:14,15
180:11
**startling** 47:14
**starts** 108:25
121:16 180:12
**state** 1:22 5:5
5:18 58:14
139:21 201:4
203:9,12
**stated** 43:10,16
157:13
**statement**
158:2
**statements**
155:19
**states** 1:1 4:18
41:24 100:4
103:2
**status** 77:6
**stay** 164:14
**stayin** 122:19
123:2,10,22
151:8 179:6
182:12 183:2,9
183:23 184:7
184:10,14,17

184:25 185:19
185:21,23
186:1,17,21
**steady** 181:8
**steinhardt**
78:13 79:8
**stenographer**
1:21 12:14
116:4,10
**step** 44:22
143:5 167:2
**stephen** 1:8
2:12
**stepped** 79:7
**steps** 48:16,17
48:17,18
**stick** 78:3
**sticking** 141:2
**stipulated** 3:2,7
3:11
**stipulation**
203:20
**stipulations**
1:24 3:1
**stop** 190:20
**story** 54:14
**strange** 192:22
**stranger** 20:7
**street** 7:22
**strike** 8:22
11:17 13:17
14:6 17:15
22:11 23:17
25:1,15 27:22
30:15 61:25

65:14 66:1
81:25 82:1
87:24 89:10
111:7 115:16
119:7,12 120:9
136:14 144:12
151:16 153:25
161:1 183:22
**string** 73:3
125:24
**strings** 126:4
**strove** 93:23
**structural**
68:20
**structure** 66:22
**student** 65:8
72:9 73:2
125:7 190:11
**students** 12:3
79:18 125:5
126:3
**studied** 125:5
**studies** 122:5
125:7 126:11
**study** 62:23,25
65:10 110:15
125:12
**stuff** 87:4
**style** 94:10,12
96:16,20,22,23
96:25 97:13,22
98:9,15 99:8
100:16 152:1
152:14

**styles** 8:5
**stylistic** 90:16
160:9
**sub** 160:18
**subcategories**
121:4
**subcategory**
124:18 160:18
**subheading**
160:21,23
**subheadings**
160:24
**subject** 89:25
**submit** 26:5
**submitted**
26:25 28:16
29:6 34:24
59:10 83:13,14
**subscribed**
198:10 202:21
**substance**
17:11 157:16
**substantial**
96:6
**substantive**
27:15 88:24
91:4
**substantively**
82:14
**substitute**
163:25 194:2
**substituted**
166:4 187:11
**substitutes**
195:19

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[successful - tempo]**

| | | | |
|---|---|---|---|
| **successful** 64:19 68:7 | **supplants** 195:12 | **syllable** 94:11 96:19 97:4 | **talking** 53:14 69:1 78:7 88:4 94:8 111:15 126:12 131:17 150:17 165:3,5 169:12 186:16 190:7 192:24 |
| **sufficient** 28:20 63:17 124:10 142:2 | **supplement** 87:13 | **sympathy** 109:3 | |
| **sufficiently** 142:3 | **supplies** 195:18 **support** 154:22 **supports** 156:4 **supposed** 21:20 | **symphony** 107:25 109:25 110:9 113:17 113:19 114:22 | |
| **suggest** 64:16 69:17 97:17,19 104:14 | **sure** 8:24 21:10 27:21 34:20 55:1 66:6 | **syncopation** 181:21 | **talks** 191:10,15 199:13 |
| **suggested** 110:13 149:13 | 121:15 133:20 166:2 170:7 | **t** | **tango** 8:1,4,15 |
| **suggesting** 91:3 91:6 121:9 122:11,12,22 122:25 | 177:8 178:17 180:19 | **t** 2:7 5:10 123:13,13 124:2 177:11 199:7 205:3,3 | **tasting** 64:13 **taught** 124:24 **taylor** 23:7 31:20 |
| **suggestion** 94:15 | **surprise** 26:7 30:7 33:8 76:18 | **table** 11:13 | **teach** 40:22 |
| **suggestions** 82:13,20,21,22 83:3,6 | **surprised** 37:19,21 | **take** 4:8 21:19 53:8 55:15,16 56:25 121:17 146:17 161:2,4 186:24 188:8 189:13 192:1 | **teacher** 125:8 **teaching** 79:10 **technical** 27:14 |
| **suite** 2:5 | **surrounds** 103:14 | | **technicolor** 67:16 |
| **sullivan** 97:9 | **survey** 105:2,4 | | **technique** 147:4 148:5 |
| **summary** 28:17 28:21 29:7,10 29:18 30:14,17 30:22 31:3,8 31:16,21 32:5 32:8,10,18 44:11 66:14,16 | **suspend** 118:8 **swear** 5:24 **swearing** 5:8 **swift** 23:7 31:17,20 | **taken** 1:20 4:13 55:8 106:20 146:1,1,15 161:8 195:20 | **technology** 78:14 |
| | | **talk** 11:3 40:16 47:2 50:3,4 84:14 87:9 91:1 93:20 125:12 149:4 166:18 189:23 190:3 | **tel** 2:6,15 |
| | **swirsky** 43:11 43:13 | | **tell** 6:20 10:1 24:9 54:9 78:3 87:6 104:19 113:23 125:4 134:12,25 164:23 |
| **super** 122:20 **superstar** 67:15 | **sworn** 3:14 6:2 198:10 201:8 202:21 | | **tells** 74:16 134:3 |
| **supplant** 195:17 | **syllabically** 96:18 97:3 | **talked** 46:22,24 51:7 185:7 | **tempo** 154:10 |

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[tempos - three]**

| | | | |
|---|---|---|---|
| **tempos**  153:24 | 27:5 32:21,23 | 161:13 169:4 | 46:6 48:2 |
| **ten**  36:12,15 | 33:15 43:4 | 174:15,21 | 49:13,24,24 |
| 39:17 52:22 | 93:22 145:4 | 175:13 180:18 | 51:13 57:12 |
| 56:25 95:15 | **testify**  88:9 | 182:14,23,25 | 65:25 67:13 |
| 102:9,11,16 | **testifying**  16:24 | 187:20,21,23 | 69:10,16 71:9 |
| 120:3 131:7 | 18:25 | 188:1,17 | 72:4,12 77:12 |
| 159:5 160:6 | **testimony**  20:8 | 191:13 193:12 | 84:7 85:2,17 |
| **tend**  74:9 | 22:9 23:12,18 | 193:16,18 | 90:11 91:11 |
| **tends**  95:2 | 23:23,24 24:5 | 196:10,20,21 | 97:1 99:15 |
| **tens**  126:3 | 24:10 26:17 | **theater**  78:17 | 100:6 101:18 |
| **term**  23:1 | 30:9 31:9 | **thematic**  71:2 | 104:24 109:18 |
| 38:24 39:22,25 | 32:22 38:16 | **theme**  67:25 | 110:22 111:15 |
| 40:12,20,25 | 40:7 41:10 | 73:20 | 113:12,15 |
| 41:8 43:17 | 55:25 56:19 | **themefinder** | 117:21,21 |
| 45:1 47:24 | 97:25 118:6 | 72:4 73:20 | 123:17 127:24 |
| 48:1 59:2 64:7 | 136:9,13,23 | 74:3 | 139:22 144:8 |
| 73:22 93:5 | 139:1,13 143:8 | **theorists**  57:14 | 153:9 160:10 |
| 95:20 96:8 | 144:11 148:2,4 | **theory**  57:11 | 162:5,16 169:2 |
| 99:24 100:1 | 148:18 161:21 | 64:4 108:2 | 169:19 172:2,3 |
| 120:23 133:10 | 171:2,25 190:6 | **thing**  68:22 | 179:24 185:5,9 |
| 137:12 155:11 | 195:15 197:1 | 85:14 105:20 | 185:14,25 |
| 167:3 | 201:7,10 | 115:1 116:13 | 186:14,15 |
| **termed**  150:23 | **textbooks** | 117:13 153:11 | 195:16 196:19 |
| **terminology** | 40:21 | 187:17 | **third**  80:7 |
| 111:2 | **thank**  6:9,11,18 | **things**  58:9 | 141:4,4 170:22 |
| **terms**  12:19 | 12:21 20:14 | 66:2 71:11 | 182:5 185:8 |
| 19:13 47:23 | 21:24 22:4 | 87:1 90:21 | 186:12 |
| 96:17 108:13 | 36:25 42:24 | 97:12 114:6,15 | **thought**  82:14 |
| 110:4 123:25 | 50:5 55:13,18 | 190:4 | 105:5 173:15 |
| 170:10 | 58:17 75:10 | **think**  17:20,22 | **thousands** |
| **terribly**  173:3 | 85:13,15 | 17:23 19:8 | 105:3 126:3 |
| **test**  20:16 47:7 | 106:16 107:18 | 24:14 29:25 | 153:10 |
| **testified**  6:5 | 114:23 115:18 | 31:2 32:21 | **three**  18:7,10 |
| 9:16 19:22 | 127:7 134:9,10 | 33:9 37:20 | 18:13,18 19:8 |
| 20:5 24:22 | 144:19 160:22 | 41:2 43:13 | 33:17 42:1 |

Atkinson-Baker, A Veritext Company
(818) 551-7300                                www.veritext.com

**[three - trumpet]**

44:3,23 45:15
48:20 54:6,14
71:21,24 73:19
74:9 101:2
103:5 108:17
109:1,4,9,12,12
110:10,11,17
113:25 114:9
114:10,10
117:4 127:13
127:15 130:10
131:7 132:22
137:4,4,5,5
138:3 139:8,18
140:17,18,22
141:13,15
143:4,22 145:6
147:23,24
148:19 149:5,9
151:13 157:17
159:14,23
161:24 167:10
167:20,21
168:4 170:23
173:12 175:3,5
175:17 176:7
176:10,11,15
176:20,21
177:3 178:21
180:8,13,13
181:14,14,15
181:15,18,18
181:18,18,20
181:22 183:20
183:21 186:9

186:11,11,16
186:20 191:21
**tie**   15:23
131:16 185:8
**tied**   130:23
181:25 183:13
183:15 186:2,7
186:12,12,18
**tighten**   127:1,8
**tighter**   75:11
**till**   67:12
**time**   1:20 3:10
6:24 7:7,20
15:19 19:24
27:16,24 28:3
28:8 35:8 39:8
44:7 54:19
55:5,10 58:24
59:4 77:22
79:22 85:12
86:13 98:23
106:18 107:15
108:9 112:7
117:2 119:10
120:5,10
142:14 148:6
153:22 157:6
161:7,10
164:18 165:10
187:3,7 188:4
192:2 203:10
203:18,24
204:7
**times**   34:11,23
50:23,25 51:1

80:12,14 86:25
87:1 117:3
120:1,3 152:10
161:21
**tip**   157:1
**title**   12:17 37:8
71:6 188:12
**today**   6:9,17
11:13 22:2
45:6 67:20
126:2 161:21
**today's**   21:15
35:3 162:6
188:24 191:9
197:1
**together**   47:13
52:7 68:23
69:5 127:16
144:22
**tonal**   48:21
**took**   32:6 55:14
77:20 98:21
108:7 112:5
164:16 165:8
187:9 189:9
**tool**   37:13
**top**   22:13 140:4
**torres**   1:21
4:25 6:3 201:3
201:21
**total**   132:14
160:1 179:14
180:6 197:2
**toward**   28:21

**town**   2:5
**trained**   41:3
**transcript**
128:2 198:1
201:9 203:6,8
203:10,13,13
203:21 204:2,2
**transcription**
103:24 104:1
128:4,6 137:19
137:20 152:18
171:7 194:19
195:9
**transcriptions**
102:14 136:8
136:11 162:13
**translate**   62:15
**translation**
9:21
**tree**   15:24
**trial**   3:10 23:12
24:5 29:11,12
30:9,15 31:4,9
33:18 43:5,18
66:10,19 68:8
**trick**   154:16
**trier**   96:2
**trio**   123:15
**trite**   45:5 54:16
72:21 143:7,10
**true**   166:7
198:3 201:9
**truly**   31:5 73:5
**trumpet**   73:5,7
73:8,12 125:20

Atkinson-Baker, A Veritext Company
(818) 551-7300                         www.veritext.com

**[trumpet - united]**

125:21 126:3
126:11
**try** 69:9 85:16
95:16 116:14
151:18 153:21
169:20 194:24
**trying** 29:25
84:13,16
111:19 114:25
142:16,17
144:10,17
148:3,4 150:7
154:15 172:7,8
**tuesday** 4:3
**turnaround**
167:1,4
**turning** 136:2
**turns** 47:20
**tutelage** 125:6
**two** 18:6,7,9,9
18:13 22:8
34:22 35:24
39:23 40:11
42:13 47:4,9
48:19 49:5,8,9
50:15 51:21
54:6 59:3,4,18
62:17 67:11,22
69:15 71:22,25
85:11 87:9
96:17 98:5
103:5 109:2,5
109:9,13,13
110:18 114:9
114:11 122:9

128:15,23
129:10,10
130:15 131:8
131:10 132:10
132:11 134:15
134:17,17
135:4,6,7,10
137:5,5,5,5
138:3,14,20,21
139:3,8,17
140:16 141:12
148:19,21
149:4,5,16
151:13 157:17
159:2,11,12,18
159:22,23
161:15 162:1
168:18 170:12
170:13,22
171:14,15
172:9,9,10,24
173:6,7,12
175:3,5,6,16,17
176:6,7,8,13,14
176:18,19,22
177:1,2,19
178:4,5,8,20
179:21,23
180:8,13,21,24
180:24,25
181:15,15,15
181:15,18,20
181:24 183:18
183:20 186:3,7
186:21,22,23

190:4
**type** 8:16
**types** 8:9,17

**u**

**u** 78:12
**u.s.** 39:10
**ultimately**
29:11 33:17
66:10,19 70:15
114:19
**unclear** 191:22
**uncomfortable**
6:14
**under** 32:19
52:10 55:12
74:6 89:25
95:9,19 107:17
108:1 121:4
122:16 125:5
161:12 187:25
**undercut** 94:14
94:14,19
**underline**
160:15
**underlined**
160:10,17,25
**undermine**
106:5 107:7
**understand**
6:12 22:10,25
24:1 29:22,24
34:9 37:18
41:17 42:21
43:25 49:23
50:12 51:6

53:25 62:11
70:14 73:22
75:3,22 79:6
91:16 92:22
94:3 95:11,12
96:7 101:7,15
101:17 111:4
111:19 129:13
133:21 134:8
144:10 148:4
153:14 154:1
155:15 166:19
170:5,25
171:25 172:1,2
**understanding**
36:11 39:1
53:6 58:12
60:10 87:10
92:24 93:4
94:25 100:2,11
113:14,20
124:5 137:14
**understood**
70:2 98:10
129:22
**unequivocally**
152:22
**union** 7:4
**unique** 178:9
178:14 183:3
183:24
**unit** 4:11 39:3
79:17
**united** 1:1 4:17
41:24 100:4

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[units - want]**

| | | | |
|---|---|---|---|
| **units** 197:3 | 105:9 108:13 | **vacate** 31:13 | **versus** 23:23 |
| **universal** 1:9 | 120:23 121:23 | **vacated** 31:10 | 113:4 154:7 |
| 2:13 | 152:9 153:16 | **vague** 24:12 | **video** 1:17 4:7 |
| **university** | 156:7 157:3 | 63:25 74:19 | 4:12 105:21 |
| 40:22 44:7 | 164:3,6,8 | 94:22 100:23 | **videographer** |
| 59:6,7 61:3,3 | **used** 25:5 38:20 | 108:5,12 110:4 | 2:21 4:1,24 |
| 78:13 79:13 | 39:21,22 41:1 | 111:2 113:9 | 55:4,9 106:17 |
| **unmasked** 6:16 | 43:17 44:25 | **value** 50:23 | 107:14 161:6,9 |
| **unmistakable** | 45:11 51:9 | 126:19,24 | 187:2,6 196:24 |
| 110:24 | 54:15 66:13 | 127:3,12 | **videos** 105:13 |
| **unmistakably** | 73:4,10 74:21 | 133:11,12 | **view** 92:11,16 |
| 111:9,24 | 96:14 99:24 | 134:13 135:2 | **viewed** 53:18 |
| 112:21 | 100:1 110:14 | 135:12 | **viola** 126:4 |
| **unoriginal** | 125:6 143:18 | **values** 134:6 | **violin** 126:4 |
| 111:10 | 151:6 152:25 | **vanilla** 118:15 | **virginia** 30:20 |
| **unquote** 70:7 | 153:9 155:11 | **variation** 52:13 | 30:20 |
| 99:9 124:4 | 156:17 158:13 | **varied** 51:9,10 | **virtually** |
| **unremarkable** | 158:13 194:18 | **various** 100:3 | 151:10 |
| 145:8 | 195:6,9 197:3 | **vary** 50:23 | **voice** 74:24 |
| **unscientific** | **using** 12:17 | **vastly** 152:23 | 75:16 |
| 28:5,7 | 72:3 93:5 | **velocity** 125:10 | |
| **untrained** | 110:5 167:3 | **verbal** 19:12 | **w** |
| 129:5 | 194:12 | **veritext** 4:24 | **w** 6:1 12:16 |
| **upbeat** 138:1 | **usual** 7:25 95:2 | 5:1 197:4 | 43:11 |
| **updated** 194:20 | **usually** 80:16 | 202:1 203:7,9 | **wait** 9:8 105:10 |
| **upheld** 31:14 | **v** | 203:11 | 115:8,8,8 |
| **usage** 41:8 | **v** 1:7 4:16 | **verse** 71:16 | **waived** 3:6 |
| **use** 12:19 13:10 | 23:13 28:23 | 75:8 159:24 | 203:23,23 |
| 21:5,5 35:22 | 30:25 31:5,12 | 161:18 190:2 | **waiving** 203:20 |
| 36:4 38:13,24 | 31:17 32:3,20 | **verses** 52:22 | **walk** 86:18 |
| 39:13,18,24 | 32:23 38:18 | 158:21 159:1,2 | **want** 10:20 |
| 40:12 50:1 | 43:11 44:4 | 159:5,6,8,19,21 | 17:10 19:17 |
| 54:21 64:7 | 47:3 66:9 | 159:22 160:5,7 | 22:10 35:11 |
| 95:16,18,19 | 68:16 202:3 | **version** 95:3 | 40:24 61:12 |
| 103:23 104:1 | 203:4 205:1 | | 77:13 78:7 |
| | | | 81:9,19,21,22 |

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**[want - word]**

82:10,12 84:19
85:20 86:18
101:7 105:11
109:5 115:14
125:12 137:9
137:10,13
153:21 154:13
154:14 164:9
168:18,24
169:20 170:7
187:14 188:20
191:24 195:8
**wanted**  21:25
92:5 127:7
143:10 194:1
**warner**  1:9
2:14 29:5
**way**  11:21
12:23 15:3
17:3 41:19
48:13 52:25
61:8 65:10
95:18 97:2
98:3 108:18
110:18 111:15
114:23 116:2,6
118:1 119:2
120:14,15
125:17,20
132:18 137:15
142:20 152:14
181:17 189:14
196:2 201:14
**ways**  71:2

**we've**  21:8
46:22 70:6
130:14 132:15
166:4 169:19
180:1
**wear**  6:13
**wearing**  6:11
**webber**  66:9,9
67:8,15,24
68:16
**weddings**  7:1
7:13,19
**weighing**  28:20
**welcome**
127:22
**went**  29:11
30:15,17 31:4
31:15 44:5
66:19 67:7
101:11 185:4
194:15
**west**  48:22
**whatsoever**
188:9
**whereof**  201:16
**whispering**  4:6
**white**  46:25
101:24 125:22
**whoa**  142:13
142:13,13,14
**wide**  157:22
**widely**  123:20
125:14 156:2
156:10 157:8
157:14

**widespread**
156:24
**wiggle**  12:13,16
12:19 14:14,20
42:9 51:18
52:23 72:16
122:2 123:18
128:3,11,17,19
129:2 130:16
130:21 131:11
131:15 132:1
132:14,17
133:1,18 137:1
138:17 140:3
140:19,23
146:4 148:21
150:5,21
152:16,20
154:4 155:5
156:23 157:8,9
158:25 159:6
160:11 162:5
163:2 166:21
167:22,24
168:20 170:20
171:4 172:17
173:9,23 175:4
175:7,8 176:13
177:24 180:15
180:17,21
181:8,10,11,18
182:8,10
183:15 184:12
184:13,14,25
185:21

**winner**  45:12
**wise**  17:22
**wish**  66:2 175:2
**withdraw**  64:1
75:9 89:14
116:13 153:20
**witness**  1:18
5:8,25 9:6,8,11
16:24 19:1
21:6 44:1 51:5
56:11 57:21
58:17 83:11
86:1 99:2,3
113:9 115:11
133:23 134:21
155:16 160:21
163:4,10
164:13,23
165:5,13,20
168:17 170:6
174:15 182:20
182:23,25
193:18 194:9
196:15 199:4
201:7,10,16
202:4 203:13
203:16 204:2,5
**witness's**  118:6
**wonderful**
86:13
**word**  38:20
39:18 51:9
60:4 90:11,18
95:16 110:5
124:1 156:18

January 30, 2024

**[word - ó]**

| | | | ó |
|---|---|---|---|
| 160:19 190:9 | **writers** 155:20 | **year** 18:1,13,16 | **ó** 123:13 |

160:19 190:9
**worded** 158:3
**words** 54:13,15
64:22 111:18
111:23
**work** 24:15
45:12 63:19
65:6,8 67:13
67:21 71:15,17
93:18 95:8
122:23 123:20
124:3 130:19
143:3 146:11
155:24,25
**worked** 44:9
**working** 80:20
**works** 8:17
14:8 45:11
51:22 56:14,15
62:17 63:7
67:7,11 68:14
69:15 70:25
71:8 73:18
101:4 110:15
117:12 122:18
126:14 127:13
145:14 157:2
166:18 186:9
**world** 71:10
78:19,20
124:15 126:17
153:7
**write** 9:23
36:16 59:11
88:13 116:7

**writers** 155:20
156:3,5,23
157:9,10,14
**writing** 19:14
87:16,21 95:5
98:14 191:10
191:15 199:13
**written** 40:18
67:17,25 95:15
113:25 192:11
**wrote** 9:24
26:25 110:9
112:25 113:1

**x**

**x** 1:3,11 199:1
199:7 200:1
204:1

**y**

**y** 31:7 43:11
**yeah** 9:11
19:19 20:15
32:21 34:20
38:5 44:1 51:5
54:22,25 56:11
83:11 86:23
87:20 94:4
111:4 112:2
126:8 141:10
142:12 144:14
144:20 165:18
177:8 186:13
191:25 195:16
196:2,20

**year** 18:1,13,16
18:20 29:4
61:5 80:12,15
**years** 14:15
18:8,21 22:19
30:2 36:12,15
36:22 37:1
38:21 39:17,18
43:12,13 61:1
65:16,19 66:12
78:16 79:6,23
86:12 95:15,15
158:14
**yellow** 15:23
**york** 1:2,13,13
1:22 2:15,15
4:19 25:25
29:8 66:11
78:12 201:4
202:1
**youtube** 105:13
105:21 193:21
194:2,13,15,20
194:21 195:5,8
195:12,12
196:7 199:16

**z**

**zeppelin** 30:25
33:21 38:17
43:8 47:4
**zero** 133:2,3,6
**zijuan** 2:8 5:13

**ó**

**ó** 123:13

Page 51

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.